**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|                                          |     |                                      |
|------------------------------------------|-----|--------------------------------------|
| ELWOOD J. COOPER,                        | )   |                                      |
|                                          | )   |                                      |
| Plaintiff,                               | )   |                                      |
|                                          | )   |                                      |
| v.                                       | )   | Civil Action No. 99-2513 (RBW)       |
|                                          | )   |                                      |
| UNITED STATES DEPARTMENT OF              | )   |                                      |
| JUSTICE, <u>et al.</u>,                  | )   |                                      |
|                                          | )   |                                      |
| Defendants.                              | )   |                                      |

---

**<u>MEMORANDUM OPINION</u>**

The plaintiff, Elwood J. Cooper, a federal prisoner proceeding <u>pro se</u>, brings this action against the United States Department of Justice (the "Justice Department"), the United States Marshals Service (the "Marshals Service"), and the United States Department of the Treasury (the "Treasury Department") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking the release of "all records related to his arrest and prosecution." <u>Cooper v. Dep't of Just.</u>, 890 F. Supp. 2d 55, 57–58 (D.D.C. 2012) (Walton, J.).  On March 14, 2016, following multiple decisions by the undersigned and other members of this Court and multiple remands by the District of Columbia Circuit over the twenty-plus-year duration of this case, the Court granted summary judgment to the defendants on what it understood to be "[t]he only remaining issue for the Court to resolve in this case[:] the propriety of the redactions made to the additional documents produced to the plaintiff in September 2005." <u>Cooper v. U.S. Dep't of Just.</u>, 169 F. Supp. 3d 20, 32 (D.D.C. 2016) (Walton, J.) ("<u>Cooper 2016</u>").  In response to the Court's ruling, the plaintiff appealed, <u>see</u> Notice of Appeal at 1, ECF No. 146, and the Circuit subsequently remanded the case to this Court for consideration of what it concluded were further "unresolved

issues in this case[,]" namely, (1) "the withholdings in records produced to [the plaintiff] prior to

[his] second appeal" and (2) "whether the agencies other than the [Marshals Service] conducted

adequate searches for responsive records[,]" Order at 1–2, <u>Cooper v. U.S. Dep't of Just.</u>,

No. 17-5219 (D.C. Cir. July 11, 2018) ("<u>Cooper III</u>").  In addition to the issues remanded by the

Circuit, regarding which both parties have moved for summary judgment, <u>see</u> Defendants'

Consolidated Brief ("Defs.' Br.") at 14, ECF No. 154; Plaintiff's <u>Ex Parte</u> Motion to the Court to

Take Judicial Notice of the Record ("Pl.'s Apr. 4, 2019 Mot. for Judicial Notice") at 4, ECF

Nos. 160 & 169;[1] also pending before the Court are two motions filed by the plaintiff following

the Circuit's remand: (1) the plaintiff's motion for judicial notice, <u>see</u> Pl.'s Apr. 4, 2019 Mot. for

Judicial Notice, and (2) the plaintiff's motion for discovery, <u>see</u> Plaintiff's Motion to Proffer

Interr[o]gatories and Request for Admission and Production of Documents in Respon[s]e to

Defendants' Opposition to His Motion to Take Judicial Notice and Notices to the Court and the

Defendants Out of Time ("Pl.'s Aug. 16, 2021 Mot. for Discovery") at 1, ECF No. 174.  Upon

consideration of the parties' submissions and the entire record in this case,[2] the Court concludes

---

[1] Although titled a motion for judicial notice, the plaintiff's motion for judicial notice does not appear to seek judicial notice of the attached records, but rather primarily sets forth a "cross-motion in opposition to [the] defendants' motion for summary judgment[,]" Pl.'s Apr. 4, 2019 Mot. for Judicial Notice at 4.  Accordingly, the Court will consider the plaintiff's motion for judicial notice as containing two motions: (1) a cross-motion for summary judgment regarding the issues remanded to this Court from the Circuit in <u>Cooper III</u> and (2) a motion for judicial notice.  The Court addresses both motions <u>infra</u>.

[2] In addition to the filings already identified, the Court considered the following submissions and their supporting exhibits in rendering its decision: (1) the Notice of Disclosure ("Pl.'s Mar. 16, 2006 Notice"), ECF No. 74; (2) the Plaintiff's Objection to the Defendant's Status Report <u>Ex Parte</u> and Motion for Discovery Hearing and for Entry of an Order to Appear Before the Court via Video Conference ("Pl.'s June 26, 2006 Objection"), ECF No. 79; (3) the Defendants' Memorandum in Support of Renewed Motion for Summary Judgment ("Defs.' Apr. 27, 2007 Mem."), ECF No. 90; (4) the Plaintiff's Cross-Motion in Response to the Defendants' Renewed Motion for Summary Judgment and Renewed Motion to Supplement Preliminary Injunction and for Discovery and Hearing Thereon and to Appear Therein via Video Conference ("Pl.'s July 16, 2007 Cross-Motion"), ECF No. 91-1; (5) the Declaration of Ray Catena ("Catena Decl."), ECF No. 91-2; (6) the Declaration of Vicki L. Rashid ("Rashid Decl."), ECF No. 91-3; (7) the Plaintiff's Motion for Leave of the Court to File Supplemental Pleading and Compel Production of Documents ("Pl.'s Aug. 26, 2011 Mot."), ECF No. 98; (8) the Plaintiff's Reply to the Defendants' Consolidated Opposition to Plaintiff's Cross-Motion for Summary Judgment, Renewed Motion for Injunction and Discovery, and Motion for Leave to Supplement and Compel Production of Documents and Defendants' to Plaintiff's Statement of

(continued . . .)

for the following reasons that it must (1) grant in part and deny in part without prejudice the

defendants' motion for summary judgment; (2) deny the plaintiff's cross-motion for summary

judgment; (3) deny the plaintiff's motion for the Court to take judicial notice; and (4) deny the

plaintiff's motion for discovery.

---

(. . . continued)
Genuine Issues of Material Facts ("Pl.'s Aug. 22, 2012 Reply"), ECF No. 103; (9) the Plaintiff's Motion for
Reconsideration and/or to Alter or Amend the Court's September 11, 2012 Order and Memorandum ("Pl.'s
Oct. 12, 2012 Mot."), ECF No. 107; (10) the Defendants' First Status Report, ECF No. 108; (11) the Plaintiff's
Motion in Opposition to Defendants' Status Reports, Motion to Compel Disclosure Pursuant to Rule 5
Fed.[ ]R.[ ]Civ.[ ]P., and Motion for Entry of Default and Reconsideration as a Matter of Law or in the Alternative
Motion for Entry of a Final Appealable Order to Allow the Circuit to Clarify the Scope of Its[] April 23[,] 2004 and
December 28, 2005 Remand Decisions ("Pl.'s Apr. 1, 2013 Mot."), ECF No. 114; (12) the Defendants' Fourth
Status Report, ECF No. 118; (13) the Plaintiff's Second Cross-Motion for Summary Judgment in Opposition to
Defendants' Second Renewed Motion for Summary Judgment ("Pl.'s Sept. 13, 2013 Cross-Mot."), ECF No. 121;
(14) the Plaintiff's Notice of Disclosure and Intent to Re[p]ly ("Pl.'s 1st Nov. 8, 2013 Notice"), ECF No. 128;
(15) the Notice of Filing of Exhibits Severed from Plaintiff's Second Cross-Motion in Opposition to Defendants'
Second Renewed Motion for Summary Judgment ("Pl.'s 2d Nov. 8, 2013 Notice"), ECF No. 129; (16) the Plaintiff's
Notice of Filing of Thirty-Nine [ ] Pages of United States Marshals Service Document in re March 14, 2016 Order
and Opinion ("Pl.'s June 8, 2016 Notice"), ECF No. 141; (17) the Plaintiff's Motion for Summary Judgment in
Response to the Defendant's Supplemental Brief in Light of Oversights and Omissions in the Court's March 14,
2016 Order and Opinion ("Pl.'s June 8, 2016 Mot."), ECF No. 142; (18) the Plaintiff's Ex Parte Motion to the Court
to Take Judicial Notice of the Record, ECF No. 144 ("Pl.'s July 11, 2016 Mot."); (19) the Plaintiff's Combined
Reply and Ex Parte Status Report and Statement of Material Facts in Genuine Dispute in Opposition to Defendants'
Notice of Filing and Consolidated Brief ("Pl.'s Opp'n"), ECF No. 156; (20) the Defendants' Reply to Plaintiff's
Consolidated Brief ("Defs.' Reply"), ECF No. 159; (21) the Plaintiff's July 2021 Notice of Filing and Intend to
Rely, ECF No. 171; (22) the Defendants' Opposition to Plaintiff's Motion to Take Judicial Notice and Response to
Plaintiff's Notice ("Defs.' Opp'n to Pl.'s Apr. 4, 2019 Mot. for Judicial Notice"), ECF No. 172; (23) the
Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 175-2; (24) the Declaration
of Dorothy A. Chambers, Chief, Disclosure Division, Bureau of Alcohol, Tobacco and Firearms ("ATF") (the
"Chambers Declaration or Chambers Decl."), ECF No. 175-3; (25) the Declaration of Leila I. Wassom (the "First
Wassom Declaration" or "Wassom Decl."), ECF No. 175-4; (26) the Declaration of Lee H. Kramer (the "Kramer
Declaration" or "Kramer Decl."), ECF No. 175-5; (27) the Declaration of Margaret P. Grafeld (the "Grafeld
Declaration" or "Grafeld Decl."), ECF No. 175-6; (28) the Supplemental Declaration of Leila I. Wassom (the
"Wassom Supplemental Declaration" or "Supp. Wassom Decl."), ECF No. 175-8; (29) the Supplemental
Declaration [of William E. Bordley] (the "Bordley Supplemental Declaration" or "Supp. Bordley Decl."), ECF
No. 175-9; (30) the Declaration [of Florastine P. Graham] ("the "Graham Declaration" or "Graham Decl."), ECF
No. 175-9, at 10–14; (31) the Declaration of John E. Boseker (the "Boseker Declaration" or "Boseker Decl."), ECF
No. 175-10; (32) the Second Supplemental Declaration [of William E. Bordley] (the "Second Supplemental Bordley
Declaration" or "2d Supp. Bordley Decl."), ECF No. 175-11; (33) the Declaration of William C. Little, Jr. (the
"Little Declaration" or "Little Decl."). ECF No. 175-13; (34) the Declaration of Stephanie M. Boucher, Chief,
Disclosure Division[,] Bureau of Alcohol, Tobacco, Firearms and Explosives (the "Boucher Declaration" or
"Boucher Decl."), ECF No. 175-14; and (35) the Declaration of Barry S. Orlow, Associate Chief Counsel, Field
Operations and Information Bureau of Alcohol, Tobacco and Firearms (ATF) (the "Orlow Declaration" or "Orlow
Decl."), ECF No. 175-15.

# I.     BACKGROUND

Filed in September 1999, this case has a long and complicated procedural history that is partially outlined in the Court's September 11, 2012 ("Cooper 2012") and March 14, 2016 ("Cooper 2016") Memorandum Opinions.[3]  See Cooper v. U.S. Dep't of Just., 890 F. Supp. 2d 55, 58–60 (D.D.C. 2012) ("Cooper 2012"); Cooper 2016, 169 F. Supp. 3d at 26–31.  Because this Memorandum Opinion concerns issues that were not addressed in Cooper 2012 or Cooper 2016, the Court will set forth the background information necessary to resolve all of the issues currently pending before the Court.

The plaintiff, who "is currently incarcerated at the [United States] Penitentiary in Coleman, Florida, where he is serving a life sentence after being convicted of drug trafficking offenses in the United States District Court for the Southern District of Florida[,]" seeks "records concerning his arrest and prosecution."  Cooper 2016, 169 F. Supp. 3d at 26 (internal quotation marks omitted); see Pl.'s June 26, 2006 Objection at 6 (stating that the "[p]laintiff sought to compel the production" of "records generated by, or in the possession of[,]" the Justice Department, the United States Customs Service ("Customs"), the Drug Enforcement Administration ("DEA"), and the West Palm Beach branch of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), "resulting f[ro]m a [t]ask [f]orce investigation they had conducted of [the plaintiff] with the cooperation of the Bahamian Royal Police [ ] and two paid confidential informants that resulted in [the plaintiff's] arrest and prosecution" (internal quotation marks and footnotes omitted)).  Because the FOIA requests by the plaintiff that are at issue in this case concern his criminal case, the Court will begin by briefing summarizing the

---

[3] In light of the numerous decisions issued by both this Court and the Circuit in this case, the Court sets forth the following list of the relevant court decisions rendered in this case in chronological order: Cooper 2003, Cooper I, Cooper 2004, Cooper II, Cooper 2012, Cooper 2016, Cooper III.  The Court refers to the district court decisions by reference to their year of publication, and to the Circuit decisions by roman numerals.

relevant portions of the plaintiff's criminal case, before turning to the FOIA requests submitted by the plaintiff.

## A.      The Plaintiff's Criminal Case

On December 26, 1997, the plaintiff was arrested on charges related to an alleged conspiracy to import cocaine into the United States.  See Minute ("Min.") Entry (Dec. 26, 1997), United States v. Cooper, Crim. Case No. 9:97-cr-08125-KLR-2 (S.D. Fla.).  On January 8, 1998, a grand jury issued a Superseding Indictment charging the plaintiff with one count of conspiracy to import cocaine, in violation of 21 U.S.C. § 963; one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846; one count of importation of cocaine, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) & b, and 18 U.S.C. § 2; and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  See Superseding Indictment at 1–3, United States v. Cooper, Crim. Case No. 9:97-cr-08125-KLR-2 (S.D. Fla.), ECF No. 17.  On that same day, the plaintiff pleaded not guilty.  See Court Mins. (Jan. 8, 1998), United States v. Cooper, Crim. Case No. 9:97-cr-08125-KLR-2 (S.D. Fla.), ECF No. 18.

On March 16, 1998, a five-day jury trial began, see Min. Entry (Mar. 16, 1998), United States v. Cooper, Crim. Case No. 9:97-cr-08125-KLR-2 (S.D. Fla.), ECF No. 43, and, on March 20, 1998, a jury found the plaintiff guilty beyond a reasonable doubt on all counts, see Verdict Form at 2, United States v. Kevin Joseph Moore & Elwood Cooper, Crim. Case No. 97-8125-CR-RYSKAMP (S.D. Fla.), ECF No. 52; Superseding Indictment at 1–3, United States v. Kevin Joseph Moore & Elwood Cooper, Crim. Case No. 97-8125-CR-RYSKAMP (S.D. Fla.), ECF No. 17.  On September 11, 1998, the plaintiff was sentenced to a term of life imprisonment.  See Judgment at 1, United States v. Cooper, Crim. Case No. 97-8125-CR-2-RYSKAMP (S.D.

Fla.), ECF No. 86.  On September 18, 1998, the plaintiff appealed his conviction and sentence, see Notice of Appeal, United States v. Cooper, Crim. Case No. 97-8125-CR-2-RYSKAMP (S.D. Fla.), ECF No. 87, and on October 25, 2001, the United States Court of Appeals for the Eleventh Circuit affirmed the plaintiff's conviction and sentence, see Mandate at 11, United States v. Kevin Joseph Moore & Elwood Cooper, Crim. Case No. 97-8125-CR-RYSKAMP (S.D. Fla.), ECF No. 118.

**B.      The Plaintiff's FOIA Requests**

On May 3, 1999, while his appeal of his criminal case was pending before the Eleventh Circuit, the plaintiff "submitted separate FOIA requests to the [DEA, Customs, the ATF, and the Marshals Service]." Cooper 2016, 169 F. Supp. 3d at 26.  The Court will discuss in turn the searches and productions of records completed by each agency in response to the plaintiff's requests.[4]

---

[4] The Court will discuss the searches and production of records made by each agency infra, however, in light of the number of requests and agencies at issue in this case, for ease of reference, it also provides the following chart of the requests addressed in this Memorandum Opinion:

| Agency Name | Date of Production | Number of Pages Located | Withholdings |
|---|---|---|---|
| ATF | February 16, 2000 | 23 pages | 7 pages were referred to the DEA; 16 pages were produced with redactions pursuant to Exemptions 7(C) and 2, see Chambers Decl. ¶ 9. |
| DEA | January 3, 2000 | 290 pages | 277 pages were withheld in their entirety; 13 pages were produced with redactions pursuant to Exemptions 2, 7(A), 7(C), and 7(F) of the FOIA and (j)(2) of the Privacy Act, see Wassom Decl. ¶ 11. |

(continued . . .)

6

### 1. The DEA's Searches and Productions

On May 3, 1999, the plaintiff submitted a FOIA request to the DEA, seeking records related to (1) his name and criminal case, see Wassom Decl., Exhibit ("Ex.") A (Pl.'s DEA FOIA Request) at 1; (2) the employment of DEA Special Agent Ray Catena, Jr., Biran Arrandale, and Ihormity Collins, see id., Ex. A (Pl.'s DEA FOIA Request) at 3; and (3) the "authority granting any agency, particularly the Coast Guard, [ ] Customs, [the Justice Department,] and[/]or any other agenc[ies] of the United States [ ] authoriz[ed] entry [into] foreign territorial waters for the purpose of mounting a narcotic operation concerning citizens of that foreign country without approval of the [g]overnment of that country[,]" id., Ex. A (Pl.'s DEA FOIA Request) at 4. "By letter dated May 18, 1999, [the] DEA informed the plaintiff that it was necessary for him to

---

| (. . . continued) | | | |
|---|---|---|---|
| DEA | August 21, 2001 | 10 photographs; 68 pages | 10 photographs were released; 6 pages from "related files" were withheld in full pursuant to FOIA Exemptions 2, 7(C), 7(D), and 7(F), and Privacy Act exemption (j)(2); 23 pages were reprocessed due to appellate rulings, with information withheld pursuant to the same FOIA exemptions; 39 pages that were referred to Customs, and portions of 38 pages were released with redactions pursuant to Exemptions 2, 7(C), 7(D), and 7(E), and 1 page was withheld in full, see Wassom Decl., Ex. K. |
| Customs | September 5, 2000 | 4 Treasury Enforcement Communication System II ("TECS") records | 3 TECS records were provided with certain portions withheld pursuant to Exemptions 2 and 7(C), 1 TECS record was referred to the State Department for direct response to the plaintiff, see Kramer Decl. ¶ 10. |
| Customs | June 13, 2001 | 182 pages | 179 pages were released in part with redactions pursuant to Exemptions 2, 7(C), 7(D), and 7(E); 3 pages were released in full, see Kramer Decl. ¶ 17. |
| Marshals Service | July 7, 1999 | 50 pages | 24 pages were released in their entirety, 4 pages were released with minimal redactions, and 26 pages of regulations were released in full, see Graham Decl. ¶ 11. |

provide [further] identifying information[,]" id. ¶ 9; see id., Ex. B (Letter from Linda M. Vettori to Elwood J. Cooper (May 18, 1999)) at 2, and, thereafter, the plaintiff submitted a certification of identity, providing his full name, date of birth, and place of birth, see id., Ex. B (Certification of Identity) at 2.

"By letter dated January 3, 2000, [the] DEA released portions of [thirteen] pages to the plaintiff[,]" and "withheld [277 pages] in their entirety."  Id. ¶ 11; see id., Ex. D (Letter from Katherine L. Myrick, Chief, Freedom of Information Operations Unit, Drug Enforcement Admin., to Elwood J. Cooper (Jan. 3, 2000) ("DEA Jan. 3, 2000 Production")) at 2.  Of the thirteen pages that were produced, the DEA withheld information "pursuant to [FOIA E]xemptions (b)(2), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(F)" and Privacy Act Exemption (j)(2).  Id. ¶ 11; see id., Ex. D (DEA Jan. 3, 2000 Production) at 2.

On that same date, the DEA also notified the plaintiff by a second letter that the plaintiff's "name was mentioned in two 'related' files" (the "related files"), and that "if [the plaintiff] wished the [related] files to be searched, he should agree to pay an estimated search fee of $56.00[.]"  Id. ¶ 12; see also id., Ex. E (Letter from Katherine L. Myrick, Chief, Freedom of Info., Drug Enf't Admin. to Elwood J. Cooper (Jan. 3, 2000)).  "By letter dated February 3, 2000, the plaintiff appealed [the] DEA's action to the [Justice Department's] Office of Information and Privacy[ ("OIP"),]" id. ¶ 13, (1) challenging "the adequacy of the DEA's search[,]" id., Ex. F (Freedom of Information/Privacy Act Appeal, under [T]itle 5 [U.S.C. §] 552 (a)(b)(ii) Pursuant to [D]enial of [R]ecords ("Feb. 3, 2000 Appeal of DEA Request")) at 3; (2) asserting that the thirteen pages that were produced were "f[a]ls[i]fied and/or [ob]tained in v[io]lation[] of the [l]aws of the United States and [of the] Bahamas[,]" id., Ex. F (Feb. 3, 2000 Appeal of DEA Request) at 3–4; and (3) challenging the DEA's asserted exemptions, see id.,

Ex. F (Feb. 3, 2000 Appeal of DEA Request) at 4–5. "By letter dated November 9, 2000, [the] OIP informed the plaintiff that[,] as a result of discussions between [the] OIP and [the] DEA, th[e] DEA had agreed to further process records [that] the plaintiff had requested," by releasing information that "had initially [been] withheld pursuant to [E]xemption (b)(7)(A)[.]" Id. ¶ 15. The OIP also informed the plaintiff that, due to "changed circumstances, Exemption 7(A) is no longer applicable to withhold the requested records in their entireties[,]" id., Ex. H (Letter from Richard L. Huff, Co-Director, Off. of Info. & Priv., U.S. Dep't of Just., to Elwood J. Cooper (Nov. 9, 2000)), and therefore, the records would be released with partial redactions of information regarding "an individual involved in the plaintiff's investigation[,]" who "is a fugitive[,]" id. ¶ 15.

"By letter dated June 25, 2001, [the] DEA forwarded [thirty-nine] pages to [Customs] for return to [the] DEA after review, deletions, and exemptions claimed." Id. ¶ 16; see also id., Ex. I (Letter from Katherine L. Myrick, Freedom of Info. Operations Unit, Drug Enf't Admin., to Lee Kramer, U.S. Customs Serv., Disclosure L. Branch, Off. of Reg. Rulings (June 25, 2001)). "By letter dated July 10, 2001, [Customs] returned the documents with information withheld pursuant to FOIA [E]xemptions (b)(2), (b)(7)(C), (b)(7)(D), and (b)(7)(E)." Id. ¶ 17; see id., Ex. J (Letter from Gloria L. Marshall, Director, FOIA/PA, Admin., Planning & Pol'y, Off. of Investigations, U.S. Customs Serv., Katherine L. Myrick, Freedom of Info. Ops. Unit, Drug Enforcement Admin. (July 10, 2001)) at 1.

By letter dated August 21, 2001, the DEA (1) "released ten photographs to the plaintiff" "[p]ursuant to a litigation review[;]" (2) informed the plaintiff that it had located "[s]ix responsive pages" as a result of its search through the related files, but was withholding the six pages "in their entirety pursuant to FOIA exemptions (b)(2), (b)(7)(C), (b)(7)(D), and (b)(7)(F),

and [Privacy Act] exemption (j)(2)[;]" (3) made "a supplemental release of portions of twenty-three pages" that were re-processed "pursuant to the disposition of [the plaintiff's [ ] appeal" to OIP[,]" and on which "[i]nformation [wa]s withheld pursuant to" the same FOIA exemptions; and (4) regarding the "thirty-nine pages [that] were referred to [Customs,]" released "[p]ortions of thirty-eight pages" withheld portions pursuant to FOIA Exemptions (b)(2), (b)(7)(C), (b)(7)(D), and (b)(7)(E), and "withheld [one page] in its entirety[.]"  Id., Ex. K (Letter from William C. Little, Jr., Chief, Freedom of Info., Litig. Unit, to Elwood Cooper (Aug. 21, 2001)) at 1.

**2.   The Marshals Service's Searches and Productions**

By letter dated May 3, 1999, the plaintiff "submitted a FOIA/[Privacy Act] request to the [Marshals Service's] West Palm Beach, Florida[,] office[,]" seeking "records pertaining to him and a copy of regulations governing [the Justice Department's] FOIA activities."  Graham Decl. ¶ 2; see id., Ex. A (Plaintiff's FOIA Request to the Marshals Service ("Pl.'s May 3, 1999 Marshals Serv. FOIA Request")) at 1–3.  The Marshals Service "conducted a search for records [relating to the] plaintiff in [its] office for the Southern District of Florida [ ], the district to which [the] plaintiff [had] directed his request[,]" and "in the locations that could reasonably be expected to contain responsive documents."  Id. ¶ 4.  "As a result of [its] search" of "the Prisoner Processing and Population Management/Prisoner Tracking [ ] System, Justice/USM-005, and the Warrant Information Network, Justice/USM-007," "[twenty-four] pages of material pertaining to [the] plaintiff were located[.]"  Id.

"By letter dated July 7, 1999, the [Marshals Service] responded to [the] plaintiff's request by releasing to him [twenty-six] pages of public record material describing the functions of the [Marshals Service] [ ], and regulations governing the FOIA activities within the [Justice Department.]"  Id. ¶ 6.  The Marshals Service "also released to [the] plaintiff the [twenty-four]

pages of material pertaining to [him]," with "[twenty] pages [released] in full, and four pages [ ] released with limited exempt information excised and withheld pursuant to [FOIA exemption] (b)(7)(c)." Id.  The Marshals Service did not withhold any documents "in their entirety." Id.

### 3. The ATF's Searches and Productions

On May 3, 1999, the plaintiff "made a request to [the] ATF[,]" Chambers Decl. ¶ 4, seeking (1) "all records and/or data contained in the [ATF's] files . . . under [his] name and [criminal case number 97 8125 CR RYSKAMP,]" id., Ex. 2 (Plaintiff's FOIA Request to the ATF ("Pl.'s ATF FOIA Request")) at 1, and (2) "all records that show[ the] employment of Biran Arrandale as agent and/or informant between 1988[ and ]1997[,]" including "receipts[ or ] checks made payable to" Arrandale, id., Ex. 2 (Pl.'s ATF FOIA Request) at 2; see also id. ¶ 4. The plaintiff also included "his birth date and [p]assport number." Id.  By letter dated May 26, 1999, Averill P. Graham, an ATF Disclosure Specialist, informed the plaintiff that "[a] search of [the ATF's] records has failed to produce the requested information[,]" but that "if [the plaintiff would] tell [the ATF] how and when [he] had contact with [the] ATF, and why [he] feel[s] certain [that the] ATF would maintain records about [him,]" the ATF would "conduct additional searches[.]" Id., Ex. 4 (Letter from Averill P. Graham, Disclosure Specialist, Bureau of Alcohol, Tobacco and Firearms, to Elwood J. Cooper (May 26, 1999) ("Graham Letter")) at 1. The ATF states that, in response to the plaintiff's FOIA request, it "[u]s[ed] the identifiers supplied by [the p]laintiff at the initial request stage" to "conduct[] a subject query in" the Treasury Enforcement Communication System II ("TECS"), the "central database containing [the] ATF's law enforcement investigations[,]" which "allows [the] ATF to know where to physically search for any records." Id. ¶ 10.  It further represents that its subject query in TECS located "no ATF-responsive records[,]" id. ¶ 11, and "[w]hen there are no ATF investigations"

located in TECS, it, "without additional information provided by the requester, cannot know

which, if any, ATF office in the United States may have a record[,]" id. ¶ 10.

"By letter dated June 25, 1999, the [p]laintiff[] administratively appealed the adequacy of

the [ATF's] search, asserting that the provided case number prove[d] that [the] ATF ha[d]

documentation, and request[ing] another search." Id. ¶ 6; see also id., Ex. 5 (Letter from Elwood

J. Cooper to FOIA [D]isclosure Specialist (June 25, 1999) ("Cooper June 25, 1999 Letter to

ATF")).  However, the ATF represents, "[t]he [p]laintiff did not provide any additional

information in his administrative appeal." Id. ¶ 6; see also id., Ex. 5 (Cooper June 25, 1999

Letter to ATF) at 1.  On August 5, 1999, the ATF denied the plaintiff's administrative appeal.

See id. ¶ 7; id., Ex. 6 (Letter from David L. Benton, Asst. Dir., Liaison & Pub. Info., Bureau of

Alcohol, Tobacco and Firearms, to Elwood J. Cooper) at 1–2.

During the pendency of this case, the plaintiff submitted filings that "provided additional

names of individuals related to his case[,]" "stated that [the] ATF had seized a gun[,]" and "made

an allegation that the [DEA] and [Customs] forwarded documents to [the] ATF regarding [ ]

Arrandale." Id. ¶ 9.  The ATF states that, in response to the plaintiff's submission, it "made an

inquiry into the individual's name provided" by the plaintiff, and "located a file under this other

individual's name that contained information about a firearm [that] was transferred from [the]

DEA to [the] ATF." Id.  The ATF determined that "[t]his file was . . . relevant to the [p]laintiff's

FOIA request" and his reference in his filings "to a seizure of a gun[,]" and it proceeded to

process the file, "which totaled [twenty-three] pages[.]" Id.  Because "[o]f these [twenty-three]

pages, [seven] pages originated with [the] DEA[,]" the ATF "referred [these seven pages] to

[the] DEA by letter dated February 7, 2000." Id.; see also id., Ex. 11 (Letter from Averill P.

Graham, Disclosure Specialist, Bureau of Alcohol, Tobacco & Firearms, to Sally Myrick, DEA

FOIA Section, Drug Enf't Admin. (Feb. 7, 2000)) at 1 (referring "seven pages . . . to [the DEA]

for [the DEA's] disclosure determination and direct response to the" plaintiff).  The remaining

"[sixteen] pages were processed by [the] ATF's Disclosure Division" and "partially released [to

the plaintiff] by letter dated February 16, 2000[.]"  Id.; see also id., Ex. 12 (Letter from Averill P.

Graham, Disclosure Specialist, Bureau of Alcohol, Tobacco & Firearms, to Elwood J. Cooper

("Feb. 16, 2000 ATF Production")) at 1 (stating that enclosed were "sixteen [ ] documents [that

had] been processed" and that "[r]edactions ha[d] been made pursuant to" Exemption 7(C), in

order to "redact the names and identifies of law enforcement officers and third parties[,]" and

pursuant to Exemption 2, in order "to redact computer codes and reference codes").  The letter

stated that the sixteen pages "were not retrievable by [the plaintiff's] name or any identifier

provided in [the plaintiff's] original FOIA request to [the] ATF."  Id., Ex. 12 (Feb. 16, 2000 ATF

Production) at 1.

        The ATF also made "an inquiry . . . of Customs to ensure [that] no [Customs] agents

[had] provided documents to [the] ATF."  Id.  After "Customs was able to locate an agent who

may have had contact with an ATF agent regarding the [p]laintiff[, t]he ATF agent performed a

manual search of his office's records, locating one document that originated with [the] DEA[,]"

which "was referred to [the] DEA for processing by letter dated January 20, 2000."  Id.; see also

id., Ex. 10 (Letter from Averill P. Graham, Disclosure Specialist, Bureau of Alcohol, Tobacco, &

Firearms, to Kathy Myrick, Drug Enf't Admin. FOIA Section (Jan. 20, 2000) ("ATF Jan. 20,

2000 Referral to DEA")).

### 4.  Customs' Searches and Productions

        "By letter dated May 3, 1999[,]" the plaintiff "requested 'full disclosure and release of all

records and/or data contained in the files of [Customs,]'" specifically any information "under

[the plaintiff's] name and [criminal] case[ number], or any identifier assigned to [his] name,"

Kramer Decl. ¶ 2, as well as, <u>inter alia</u>, records relating to the scope of Customs' authority, <u>see</u> <u>id.</u>; <u>see also</u> <u>id.</u>, Ex. 1 (Plaintiff's FOIA Request to Customs ("Pl.'s Customs FOIA Request")) at 1–6 (requesting records related to (1) Customs' authority for its agents "to use alias(es) and[/]or pseudonym(s), weapons or firearm(s), ships, vessels, air[]crafts[,] and/or military equipment[;] (2) Customs' authority to "enter[] foreign territorial waters for the purpose of mounting a narcotic operation concerning citizens of that foreign nation without approval of the [g]overnment of that [nation;]" (3) the "geographical boundaries" of Customs' authority; (4) the "employment of Alfred Catena Junior, Special Agent, [and] Biran Arrandale[,] informant[,] between 1988[ and ]1997[;]" and (5) the "check provided to Arrandale in the amount of 75,000.00 on behalf of" Customs).

Customs "acknowledged receipt of [the plaintiff's] May 3, 1999[] FOIA and Privacy Act request[.]" <u>Id.</u> ¶ 3. Having not received any further correspondence from Customs, "[b]y letter . . . dated May 3, 2000, [the plaintiff] appealed Customs' failure to respond to his request[,]" and "agreed to modify or limit his request to [the following] three items in order to expedite [ ] processing of his request[:]" (1) "records or report[s]" from "Customs [A]gent Gambino [of the] Palm Beach branch" regarding the plaintiff's "DEA and Customs case[,]" as "implied in [a] document . . . described [by the plaintiff] as a 'declaration' by DEA [A]gent Catena Jr.[;]" (2) "[i]nvestigation report[s] or records concerning [the plaintiff] conducted by [ ] Customs Special [A]gent Hutchison while in Lake Worth[,] Florida [i]n June [ ] 1997, as testified [to] by former Customs agent and now DEA agent Catena Jr.[;]" and (3) "suite on [ ] Customs Case, <u>Unite[d] [ ] States v. Alonso Gentry</u>[,] Alfred Catena as lead Customs agent or

were publish[ed] in the Federal Register such as case number e[tc.]"[5] Id. ¶ 4 (underline added);

see also id., Ex. 3 (Freedom of Information P/A Appeal under title 5 U.S.C. § 552(6)(ii) ("Pl.'s

Customs FOIA Appeal")) at 1–2.

On May 19, 2000, "Special Agent in Charge, Miami, Florida, Frank J. Figueroa[,]

advised John E. Eichelberger, the Director of Administration, Planning and Policy for the Office

of Investigations that a search of [TECS] records indicated that some of the records requested by

[the plaintiff] may be located with the [DEA] and [the United States Department of State ("]State

Department["])." Id. ¶ 6.  "By letter dated September 5, 2000, [Gloria L.] Marshall[, Director of

FOIA/PA, Office of Administration, Planning and Policy for the Office of Investigations at

Customs,] referred [the plaintiff's] request to Margaret Grafeld, the Acting Director for the

Office of [Information Resources Management] Programs and Services A/IM/IPF for the [State

Department], for that agency's determination of disclosure and direct response concerning one

record that appeared in TECS." Id. ¶ 10.  "On the same date, [ ] Marshall [also] responded to

[the plaintiff directly], identifying four [ ] TECS records responsive to his request[,]" three of

which "were provided to [the plaintiff], with certain portions withheld pursuant to [FOIA]

exemptions . . . (b)(2) and (b)(7)(C)[,]" and "advis[ing the plaintiff] that any remaining records

pursuant to his request had been referred to the [State Department] for determination of

disclosure and direct response to him." Id.

"By letter dated October 2, 2000, [the plaintiff] appealed [Customs' determination

regarding the four TECS records,]" arguing that (1) "Customs had failed to address his request

---

[5] In a subsequent letter dated May 29, 2000, the plaintiff once again requested that Customs consider only the three requests submitted in his appeal.  See Kramer Decl., Ex. 7 (Denial of Freedom of Information appeal ref: Initial response ("Pl.'s May 29, 2000 Letter to Customs")) at 2 (stating that "this notification comes as an alternative for reduction of [the plaintiff's] initial request in order to expedite processing, which now consist[s] only of two investigative reports and a case suite United States v. Alonso Gentry" (underline added)).

for a copy or the case suite of . . . <u>United States v. Alonso Gentry</u>, or where it can be found in the Federal Register[,]" (2) "as to the TEC[S] records and/or [their] authenticity, no specification was made as to the identification of the responsive records or which records [were] referred to the [State Department,]" and (3) Customs' application of FOIA exemptions 2 and 7(C) was incorrect because "the information sought was testified to in open court and not subject to exemption." <u>Id.</u> ¶ 11 (internal quotation marks omitted); <u>see</u> <u>id.</u>, Ex. 11 (DIS 2-01 01: APP: FOIA ("Pl.'s Oct. 2, 2000 Customs FOIA Appeal")) at 1–2.

"By letter dated October 23, 2000," Customs explained to the plaintiff that the "Miami office had been directed to process his request as expeditiously as possible and was in the process of redacting documents responsive to his request." <u>Id.</u> ¶ 13. "By letter dated February 5, 2001, John P. Clark, Special Agent in Charge, Miami[,] Florida, acknowledged [the plaintiff's] requests" and notified the plaintiff that Customs required "additional information so that [it] could determine which reports" were responsive to the plaintiff's request. <u>Id.</u> ¶ 15. By "letter dated February 20, 2001," the plaintiff "amended his request with regard to the <u>Gentry</u> case to any information [that] Customs could provide[,] such as [the c]ourt [d]istrict, [s]tate or [f]ederal jurisdiction, [or c]ourt docket number[.]" <u>Id.</u> ¶ 16. On June 13, 2001, "the Miami Customs office responded to [the plaintiff's] request, identifying 182 pages of [responsive] documents" and stating "that Customs was thereby releasing" 179 pages only "in part (based upon [FOIA] exemptions from disclosure (b)(2), (b)(7)(C), (b)(7)(D), and (b)(7)(E)), and three pages . . . in full." <u>Id.</u> ¶ 17.[6]

---

[6] Customs states that "those records which have been released: in full (3 pages), partially released (182 pages from the Special Agent in Charge, New Orleans), and [3] pages from the Office of Investigations, Headquarters, (only one page was withheld in its entirety), comprise all of the Customs records responsive to the plaintiff's request." Kramer Decl. ¶ 30. However, in Customs' <u>Vaughn</u> Index, it represents that 346 "total pages [were] found[,]" 154 "total pages [were] withheld in [their] entirety[,]" 189 "total pages [were] released in part[,]" and 3 "total pages [were] released in [their] entirety." <u>Id.</u>, Ex. 20 (Customs <u>Vaughn</u> Index) at 9. In light of this discrepancy, the Court
(continued . . .)

**5.   The Executive Office for United States Attorneys' and the United States Attorney's Office for the Southern District of Florida's Searches and Productions**

The plaintiff alleges that he submitted a FOIA request on May 3, 1999, to the United

States Attorney's Office for the Southern District of Florida (the "United States Attorney's

Office").  See Pl.'s Opp'n at 6.  The defendants dispute that the United States Attorney's Office

ever "receive[d] a FOIA request from [the plaintiff[.]"[7]  Defs.' Br. at 11 n.4; see Boseker Decl.

¶ 7 (stating that the plaintiff's "name did not appear in [the] computer file system" maintained by

the Executive Office for United States Attorneys (the "Executive Office") that tracks FOIA

requests received by the Executive Office or individual United States Attorney Offices).

However, once notified "[o]n or about June 20, 2006," by defense counsel that the plaintiff "had

indicated [in this litigation] that '[the Justice Department]' . . . had received and processed a

FOIA request from [the plaintiff] in 1999[,]" Boseker Decl. ¶ 6; see id., Ex. 1 (Pl.'s U.S. Att'y's

Off. FOIA Request) at 1, 5 (seeking the "release of all record and/or data . . . under [the

plaintiff's] name and [criminal] case, or any identifier assigned to [the plaintiff's] name" or

related to the "employment of Alfred Catena Junior, Special Agent, [and] Biran Arrandale[,]

informant[,] between 1988[ and ]1997[,] acting as [a]gents of [ ] Customs"), the Executive

---

(. . . continued)
will require Customs to submit an additional declaration or Vaughn Index clarifying the reason for the apparent discrepancy and confirming the total number of pages located, processed, withheld, released in part, and released in full.

[7] After defense counsel notified the Executive Office for United States Attorneys (the "Executive Office") of the plaintiff's alleged request, the Executive Office "searched its own computer files, which would reveal by search under the requester's name the record of any FOIA [or Privacy Act] request made to [the Executive Office] during the relevant time period and thereafter[.]"  Boseker Decl. ¶ 7.  However, the plaintiff's "name did not appear in this computer file system[.]"  id.  Moreover, the United States Attorney's Office for the Southern District of Florida's "FOIA contact could not independently verify [the United States Attorney's Office for the Southern District of Florida's] receipt of the alleged request letter in 1999, but believed that the letter was not apparently considered or treated as a FOIA/[Privacy Act] request by the individual who read it, and thus had not forwarded it to [the Executive Office] per [the] usual handling of such correspondence."  Id. ¶ 9.  "Absent the [United States Attorney's Office] forwarding of th[e] letter, [the Executive Office] had no request from [the plaintiff]."  Id. (citing 28 C.F.R. § 16.3(a) (noting that a FOIA "request will be considered received as of the date it is received by the proper component's FOIA office")).

Office, which handles FOIA requests on behalf of individual United States Attorney's Offices, initiated a search.[8]  See id. ¶ 10 (noting that the Executive Office "opened a FOIA/[Privacy Act] file in conjunction with [this] litigation, assigned it FOIA No. 06-2287, and asked the FOIA contact for the [United States Attorney's Office for the Southern District of Florida] to conduct a search for all records pertaining to [the plaintiff] that might be maintained in its files").

"By letter dated July 25, 2006," Boseker Decl. ¶ 11, the Executive Office notified the plaintiff that it had requested that the United States Attorney's Office for the Southern District of Florida "conduct a search[,]" id. ¶ 10.  In the same letter, the Executive Office "advised [the plaintiff] that a 'Project Request,' (i.e., a 'very large request'), such as where an individual sought all of his criminal records, could take up to nine months to process[,]" but that the "time-frame might be lessened by . . . narrowing the scope [of the request.]"  Id.; see id., Ex. B (Letter from William G. Stewart II, Acting Asst. Dir., Exec. Off. for U.S. Attys. Freedom of Info./Privacy Act Staff, to Elwood J. Cooper (July 25, 2006)) at 1.  The Executive Office also informed the plaintiff that, "by making this request[,] he had agreed to pay up to $25.00 in fees." Id.; see id., Ex. B (Letter from William G. Stewart II, Acting Asst. Dir., Exec. Off. for U.S. Attys. Freedom of Info./Privacy Act Staff, to Elwood J. Cooper (July 25, 2006)) at 1.

By "letter dated September 28, 2006[,]" the Executive Office "notif[ied the plaintiff] that [its] FOIA contact had estimated that to complete its search it would take an additional five hours of search time ([in addition] to the two hours already expended at no charge)," resulting in an

---

[8] Regardless of whether the Executive Office or the United States Attorney's Office for the Southern District of Florida received the plaintiff's alleged May 3, 1999 FOIA request, the parties agree that the Executive Office and the United States Attorney's Office did not take any action on the request prior to defense counsel's notifying the Executive Office of the plaintiff's allegations during this litigation.  See Pl.'s Opp'n at 3 n.4 (arguing that the Executive Office and United States Attorney's Office for the Southern District of Florida "received [his] FOIA request and failed to acknowledge its receipt or process [his] appeal thereof"); Defs.' Br. at 11 n.4 (arguing that "the [Executive Office] did not receive a FOIA request from [the plaintiff]" and "[b]ecause [the plaintiff] never perfected a request with respect to [the Executive Office], it has not conducted a search or provided any records to him").

"estimated fee of $140.00 ([five] hours billed at $28.00 per hour])[.]"  Id. ¶ 12; see id., Ex. C

(Letter from William G. Stewart II, Acting Asst. Dir., FOIA & Privacy Act Staff, Exec. Off. for

U.S. Att'ys to Elwood J. Cooper ("Exec. Off. Sept. 28, 2006 Letter")).  Because the Executive

Office had already located "an estimated 10,500 pages of documents in the case involving more

than one defendant, [and] an as[-]yet[-]unknown quantity of pages to be located dealing with [the

plaintiff] himself[,]" it advised the plaintiff that "a fee larger than $25.00 was anticipated" and,

accordingly, "before going any further, he would need to agree to pay such anticipated fees[.]"

Id.  It further informed the plaintiff that, "absent this agreement being received within [thirty]

days of the date of this letter" or the plaintiff "reformulat[ing] his request and possibly reduc[ing]

the anticipated fees to be incurred[,]" the plaintiff's "file [would be] closed."  Id.

      "On January 29, 2007," the Executive Office "received a letter from [the plaintiff] dated

September 23, 2006[,]" which "sought to narrow his request to particular records or types of

records that might be in his file[.]"  Id. ¶ 13; see id., Ex. D (Letter from Elwood J. Cooper to Mr.

Stewart, EOUSA/FOI/PA/Stewart II (Sept. 23, 2006) ("Pl.'s Sept. 23, 2006 Letter to Exec.

Off.")).  Specifically, the plaintiff limited his requests to (1) "documented proof [that]

corroborate[s] the testimony of [A]gent Catena that the DEA had gained the cooperation and had

received permission from the Bahamian Government on November 5, 1997, to allow its

DEA[-]controlled vessel legal entry into the Bahamas[;]" (2) "[c]opies of the two [Royal

Bahamian Police Force] reports dated November 11 and 12, 1997, as identified in" a record

released to the plaintiff as part of the DEA's January 3, 2000 production; (3) "[t]he arrest

statement [that A]gent Catena . . . testified he had obtained from Glenroy Craig upon his

arrest[;]" (4) "Customs [A]gent[] Robert Gambino's report documenting a serialized listing and

denominations of the mon[ie]s alleged to have been seized from Craig[;]" (5) "documentation of

mon[ie]s[ ](copies of checks, payment receipt[s], etc.) [that A]gent Catena testified were reimbursed to Arrandale and Collins for their contribution [to] the DEA investigation" of the plaintiff; (6) "[a] copy of the 'chemist report' refer[ring to] the cocaine seized in [the plaintiff's criminal] case[;]" (7) "[c]opies of those transcripts of the audio[-]recorded conversation between [the plaintiff] and the DEA informants" that were allegedly "prepared by the government but [ ] not submitted into evidence at [the plaintiff's] trial[;]" and (8) "[r]ecord receipts of Treasury Check(s) of Equitable Sharing Pr[o]ceeds of mon[ie]s paid out to the City of Delray Beach that were sent out to the [United States Attorney's Office for the Southern District of Florida] in 1998 and 1999." Id., Ex. D (Pl.'s Sept. 23, 2006 Letter to Exec. Off.) at 2–3. Upon receipt, the Executive Office "forwarded [the plaintiff's] itemized . . . request to the [United States Attorney's Office for the Southern District of Florida]" and "[t]he FOIA contact resumed searching for the specifically enumerated records among the afore-referenced large volume of records." Id. ¶ 14.

"On February 2, 2007," the Executive Office "received a letter from [the plaintiff] dated January 8, 2007," id. ¶ 15, in which the plaintiff stated that he "agree[d] to pay all such fees[,]" but also argued that because the "documents that have been located this far and the p[ro]cessing thereof did not result [from his alleged May 3, 1999] FOIA request to [the Executive Office], but rather . . . at the direction of [defense counsel] in" this case, "any costs associated with that search should be submitted to the court" as part of a "motion for litigation costs[,]" id., Ex. E (Letter from Elwood J. Cooper to Stewart, U.S. Dep't of Just. (Jan. 8, 2007) ("Pl.'s Jan. 8, 2007 Letter to Exec. Off.")) at 1–2.

"By letter dated April 10, 2007, [the Executive Office] notified [the plaintiff] that the [United States Attorney's Office for the Southern District of Florida] had completed its search

for the []specific documents[] requested [by the plaintiff], and that it had expended a total of

twenty-three and one[-]half hours in that effort[,]" resulting in a fee of $602.00.  Id. ¶ 16.  The

Executive Office advised the plaintiff that payment was required "within [thirty] days before [the

Executive Office] would take any further action respecting the processing of the[se] records[.]"[9]

Id.

## C.    This Case

On September 28, 1999, the plaintiff initiated this lawsuit.  See generally Complaint for

Declaratory and Injunctive Relief ("Compl."), ECF No. 178-1.[10]   On May 28, 2003, "Judge

Thomas Penfield Jackson, a former member of this Court, granted summary judgment to the

defendants after finding that they had 'fully complied' with their FOIA obligations in responding

to [the plaintiff's] requests."  Cooper 2012, 890 F. Supp. 2d at 59 (quoting Memorandum and

Order at 3 (May 28, 2003) (Jackson, J.) ("Cooper 2003")).  The plaintiff appealed the ruling.  See

Notice of Interlocutory Appeal, ECF No. 54.  On April 2, 2004, prior to the Circuit's disposition

of the plaintiff's appeal, "the defendants discovered "three cashier's checks used as evidence in

the plaintiff's criminal trial[,]" which were responsive to the plaintiff's FOIA request, "and

---

[9] In their brief, the defendants assert that the "plaintiff failed to pay [the fee]" and, as a result, the Executive Office "closed the matter in 2009[,]" Defs.' Br. at 11 n.4, however, the declaration provided by the defendants does not make such representations, see generally Boseker Decl.

[10] In its preparation of this Memorandum Opinion, the Court discovered that it required access to certain filings that pre-dated the Court's ECF system and, accordingly, were not available via the Court's electronic docket.  Despite a diligent search for the hard copies of the documents that were originally filed with the Court, the Court was unable to locate the documents.  Accordingly, the Court requested that the defendants provide the Court with copies of the relevant documents.  See Order at 1 (May 26, 2020), ECF No. 162 (requesting a copy of the documents cited in the defendants' consolidated brief); Order at 1 (August 26, 2021), ECF No. 177 (requesting a copy of the Complaint).  On August 27, 2021, the defendants filed copies of the Complaint and Answer.  See Defendants' Response to August 26, 2021 Order at 1, ECF No. 178; id., Ex. 1 (Complaint for Declaratory and Injunctive Relief); id., Ex. 2 (Answer for Federal Defendants).  The copy of the Complaint to which the Court refers in this Memorandum Opinion is the copy that was filed by the defendants on August 27, 2021, in response to the Court's August 26, 2021 Order.

promptly mailed copies [of the checks] to the plaintiff." Cooper v. Dep't of Just., No. Civ. A.

99-2513, 2005 WL 670296, at *1 (D.D.C. Mar. 22, 2005) (Urbina, J.) ("Cooper 2005").

    **1.** **Cooper I**

On June 17, 2004, the Circuit vacated Judge Jackson's Order in Cooper 2003 and

remanded the case back to this Court.  See Cooper v. Dep't of Just., No. 03-5172, 2004 WL

895748, at *1–2 (D.C. Cir. Apr. 23, 2004) (per curiam) ("Cooper I").  The Circuit cited affidavits

provided by the defendants "detailing the searches they conducted and the FOIA exemptions that

[they had] applied[,]" including a declaration from the Marshals Service "stating that it had

conducted a search for [the plaintiff's] records in its Southern District of Florida office, the

district to which [the plaintiff] directed his request, and in all locations that could reasonably be

expected to contain responsive documents." Id. at *2.  The Circuit concluded that this evidence

entitled the defendants to "a presumption that the [Marshals Service's] search was adequate[,]"

however,

> [the plaintiff] submitted countervailing evidence as to the adequacy of the
> [Marshals Service's] search, repeatedly pointing to cashier's checks that had not
> been produced.  In support, [the plaintiff] cited the trial testimony of a DEA agent
> stating that the cash seized in connection with [the plaintiff's] criminal
> prosecution was converted into cashier's checks and sent to the [Marshals
> Service].  Thus, contrary to the district court's conclusion that [the plaintiff]
> 'insists, without offering any proof, that other documents exist,' [the plaintiff] did
> offer such proof.  Moreover, prior to the district court's ruling on summary
> judgment, [the defendants] indicated that they had not produced a copy of a check
> that was transferred from the DEA to the [Marshals Service], and offered to
> submit an additional declaration from [the Marshals Service] addressing it.

Id. at 2–3 (quoting Cooper 2003 at 2).  The Circuit further rejected the defendants' argument that

"they did not produce the cashier's checks because [the plaintiff's] FOIA request did not

specifically identify the checks[,]" underscoring that "the government has a duty to construe

FOIA requests liberally." Id. at 3 (citing Nation Mag. v. U.S. Customs Serv., 71 F.3d 885, 890

(D.C. Cir. 1995)).  Because the defendants had "not explained why" they had not located the

cashier's checks during their searches in response to the plaintiff's 1999 FOIA "request for all records pertaining to his case[,]" the Circuit concluded that the defendants "ha[d] not rebutted the evidence presented by [the plaintiff] that raised a substantial doubt as to the adequacy of the [Marshals Service's] search" and, "[a]ccordingly, summary judgment was not appropriate on this issue." Id.

### 2. Remand from Cooper I

On remand, Judge Jackson scheduled a status conference for July 13, 2004, see Notice of Hearing (June 22, 2004), and the plaintiff filed a motion for leave to appear at the hearing remotely due to his incarceration, which Judge Jackson denied, see Plaintiff's Motion for Entry of an Order to Appear Before the Court via Speaker Telephone or Other Remote Electronic Means, and Request for Issuance of Subpoena at 1, ECF No. 61. At the July 13, 2004 status conference, "[n]one of the parties appeared." Cooper 2005, 2005 WL 670296 at *1. Relying on the defendants' representation at the rescheduled hearing on July 13, 2004, that "the cashier's checks in dispute had been turned over to the plaintiff," Judge Jackson concluded that "no viable claim [remained] in dispute" and "dismissed the case from the bench[.]" Id. Thereafter, the plaintiff filed two motions seeking review of Judge Jackson's July 13, 2004 Order dismissing the case. See id. at 2. Judge Jackson subsequently retired, and the case was reassigned by the Court's calendar committee to Judge Ricardo M. Urbina, another former member of this Court. Id. at 2. Judge Urbina ultimately denied both of the plaintiff's motions, concluding that "[t]he only material issue on remand from the [ ] Circuit—the location of the missing cashier's checks—was resolved when the defendant[s] discovered the checks and mailed them to the plaintiff" and "[o]nce the checks were found, no issue in dispute remained and Judge Jackson properly dismissed the case." Id. at 3; see also Order at 1 (Mar. 3, 2005), ECF No. 66.

### 3. __Cooper II__

The plaintiff appealed again, <u>see</u> Notice of Appeal at 1, ECF No. 70, and, "while [the plaintiff's] second appeal was pending, the Marshals Service and the DEA 'made [available to the plaintiff] additional documents relating to the cashier's checks[,]" which had "resulted from a search by the [Marshals Service] for [the] cashier's checks [conducted] in response to the Circuit's" <u>Cooper I</u> decision ("the 2005 production"), <u>Cooper 2012</u>, 890 F. Supp. 2d at 60 (internal quotation marks omitted).  On December 28, 2005, the Circuit ordered that Judge Jackson's "July 13, 2004 [O]rder dismissing the case be vacated and the case remanded [again] to the district court."  Order at 1, <u>Cooper v. Dep't of Just.</u>, No. 05-5093 (D.C. Cir. Dec. 28, 2005) ("<u>Cooper II</u>").  The Circuit instructed that,

> [o]n remand, the district court shall reevaluate the adequacy of the . . . Marshals Service's [ ] search for records in general, as [<u>Cooper I</u>] instructed.  The [Marshals Service's] production during this appeal of additional records responsive to [the plaintiff's FOIA] request has not rendered this case ready for summary appellate disposition because the production casts even more doubt on the adequacy of the [Marshals Service's] initial search.  On remand, the district court also shall address any challenges made by [the plaintiff] to the redactions associated with this production.

<u>Id.</u>

### 4. Remand from __Cooper II__

On remand, Judge Urbina directed the parties to report the status of the case, <u>see</u> Min. Order (Mar. 9, 2006), and on June 26, 2006, the plaintiff filed a motion for a discovery hearing, <u>see</u> Plaintiff's Objection to the Defendant's Status Report Ex Parte and Motion for Discovery Hearing and for Entry of an Order to Appear Before the Court via Video Conference at 1, ECF No. 79.  On February 15, 2007, Judge Urbina denied without prejudice the plaintiff's motion for a discovery hearing and set a briefing schedule for the defendants to file a renewed motion for summary judgment, <u>see</u> Min. Order (Feb. 15, 2007), which was filed on April 27, 2007, <u>see</u>

Defs.' Apr. 27, 2007 Mem. at 1, and fully briefed on December 4, 2007, see Plaintiff's Cross-Motion in Response to the Defendants' Renewed Motion for Summary Judgment and Renewed Motion to Supplement Preliminary Injunction and for Discovery and Hearing Thereon and to Appear Therein via Video Conference at 1, ECF No. 93; Plaintiff's Notice of Filing and Intent to Rely in Opposition to Defendants' Renewed Motion for Summary Judgment and to Permit Limited Discovery at 1, ECF No. 96.

On March 26, 2008, Judge Urbina stayed the case to provide the plaintiff with the opportunity to file "a statement of genuine issues of material fact," which he had not included with his filings in opposition to the defendants' renewed motion for summary judgment.  Order at 1 (Mar. 26, 2008), ECF No. 94.  On May 1, 2008—the deadline set by Judge Urbina for the plaintiff to file his statement of genuine issues of material fact—the plaintiff filed a motion for an extension of time to file his submission, see Plaintiff's Motion for Enlargement of Time to File Further Briefing at 1, ECF No. 95, and, on July 21, 2008, the plaintiff filed his submission, see Plaintiff's Notice of Filing and Intent to Rely in Opposition to Defendants' Renewed Motion for Summary Judgment and to Permit Limited Discovery at 1, ECF No. 96.  On October 10, 2008, Judge Urbina granted the plaintiff's motion for an extension of time.  See Min. Order (Oct. 1, 2008).  On August 16, 2010, the plaintiff filed a notice of change of address, and on August 26, 2011, he filed a motion for leave "to supplement the pleadings" and for resolution of the defendants' renewed motion for summary judgment.  See Plaintiff's Motion for Leave of the Court to File Supplemental Pleading and Compel Production of Documents at 1, ECF No. 98.

"On April 20, 2012, this case was randomly reassigned to the undersigned member of the Court upon Judge Urbina's retirement."  Cooper 2012, 890 F. Supp. 2d at 60.  On May 8, 2012, the Court issued an Order directing the parties to file updated consolidated submissions.  See

Order at 1–2 (May 8, 2012), ECF No. 99.  On July 26, 2012, the defendants filed their

consolidated brief, see Defendants' Consolidated Opposition to Plaintiff's Cross-Motion for

Summary Judgment and to Plaintiff's Renewed Motion for Preliminary Injunction and Discovery

at 1, ECF No. 102, and on August 22, 2012, the plaintiff filed his reply, see Pl.'s Aug. 22, 2012

Reply at 1.

On September 11, 2012, the Court issued a Memorandum Opinion and Order, granting in

part and denying in part the defendants' renewed motion for summary judgment and denying

without prejudice the plaintiff's renewed cross-motion for summary judgment.  See

Cooper 2012, 890 F. Supp. 2d at 65.  The Court concluded that "the two issues identified by the

Circuit" in Cooper II—namely, (1) "the adequacy of the Marshals Service's search for records in

general" and (2) "any challenges made by [the plaintiff] to the redactions associated with the

production of documents made by the Marshals Service" in its 2005 production— "were the only

issues that rendered 'summary appellate disposition' of the case inappropriate[.]"  Id. at 60–61

(internal quotation marks and alterations omitted).  Accordingly, the Court "deem[ed] it

appropriate to focus solely" on those two issues."  Id. at 60.

The Court then held that the Marshals Service "demonstrated that its search was

reasonable."  Id. at 64.  However, the Court "deem[ed] it inappropriate at th[at] time to assess the

propriety of the Marshals Service's invocation of Exemption 2" in support of the defendants'

redactions to documents in the 2005 production because the defendants had represented that they

would "file supplemental information regarding [their invocation of] Exemption 2" in light of the

Supreme Court's decision in Milner v. Department of the Navy, 562 U.S. 562, 569 (2011).  Id.

at 65.  In Milner, the Supreme Court had "abrogated and narrowed the expansive interpretation

of [ ] Exemption 2 advanced by the . . . Circuit in Crooker v. Bureau of Alcohol, Tobacco, and

Firearms, 670 F.2d 1051, 1073 (D.C. Cir. 1981)[,]" and "because the Marshals Service ha[d] invoked both Exemptions 2 and 7(C) as to several documents," the Court ultimately "defer[red] consideration of the Marshals Service's invocation of both [E]xemption[]" 2 and Exemption 7(C).  Id. (emphasis in original).  The Court therefore directed the defendants to file status reports "discussing the progress of their re-review of withholdings in this case pursuant [to] FOIA Exemption 2 in light of . . . Milner[.]"  Order at 1 (Sept. 11, 2012), ECF No. 105.

On October 12, 2012, the plaintiff filed a motion for reconsideration, see Pl.'s Oct. 12, 2012 Mot. at 1, and on April 1, 2013, the plaintiff filed a "motion in opposition to the defendants' status reports[,]" Pl.'s Apr. 1, 2013 Mot. at 1.  On June 20, 2013, the Court denied the plaintiff's motions and set a briefing schedule for new cross-motions for summary judgment, "focusing solely on the propriety of the redactions made to the additional documents produced to the plaintiff in September 2005."  Order at 1 (June 20, 2013), ECF No. 119.  Thereafter, the parties filed new cross-motions for summary judgment, addressing the validity of the redactions in the 2005 production.  See Cooper 2016 at 28.

On March 14, 2016, the Court granted in part the defendants' Second Summary Judgment Motion and denied the plaintiff's Second Cross-Motion for Summary Judgment.[11]  See id. at 46.  The Court concluded that "the defendants properly invoked Exemptions 7(C), (D), and (E) to justify their redactions . . . [, h]owever, the DEA ha[d] yet to sufficiently show that it has released all the reasonably segregable material from [one particular document,] document 35."  Id. at 44.  Therefore, the Court "reserve[d] judgment on whether the DEA ha[d] released all

---

[11] In Cooper 2012, the Court set forth its understanding of "why [ ] rulings on [the parties' new cross-motions for summary judgment] were not rendered" prior to 2016, noting the facts that (1) the case was administratively closed by the Court on June 25, 2012, for reasons not reflected in the record and (2) "on October 2, 2013, the defendants filed" a motion to stay the case in light of the lapse of appropriations, but failed to subsequently "notify the Court that the lapse in appropriations had [ ] ended and that the stay should be lifted."  Cooper 2012, 169 F. Supp. 3d at 25 n.1.

reasonably segregable information from document 35 and require[d] the defendants to submit supplemental briefing on this issue[,]" id., which the defendants filed on April 14, 2016, see Defendants' Supplemental Brief at 1, ECF No. 140.  On June 8, 2016, the plaintiff filed a notice, attaching "[t]hirty-nine[ Marshals Service] documents[ allegedly] referenced in paragraph 3 of the Second Bordley declaration[,]" Pl.'s June 8, 2016 Notice at 1, and an additional motion for summary judgment that argued that "the Court has committed clerical mistakes, oversights, and omissions in its consideration of all the redactions associated with the" 2005 production, see Pl.'s June 8, 2016 Mot. at 1.

On August 31, 2017, the Court granted in full the defendants' second motion for summary judgment and denied the plaintiff's cross-motion for summary judgment, see Order at 8 (Aug. 31, 2017), ECF No. 145, resolving what it understood to be "the sole remaining issue [in this case], i.e., the 'redactions made to the additional documents produced to the plaintiff in September 2005[,]'" Cooper 2016 at 28 (quoting Order at 10 (June 20, 2013), ECF No. 119).

## 5.  **Cooper III**

On September 25, 2017, the plaintiff again filed a notice of appeal.  See Notice of Appeal at 1, ECF No. 146.  On July 11, 2018, the Circuit once again remanded the case to this Court, concluding that, "in light of the vacatur of the [Cooper 2003] judgment [in Cooper I], . . . the [ ] Court to date has not addressed [either] the withholdings in records produced to [the plaintiff] prior to the second appeal" or "whether the agencies other than [the Marshals Service] conducted adequate searches for responsive records."[12]  Order at 2, Cooper v. U.S. Dep't of Just.,

---

[12] The Circuit's prior decisions in Cooper I and Cooper II directed the Court to focus on the searches and productions made by the Marshals Service.  As previously explained, see supra Section I.C.1, the Circuit's Cooper I decision, in vacating Cooper 2003, held that the defendants had "not rebutted the evidence presented by the [plaintiff] that raised a substantial doubt as to the adequacy of the [Marshal Service's] search" and, "[a]ccordingly, summary judgment was not appropriate on this issue."  Cooper I, 2004 WL 895748, at *2 (emphasis added).  In Cooper II, the Circuit similarly directed the Court to address only the Marshals Service's search.  See Cooper II at 1
(continued . . .)

No. 17-5219 (July 11, 2018) (per curiam) ("Cooper III") (emphasis added).  The Circuit directed

the Court to enter an "order addressing the remaining issues and stating the reasons for its

decision[,]" id. at 2, and ordered "that the record be remanded to [this C]ourt for further

proceedings consistent with [its] order[,]" id. at 1.

### 6.  Remand from **Cooper III** & the Pending Motions

On July 16, 2018, the Court ordered the defendants to "file . . . a consolidated brief

addressing the two remaining unresolved issues in this case[, as described by the Circuit in

Cooper III]: [(1)] the withholdings in records produced to [the plaintiff] prior to [his] second

appeal and [(2)] whether the agencies other than [the Marshals Service] conducted adequate

searches for responsive records."  Order at 1 (July 16, 2018), ECF No. 152.  On August 13,

2018, the defendants filed their consolidated brief, see Defs.' Br. at 1.  On September 19, 2018,

the plaintiff filed his opposition and motion for "summary judgment or discovery in his favor on

the grounds that [the defendants'] consolidated brief fails to address the issues of material facts

in genuine dispute for which the record of this case was remanded and held in abeyance[,]" Pl.'s

Opp'n at 1–2.  On April 4, 2019, the plaintiff filed his motion for the Court to take judicial

notice, see Pl.'s Apr. 4, 2019 Mot. for Judicial Notice at 1, which the defendants opposed on

July 27, 2021, see Defs.' Opp'n to Pl.'s Apr. 4, 2019 Mot. for Judicial Notice at 1.[13]  On May 26,

---

(. . . continued)
(ordering that, "[o]n remand, the district court shall reevaluate the adequacy of the . . . Marshals Service's [ ] search
for records in general" because "[t]he [Marshals Service's] production during this appeal of additional records
responsive to [the plaintiff's FOIA] request has not rendered this case ready for summary appellate disposition
[when] the production casts even more doubt on the adequacy of the [Marshals Service's] initial search" and that,
"[o]n remand, the district court also shall address any challenges made by [the plaintiff] to the redactions associated
with this production[,]" i.e., the Marshals Service's production (emphasis added)).

[13] Because the plaintiff titled his motion for judicial notice the "Plaintiff's Ex Parte Motion to the Court to Take
Judicial Notice of Record[,]" see Pl.'s Apr. 4, 2019 Mot. for Judicial Notice at 1, the Court docketed the motion ex
parte and the defendants, who accordingly were not alerted to the motion, did not file an opposition.  However, in
the Court's review of the case materials in the drafting of this Memorandum Opinion, it ascertained that, despite the
title of the motion, the plaintiff claimed to have served the defendants with a copy of the motion.  See id. at 5

(continued . . .)

2020, the Court ordered the defendants to "submit to the Court [documents referenced in their consolidated brief,]" Order at 1 (May 26, 2020), ECF No. 162, and the defendants filed their submission of the referenced documents on July 31, 2020, see Defendants' Notice of Compliance with May 26, 2020 Order at 1, ECF No. 164.[14]

On August 16, 2021, the plaintiff filed another motion for discovery. See Pl.'s Aug. 16, 2021 Mot. for Discovery at 1. In that motion, the plaintiff "requests leave and [an] exten[s]ion of time to proffer as an offer of proof as to the inadequacy of the defendants' searches and the withholding of additional records in this case[.]" Id.

## II.    STANDARD OF REVIEW

"FOIA cases typically are resolved on a motion for summary judgment." Ortiz v. U.S. Dep't of Just., 67 F. Supp. 3d 109, 116 (D.D.C. 2014) (citation omitted). The "FOIA requires federal agencies to disclose, upon request, broad classes of agency records unless the records are covered by the statute's exemptions." Students Against Genocide v. U.S. Dep't of State,

---

(. . . continued)

(stating that the plaintiff "certif[ies] that a true and correct copy of the above and foregoing was sent by U.S.[ ]mail[ ](postage prepaid) this 27th day of March, 2019, marked for delivery to" defense counsel). Accordingly, the Court directed the parties to advise the Court as to whether the defendants had received a copy of the motion and whether it should continue to be filed ex parte on the docket. See Order at 1–2 (June 24, 2021), ECF No. 165. After being advised that the defendants had not received a copy of the motion, see Defendants' Response to the Court's June 24, 2021 Order at 1, ECF No. 166 (stating that the "[d]efendants' counsel did not receive [the p]laintiff's ex parte motion to take judicial notice of the record that is the subject of the Court's June 24, 2021 Order"), and that the plaintiff had intended to serve the motion on the defendants, see Plaintiff's Notice of Compliance with the Court's June 24, 2021 Order at 1, ECF No. 167 ("I hereby declare under penalty of perjury that[,] on March 27, 2019[,] I cause[d] a copy of the original of [the motion] to be served via U.S.[ ]mail marked for delivery to defendants' counsel[.]"), the Court ordered the Clerk of the Court to file the plaintiff's motion for judicial notice on the public docket and directed the defendants to respond to the motion on or before July 27, 2021, see Order at 2 (July 13, 2021), ECF No. 168. The defendants filed their opposition on July 27, 2021. See Defs.' Opp'n to Pl.'s Apr. 4, 2019 Mot. for Judicial Notice at 1. Accordingly, even though the defendants' opposition was filed over two years after the filing of the plaintiff's motion for judicial notice, it is deemed timely filed.

[14] On November 12, 2019, the plaintiff filed a notice advising the Court that he had submitted a petition for a writ of mandamus to the Circuit. See Plaintiff/Petitioner Elwood Cooper's Notice of Service Process of Writ of Mandamus to the D.C. Circuit Court of Appeals at 1, ECF No. 161. On September 21, 2020, the Circuit issued a per curiam Order, denying the plaintiff's petition. See Order at 1, In re Elwood J. Cooper, No. 19-5312 (D.C. Cir. Sept. 21, 2020) (per curiam). As the Circuit noted, in issuing this Memorandum Opinion and Order, the Court is "act[ing] as promptly as its docket permits." Id.

257 F.3d 828, 833 (D.C. Cir. 2001) (citing 5 U.S.C. § 552(a)(3)(A), (b)); see also Wash. Post Co.
v. U.S. Dep't of Just., 863 F.2d 96, 101 (D.C. Cir. 1988) (citation omitted) ("[The] FOIA is to be
interpreted with a presumption favoring disclosure and exemptions are to be construed
narrowly.").  In a FOIA action, the defendant agency has "[the] burden of demonstrating that the
withheld documents are exempt from disclosure[.]"  Boyd v. U.S. Dep't of Just.,
475 F.3d 381, 385 (D.C. Cir. 2007).  This burden "cannot be met by mere conclusory
statements."  Wash. Post Co., 863 F.2d at 101 (citation omitted).  Rather, "[t]he agency may
meet this burden by filing affidavits describing the material withheld and the manner in which it
falls within the exemption claimed," King v. U.S. Dep't of Just., 830 F.2d 210, 217 (D.C.
Cir. 1987) (citations omitted), and by "show[ing] how release of the particular material would
have the adverse consequence that the [FOIA] seeks to guard against," Wash. Post Co., 863 F.2d
at 101 (citation omitted).

      Moreover, courts will grant summary judgment to the government in a FOIA case only if
the agency can prove "that it has fully discharged its obligations under the FOIA, after the
underlying facts and the inferences to be drawn from them are construed in the light most
favorable to the FOIA requester."  Friends of Blackwater v. U.S. Dep't of Interior,
391 F. Supp. 2d 115, 119 (D.D.C. 2005) (quoting Greenberg v. U.S. Dep't of Treasury,
10 F. Supp. 2d 3, 11 (D.D.C. 1998)).  Thus, in a lawsuit brought to compel the production of
documents under the FOIA, "an agency is entitled to summary judgment if no material facts are
in dispute and if it demonstrates 'that each document that falls within the class requested either
has been produced . . . or is wholly[, or partially,] exempt [from disclosure].'"  Students Against
Genocide, 257 F.3d at 833 (omission in original) (quoting Goland v. Cent. Intel. Agency,
607 F.2d 339, 352 (D.C. Cir. 1978)).  "Even when [a] requester files a motion for summary

judgment, the [g]overnment 'ultimately has the onus of proving that the [documents] are exempt

from disclosure[,]'" and "[t]he burden upon the requester is merely 'to establish the absence of

material factual issues before a summary disposition of the case could permissibly occur.'"  Pub.

Citizen Health Rsch. Grp. v. Food & Drug Admin., 185 F.3d 898, 904–05 (D.C. Cir. 1999)

(quoting Nat'l Ass'n of Gov't Emps. v. Campbell, 593 F.2d 1023, 1027 (D.C. Cir. 1978))

(alteration omitted).

   In applying the above framework, the Court is mindful of the fact that the plaintiff is

proceeding in this matter pro se.  This appreciation is required because the pleadings of pro se

parties are "to be liberally construed, and a pro se complaint, however inartfully pleaded, must be

held to less stringent standards than formal pleadings drafted by lawyers."  Erickson v. Pardus,

551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted).  Furthermore, all factual

allegations by a pro se litigant, whether contained in the complaint or other filings in the matter,

should be read together in considering whether to grant a dispositive motion.  See Richardson v.

United States, 193 F.3d 545, 548 (D.C. Cir. 1999).  Nonetheless, "when faced with a motion for

summary judgment," a pro se litigant "must comply with the Federal Rules of Civil Procedure

and this Court's local rules . . . regarding responding to statements of material fact and

marshalling record evidence that establishes each element of his claim for relief[.]"  Hedrick v.

Fed. Bureau of Investigation, 216 F. Supp. 3d 84, 93 (D.D.C. 2016) (citations omitted); see

McNeil v. United States, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural

rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who

proceed without counsel.").

### III.   ANALYSIS

In <u>Cooper III</u>, the Circuit instructed this Court to address two remaining issues in this case: (1) "the withholdings in records produced to [the plaintiff] prior to the second appeal" and (2) "whether the agencies other than [the Marshals Service] conducted adequate searches for responsive records."  <u>Cooper III</u> at 1.  The Court will address in turn (1) the parties' dispute related to the scope of the remand in <u>Cooper III</u>; (2) the plaintiff's request to the Executive Office; (3) the adequacy of the searches conducted by the agencies other than the Marshals Service; (4) the withholdings in the records produced to the plaintiff prior to the 2005 production; and (5) the segregability of the withholdings in the records produced to the plaintiff prior to the 2005 production.

### A.   The Scope of <u>Cooper III</u>

In light of the parties' dispute regarding the scope of the remand from the Circuit in <u>Cooper III</u>, <u>see</u> Pl.'s Opp'n at 2 n.2 (arguing that "[t]he defendants[,] in their consolidate[d] brief[, are] attempting to construe and circumvent the directives of both this Court's and the [ ] Circuit's [o]rder[s]"); Defs.' Reply at 1–2 n.1 (arguing that "[p]articularly with respect to the search issue, contrary to [the p]laintiff's suggestion, [the d]efendants' [c]onsolidated [b]rief addresses the adequacy of searches for responsive records prior to 2005"), the Court will begin by clarifying its understanding of the scope of the Circuit's remand in <u>Cooper III</u> and, accordingly, what it must address in this Memorandum Opinion.

In <u>Cooper III</u>, the Circuit stated the following:

> In 1999, [the plaintiff] requested records relating to his arrest and prosecution from the [ATF], the [DEA], the [Justice Department,] [Customs], and [the Marshals Service].  The district court's judgment [in <u>Cooper 2003</u>] in favor of [the defendants] was vacated by this court [in <u>Cooper I</u>].  Likewise, the district court's order [in <u>Cooper 2004</u>] dismissing the case was also vacated.

> In granting summary judgment to the government following [Cooper II], the district court confined its inquiry to considering only (1) whether [the Marshals Service's] search for records was adequate, and (2) whether the withholdings pursuant to FOIA exemptions asserted in [the Marshals Service's] and [the] DEA's [ ] 2005 [ ] productions were proper. However, in light of the vacatur of [Cooper 2003], and as the government has acknowledged in its district court filings, 'the District Court to date has not addressed the withholdings in records produced to [the plaintiff] prior to [Cooper II]. Nor has the district court resolved whether the agencies other than [the Marshals Service] conducted adequate searches for responsive records. On remand, the district court may order the parties to submit further briefing concerning the unresolved issues in this case. The district court is requested to notify this court promptly upon the issuance of an order addressing the remaining issues and stating the reasons for its decision.

Cooper III at 1–2 (internal quotation marks and citations omitted).  With these instructions, the Circuit "ordered that the record be remanded to the district court for further proceedings consistent with this order."  Id. at 1.

Therefore, according to the Circuit in Cooper III,  there are two issues that remain "unresolved": (1) "the withholdings in records produced to [the plaintiff] prior to [Cooper II,]" which is "unresolved" due to "the vacatur of [Cooper 2003;]" and (2) "whether the agencies other than [the Marshals Service] conducted adequate searches for responsive records[,]" which is "unresolved" due to "the vacatur of [Cooper 2003]" and the focus in Cooper II, Cooper 2012, and Cooper 2016 on the 2005 production.[15]  Id. at 1–2.  Pursuant to the Circuit's most recent directive, the Court will address these two issues.

---

[15] In his opposition, the plaintiff identifies three issues for the Court to address on remand: "(1) [t]he withholdings in the records produced to [him] prior to the second appeal, (2) whether the agencies other than the [Marshals Service] conducted adequate searches for responsive records, and (3) [whether] the parties [should be ordered] to submit further briefing concerning the unresolved issues in this case[.]"  Pl.'s Opp'n at 1.  This appears largely to comport with the defendants' identification of the issues to be addressed on remand, namely:

> (1) the withholdings pursuant to [FOIA] exemptions in records provided to [the] plaintiff prior [his] appeal in 2005 [in Cooper II]; and (2) the adequacy of the searches conducted by all agencies

(continued . . .)

**B.     The Plaintiff's Request to the Executive Office for United States' Attorneys**

The Court begins by considering the plaintiff's contentions regarding the processing of

his alleged FOIA request made on May 3, 1999, to the United States Attorney's Office for the

Southern District of Florida.[16]   See Pl.'s Opp'n at 6; see also Boseker Decl., Ex. A (Pl.'s U.S.

Att'y's Off. FOIA Request) at 1.   The plaintiff argues that the United States Attorney's Office

failed to respond initially to his FOIA request and, after it was advised of the plaintiff's alleged

request by defense counsel, failed to process responsive pages that it located.   See Pl.'s Opp'n

at 6.

---

(. . . continued)

> that received the FOIA requests at issue in this case other than the . . . Marshals Service's search
> for records specifically relating to [the] cashier's checks.

Defs.' Br. at 1.  Despite this apparent agreement, the plaintiff also argues that

> [t]he defendants[,] in their consolidate[d] brief[, are] attempting to construe and circumvent the
> directives of both this Court's and the [ ] Circuit's [o]rder[s] by addressing the withholdings
> pursuant to exemptions in records provided to [the] plaintiff instead cited herein and on appeal,
> and [sic] adequacy of the searches conducted by all agencies other than [the Marshal Service's]
> search for records specifically relating to cashier's checks as oppose[d] to and adequate searches
> for responsive records in general.

Pl.'s Opp'n at 2 n.2.  The defendants contest the plaintiff's characterization, arguing that, "[p]articularly with respect
to the search issue, contrary to [the p]laintiff's suggestion, [the d]efendants' [c]onsolidated [b]rief addresses the
adequacy of searches for responsive records prior to 2005."  Defs.' Reply at 1–2 n.1.

As noted above, the Court understands the Circuit's opinion to remand two issues for consideration to this Court:
(1) "the withholdings in records produced to [the plaintiff] prior to [Cooper II]," and (2) "whether the agencies other
than [the Marshals Service] conducted adequate searches for responsive records[,]" Cooper III at 1–2.  To the extent
that the Circuit also instructed that, "[o]n remand, the district court may order the parties to submit further briefing
concerning the unresolved issues in this case[,]" id. at 2, the Court has ordered the parties "to submit further
briefing" concerning these issues.  See Order at 1 (July 16, 2018), ECF No. 152.  Moreover, the Court concludes
that as to the issues resolved by the Court in Cooper 2012 and Cooper 2016, and the issues that were remanded in
Cooper III and that are addressed infra, no further "unresolved" issues remain.  However, to the extent the parties
have raised additional issues that need to be addressed, the Court will also address them infra.

[16] As noted above, see supra Section I.B.5, the defendants dispute that the Executive Office and the United States
Attorney's Office for the Southern District of Florida ever "receive[d] a FOIA request from [the plaintiff[,]" Defs.'
Br. at 11 n.4.  However, there is no dispute that, once the Executive Office was notified by defense counsel on
June 20, 2006, about the plaintiff's claim in this litigation that he had submitted a request to the United States
Attorney's Office for the Southern District of Florida, the Executive Office began to conduct a search for responsive
documents.  Accordingly, the Court's analysis in this section will focus on whether that search—as it was conducted
in 2006—was adequate.

In response, the defendants first argue that "[t]he absence of any allegation in the [C]omplaint regarding a FOIA request made to [the Executive Office] or an individual [United States] Attorney's Office means that any claims about such a request should be outside the scope of this action[,]" Defs.' Reply at 6. According to the defendants, the plaintiff did not include any alleged FOIA request to the Executive Office or a particular United States Attorney's Office in his Complaint. See Defs.' Br. at 10 n.4 (arguing that, "[e]arlier in this litigation but not in [his C]omplaint, [the plaintiff] claimed that he had also sent a FOIA request to the [Executive Office]"); Defs.' Reply at 6 ("The absence of any allegation in the [C]omplaint regarding a FOIA request made to [the Executive Office] or an individual [United States] Attorney's Office means that any claims about such a request should be outside the scope of this action."). The defendants are correct that the plaintiff's Complaint does not mention either a United States Attorney's Office or the Executive Office by name and does not specifically refer to a request to the United States Attorney's Office for the Southern District of Florida. See generally Compl. However, the plaintiff's Complaint does refer to a FOIA request submitted to the Justice Department, see id. ¶ 1, of which the Executive Office is a "component[,]" Richardson v. U.S. Dep't of Just., 730 F. Supp. 2d 225, 229 n.1 (D.D.C. 2010). Cf. Boseker Decl. ¶ 6 (stating that, "while naming other defendants as entities in his action, [the plaintiff] had indicated that 'DOJ' . . . had received and processed a FOIA request . . . in 1999" and, "[a]s such, [the Executive Office] was considered to be a defendant in the above-captioned action, where such participation had not been prior-noticed"). Moreover, according to the Boseker Declaration, once defense counsel notified the Executive Office of the plaintiff's allegations, it

> opened a FOIA/[Privacy Act] file in conjunction with th[is] [ ] litigation, assigned it FOIA No. 06-2287, and asked the FOIA contact for the [United States Attorney's Office for the Southern District of Florida] to conduct a search for all

records pertaining to [the plaintiff] that might be maintained in its files, pursuant
to his initial request letter.

Id. ¶ 10.  Accordingly, in light of the liberal construction afforded complaints filed by pro se

plaintiffs; Boseker's statement that the Executive Office "considered [itself] to be a defendant in

th[is] [ ] action[,]" id. ¶ 6; and the fact that the Executive Office subsequently conducted searches

in response to the plaintiff's alleged FOIA request, see id. ¶ 10, the Court disagrees with the

defendants that the plaintiff's FOIA request to the United States Attorney's Office for the

Southern District of Florida should be considered "outside the scope of this action[,]" Defs.'

Reply at 6, at this stage of the litigation.

        The defendants next argue that, to the extent the Executive Office began conducting a

search once it was advised of the plaintiff's alleged request by defense counsel, see Boseker

Decl. ¶¶ 10–16, "summary judgment in favor of [the] defendants on a FOIA request to [the

Executive Office] would be appropriate based on [the p]laintiff's multiple failures to exhaust his

administrative remedies by following the agency's regulations to submit a request and pay the

associated fees."  Defs.' Reply at 6.  Indeed, under the FOIA, "a party [must] exhaust his

administrative remedies before seeking judicial review."  Skinner v. U.S. Dep't of Just., 744 F.

Supp. 2d 185, 195 (D.D.C. 2010), overruled on other grounds by Milner, 562 U.S. 562 (2011).

"Exhaustion does not occur until the required fees are paid or an appeal is taken from the refusal

to waive fees."  Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 66 (D.C. Cir. 1990).

        According to the Boseker Declaration, the Executive Office notified the plaintiff twice

that he would need to pay the fees associated with the processing of his FOIA request before the

Executive Office would complete its searches and processing of the requested documents.  See

Boseker Decl. ¶¶ 12, 16.  First, by letter dated September 28, 2006, the Executive Office advised

the plaintiff that he would "need to agree to pay [the] anticipated fees" before the Executive

Office would proceed with its searches and processing of records due to the "estimated [search] fee of $140.00" and anticipated processing "fee larger than $25.00" in light of the "estimated 10,500 pages of documents" already located and "an as[-]yet[-]unknown quantity of pages to be located dealing with [the plaintiff.]"[17]  Id. ¶ 12.  Second, on April 10, 2007, the Executive Office sent the plaintiff "an advance fee letter, pursuant to 5 U.S.C. §[ ]552(a)(4)(A)(v) and 28 C.F.R. §[ ]16.11(I), requiring payment of $602.00 within [thirty] days before [the Executive Office] would take any further action respecting the processing of the records located in connection with his request."  Id. ¶ 16.

In response to the Executive Office's September 28, 2006 letter, the plaintiff stated that, "without waiving [his] objection, [he] h[e]reby agree[s] to pay all such fees."  Id., Ex. E (Pl.'s Jan. 8, 2007 Letter to Exec. Off.) at 2.  However, in the same letter, the plaintiff stated that, "for fee-notice purposes, [ ] the documents that have been located this far and the p[ro]cessing thereof did not result [from the plaintiff's submi[ssion of] a FOIA request to [the Executive Office], but rather by, and at the direction of[, defense counsel[,]" and, "[t]herefore, any costs associated with that search should be submitted to the court through [defense counsel] to be determine[d] in the defendant[s'] motion for litigation costs."[18]  Id., Ex. E (Pl.'s Jan. 8, 2007 Letter to the Exec. Off)

---

[17] Under the FOIA and Justice Department regulations, the Executive Office was authorized in its September 28, 2006 letter to require the plaintiff to agree to pay the fees prior to proceeding with its processing of the requested records.  See Chaplin v. Stewart, 796 F. Supp. 2d 209, 211 (D.D.C. 2011) (stating that the FOIA permits an agency to "charge a requester reasonable fees for the search, review, and duplication of responsive documents" (citing 5 U.S.C. § 552(a)(4)(A))), vacated as moot, No. 11-5252, 2015 WL 9309592 (D.C. Cir. 2015); 28 C.F.R. § 16.11(e) (1999) (stating that, "[i]n cases in which a requester has been notified that actual or estimated fees amount to more than $25.00, the request shall not be considered received and further work shall not be done on it until the requester agrees to pay the anticipated total fee").

[18] The Court notes that, if it accepted the plaintiff's statement to the Executive Office that the search had been initiated "at the direction of" defense counsel in this case, rather than in response to his FOIA request, see Boseker Decl., Ex. E (Pl.'s Jan. 8, 2007 Letter to the Exec. Off.) at 2, it would also have to conclude that the plaintiff lacks standing to challenge the Executive Office's failure to search for and process the requested records, because "standing under [the] FOIA is limited to the person who made the initial request[,]" Feinman v. Fed. Bureau of Investigation, 680 F. Supp. 2d 169, 172 (D.D.C. 2010) ("[S]tanding under [the] FOIA is limited to the person who
(continued . . .)

at 2.  Accordingly, the plaintiff's letter is, at best, inconclusive as to whether he agreed to pay the anticipated fees resulting from the processing of his FOIA request.

However, even if the plaintiff's January 8, 2007 letter could be construed as an agreement to pay the fees, there is no evidence in the record before the Court that, when the Executive Office notified the plaintiff in its April 10, 2007 letter that it "require[ed] an advance payment of $602.00 . . . before [it would] continue [ ] processing [his] request[,]" id., Ex. F (Exec. Off. Apr. 10, 2007 Letter) at 1, the plaintiff paid the required advance fee.  Under 28 C.F.R. § 16.11(i)(2)–(4) (1999),[19]

> [w]here a component [of the Justice Department] determines or estimates that a total fee to be charged under this section will be more than $250.00, it may require the requester to make an advance payment of an amount up to the amount of the entire anticipated fee before beginning to process the request, except where it receives a satisfactory assurance of full payment from a requester that has a history of prompt payment.
>
> . . .
>
> In cases in which a component requires advance payment or payment due under paragraph (i)(2) or (3) of this section, the request shall not be considered received and further work will not be done on it until the required payment is received.

28 C.F.R. § 16.11(i)(2)—(4) (1999).  Accordingly, because its search efforts had already resulted in a fee of $602.00, see Boseker Decl. ¶ 16, the Executive Office was authorized to require that the plaintiff pay the fee prior to continuing its search and processing of the requested records, see

---

(. . . continued)
made the initial request.").  However, because the plaintiff has not advanced this argument before this Court, the Court will not consider it as a bar precluding his pursuit of this action.

[19] The Court cites the 1999 version of 28 C.F.R. § 16.11(2)–(4), see 28 C.F.R. § 16.11(2)–(4) (1999), because that was the version of the regulations in effect on April 10, 2007, when that the Executive Office informed the plaintiff that he was required to pay the fee prior to completion of the search, see Boseker Decl., Ex. F (Exec. Off. Apr. 10, 2007 Letter) at 1.  The provision was subsequently amended in 2015, see 80 Fed. Reg. 18,099–19,001 (Apr. 3, 2015), and 2017, see 82 Fed. Reg. 727 (Jan. 4, 2017), however, the provision still authorizes the Justice Department to require a "commitment or designation in writing" from a requester that either (1) he or she will pay "the actual or estimated total fee" or "some amount of fees the requester is willing to pay," or (2) "in the case of a noncommercial use requester who has not yet been provided with the requester's statutory entitlements, . . . the requester seeks only that which can be provided by the statutory entitlements[,]" 28 C.F.R. § 16.10.

28 C.F.R. §§ 16.11(i)(4) (1999) (providing that "further work will not be done . . . until the required payment is received").

Because the plaintiff does not argue that he paid the required fees, see generally Pl.'s Opp'n, the Court concludes that the plaintiff has not demonstrated that he exhausted his administrative remedies by paying the fees required by the FOIA and Justice Department regulations.[20]   See Oglesby, 920 F.2d at 66 ("Exhaustion does not occur until the required fees are paid or an appeal is taken from the refusal to waive fees.").   Accordingly, the Court must grant summary judgment to the defendants regarding the plaintiff's alleged FOIA request to the Executive Office and the United States Attorney's Office for the Southern District of Florida. See Hines v. United States, 736 F. Supp. 2d 51, 54 (D.D.C. 2010) (granting summary judgment to the agency defendants because "the plaintiff ha[d] failed to exhaust his administrative remedies").

[20] Under 5 U.S.C. § 552(a)(4)(A)(iii) and 28 C.F.R. § 16.11(k) (1999), a FOIA requester may seek a waiver or reduction of fees if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii); see also 28 C.F.R. § 16.11(k)(1) (1999).  Neither the plaintiff's September 23, 2006, see Boseker Decl., Ex. D (Pl.'s Sept. 23, 2006 Letter to Exec. Off.) at 1–3, nor his January 8, 2007, see id., Ex. E (Pl.'s Jan. 8, 2007 Letter to Exec. Off.) at 1–2, letters to the Executive Office explicitly addresses the requirements for a fee waiver specified in 28 C.F.R. § 16.11(k)(2) (1999).  See 28 C.F.R. § 16.11(k)(2) (1999) (providing that, in order to determine whether disclosure "is likely to contribute significantly to public understanding[,]" the agency "will consider[:]" (1) whether "[t]he subject of the requested records [ ] concern[s] identifiable operations or activities of the federal government," (2) whether the "disclosable portions of the requested records" are "meaningfully informative about government operations or activities[,]" (3) whether the disclosure "contribute[s] to the understanding of a reasonably broad audience of persons interested in the subject," and (4) whether "[t]he public's understanding of the subject in question" would "be enhanced by the disclosure to a significant extent").  As the Circuit has noted, although "fee-waiver applications are to be liberally construed in favor of finding that requesters meet [the] FOIA's two-prong test, requesters still must justify their entitlement to a waiver of fees in reasonably specific and non-conclusory terms."  Nat'l Sec. Couns. v. U.S. Dep't of Just., 848 F.3d 467, 473 (D.C. Cir. 2017) (internal quotation marks omitted).  As the plaintiff's letters do not present "reasonably specific and non-conclusory" argument in favor of a fee waiver, the Court concludes that, even if the plaintiff had requested a fee waiver in his letters, he did not present grounds sufficient to support the granting of a waiver.

**C.      The Adequacy of the Searches Conducted by Agencies Other than the Marshals Service's Search for Records Relating to the Cashier's Checks**

The Court next addresses the adequacy of the searches conducted by the defendants—other than the Marshals Service—for records responsive to the plaintiff's FOIA requests.[21]  The defendants argue that "[t]aking the [Marshals Service's] search for cashiers checks separately, the initial searches for responsive records [conducted by the defendants] were otherwise reasonable and adequate because each agency used reasonable means to locate responsive records in the agency's investigative files."  Defs.' Br. at 11.  In response, the plaintiff raises several challenges to the adequacy of the defendants' searches, and the Court will discuss each of the plaintiff's challenges in turn.

"An agency fulfills its obligations under [the] FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents."  Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal quotation marks omitted).  "[C]ourt[s] appl[y] a reasonableness test to determine the adequacy of a search

---

[21] On August 16, 2021, the plaintiff filed his most recent motion for discovery.  See Pl.'s Aug. 16, 2021 Mot. for Discovery at 1.  As an initial matter, the plaintiff requests a seven-day extension nunc pro tunc for the filing of this motion because of his delayed receipt of the defendants' opposition to his motion for judicial notice and the Bureau of Prisons' COVID-19 protocol.  See id. at 1 n.1.  The defendants having opted not to oppose this request and the Court perceiving no prejudice that would result from granting it, the Court will grant the plaintiff's request for the seven-day extension of time nunc pro tunc and consider the merits of the plaintiff's request to conduct discovery.  Turning to the merits of the plaintiff's request for discovery, the Court concludes that the plaintiff has not made an adequate showing that discovery is warranted in this case.  In FOIA cases, "[d]iscovery is only appropriate when an agency has not taken adequate steps to uncover responsive documents[,]" Schrecker v. Dep't of Just., 217 F. Supp. 2d 29, 35 (D.D.C. 2002) (citing SafeCard Servs., Inc. v. Secs. & Exchange Comm'n, 926 F.2d 1197, 1202 (D.C. Cir. 1991)), and is only permitted "where[, inter alia,] a 'plaintiff has made a sufficient showing that the agency acted in bad faith[,]'"  Justice v. Internal Revenue Serv., 798 F. Supp. 2d 43, 47 (D.D.C. 2011).  In his motion, the plaintiff argues that (1) two declarations filed in his criminal case "regarding seized and forfeited cash [were] submitted in bad faith" and (2) "[t]his Court has previously expressed its displeasure with [defense] counsel's apparent lack of candor[.]"  Pl.'s Aug. 16, 2021 Mot. for Discovery at 2.  However, to the extent that these arguments demonstrate bad faith, they allege bad faith on the part of third parties, namely declarants in the plaintiff's criminal case and defense counsel, rather than bad faith on the part of the defendant agencies regarding his FOIA requests.  Cf. In re Clinton, 970 F.3d 357, 365 (D.C. Cir. 2020) (noting that "courts may order limited discovery where there is evidence—either at the affidavit stage or (in rarer cases) before—that the agency acted in bad faith in conducting the search" (emphasis added)).  Accordingly, because the plaintiff raises no arguments in his motion for discovery "that the [defendants] acted in bad faith[,]" id., in responding to his FOIA requests, see generally Pl.'s Aug. 16, 2021 Mot. for Discovery, the Court will deny the motion to permit him to conduct discovery.

methodology, consistent with congressional intent tilting the scale in favor of disclosure[.]"
Morley v. Cent. Intel. Agency, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal quotation marks
and citations omitted).  "This 'reasonableness' inquiry is necessarily 'dependent upon the
circumstances of the case.'"  Swick v. U.S. Dep't of the Army, 471 F. Supp. 3d 246, 251
(D.D.C. 2020) (quoting Davis v. Dep't of Just., 460 F.3d 92, 103 (D.C. Cir. 2006)).  "The
question is not 'whether there might exist any other documents possibly responsive to the
request, but rather whether the search for those documents was adequate.'"  Steinberg v. Dep't of
Just., 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting Weisberg v. Dep't of Just., 745 F.2d 1476,
1485 (D.C. Cir. 1984)) (emphasis in original).  "The agency must show that it made a good faith
effort to conduct a search for the requested records, using methods which can be reasonably
expected to produce the information requested."  Valencia-Lucena, 180 F.3d at 326 (internal
quotation marks and alterations omitted).  "The agency cannot limit its search to only one or
more places if there are additional sources that are likely to turn up the information requested."
Id. (internal quotation marks omitted).  "In a suit seeking agency documents . . . at the summary
judgment stage, where the agency has the burden to show that it acted in accordance with the
statute, the court may rely on a reasonably detailed affidavit, setting forth the search terms and
the type of search performed, and averring that all files likely to contain responsive materials (if
such records exist) were searched."  Chambers v. U.S. Dep't of Interior, 568 F.3d 998, 1003
(D.C. Cir. 2009) (internal quotation marks omitted).

    **1.  The Adequacy of the DEA's Search for Responsive Records**

       The Court begins by addressing the adequacy of the DEA's search.  According to the
First Wassom Declaration, in response to the plaintiff's FOIA request, the DEA searched its
"Investigative Records Filing System [("IRFS"),]" which "contains administrative, general[,] and
investigative files compiled for law enforcement purposes[,]" and was the only location at the

DEA that "would reasonably contain information responsive to the plaintiff's request."  Wassom Decl. ¶ 19 ("No other location at [the] DEA would reasonably contain information responsive to the plaintiff's request"); see id. ¶ 20 (stating that the "IRFS contains administrative, general[,] and all . . . investigative report files compiled for law enforcement purposes" (emphasis added)). The DEA states that, within IRFS, any records responsive to the plaintiff's request "would be found in Criminal Investigative Case files," which "contain reports on individuals suspected or convicted of narcotics violations, reports of arrests, information on drug possession, sales[,] and purchases by such individuals, and information on the transport of such drugs, either inside the United States, or internationally, by such individuals."  Id. ¶ 21.  Here, according to the DEA, "[t]o retrieve investigative case files and reports related to the plaintiff, a DEA pre-processor conducted a search of NADDIS," the system by which "[i]nvestigative case files maintained in IRFS are retrieved[,]" using the plaintiff's "name, social security number, and date of birth." Id. ¶ 22.

The Court concludes that the First Wassom Declaration is entitled to the "presumption of good faith" generally accorded to agency declarations.  SafeCard Servs., Inc. v. Secs. & Exch. Comm'n, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  The defendants have "provided a reasonably detailed and non-conclusory declaration describing the contents and organization of the [IRFS,]" Spurling v. U.S. Dep't of Just., 425 F. Supp. 3d 1, 12 (D.D.C. 2019) (Walton, J.), as well as the terms that the DEA used to conduct its search—namely, the plaintiff's "name, social security number, and date of birth[,]" Wassom Decl. ¶ 22.  Moreover, the DEA represents that it searched "all locations likely to contain responsive records[,]" Heffernan v. Azar, 317 F. Supp. 3d 94, 113 (D.D.C. 2018), because it searched the IRFS and "[n]o other location at [the] DEA would reasonably contain information responsive to the plaintiff's request[,]" Wassom Decl. ¶ 19.

In response, the plaintiff argues that the DEA's search was inadequate because it did not locate records related to the alleged forfeiture of two vehicles, a BMW and an Infiniti Q-45, and additional United States Treasury checks.  See Pl.'s Aug. 26, 2001 Mot. at 8;[22] see also Pl.'s Apr. 4, 2019 Mot. for Judicial Notice[23] at 3 (arguing that documents provided by the plaintiff "clearly evidence at the least withholding of additional seizure and forfeiture documents by [the] DEA and [the Marshals Service] relat[ed] to the BMW and the Infinit[i] Q-45").

_____

[22] In light of (1) the fact that the issues before the Court on remand from Cooper III are the same issues that were briefed for this Court initially, (2) the length of time since these issues were first presented to the Court, (3) the mandate to construe the pro se plaintiff's filings liberally, and (4) the plaintiff's incorporation of his prior arguments in his opposition, see Pl.'s Opp'n at 2 n.3 ("request[ing] leave [to] rel[y] on [enumerated] submissions and exhibits previously filed in this case"), the Court will consider not only the arguments presented in the plaintiff's filings submitted after Cooper III, but also the pertinent arguments presented in his earlier filings.

[23] For the following reasons, the Court will deny the plaintiff's motion for the Court to take judicial notice of the documents attached to his motion, i.e., the declarations from Agent Ray Catena, Jr., and Vicki L. Rashid; the documentation regarding the forfeiture of U.S. currency; and the records from a private Florida company, Secure-All of Florida, Inc., showing "the receipt, maintenance, cost and disposition of [a] 1998 BMW 735I[,]" Pl.'s Apr. 4, 2019 Mot. for Judicial Notice, Ex. 1 at 56.  See id.; see also id., Ex. 1.  As noted above, see supra note 1, the plaintiff's motion for judicial notice predominantly amounts to a cross-motion for summary judgment and, although the plaintiff briefly states that he "moves the Court to take judicial notice of records to aid the Court's decisional process[,]" including certain "declarations and [p]ublic [a]uction records relat[ed] to the cashier's checks and certain withholdings in records that had not been produced to [the plaintiff] . . . prior to the second appeal of this case[,]" Pl.'s Apr. 4, 2019 Mot. for Judicial Notice at 1, he presents no argument or case law to support that request.  See generally id.  Moreover, as the defendants correctly note, see Defs.' Opp'n to Pl.'s Apr. 4, 2019 Mot. for Judicial Notice at 1–2, the plaintiff has already placed copies on the docket of all of the documents appended to his motion for judicial notice.  Compare Pl.'s Apr. 4, 2019 Mot. for Judicial Notice, Ex. 1 (Catena Decl.) at 1–5, with Plaintiff's Notice of Clarification of Belated Filing of Plaintiff's Cross-Motion in Response to the Defendants' Renewed Motion for Summary Judgment and Notice of Disclosure in Support of Plaintiff's Cross-Motion and Motion to Leave to [Acc]ept Belated Filing Thereof, Ex. 2 (Catena Decl.), ECF No. 91-2.  Compare Pl.'s Apr. 4, 2019 Mot. for Judicial Notice, Ex. 1, at 6–54 (Rashid Decl.; U.S. currency forfeiture documents), with Pl.'s Sept. 13, 2013 Cross-Mot., Ex. 1, at 1–48 (same).  Compare Pl.'s Apr. 4, 2019 Mot. for Judicial Notice, Ex. 1, at 55–70 (Secure-All of Florida documents), with Pl.'s Opp'n, Ex. 2 (Tab G), at 108–22 (same).  Thus, this issue is moot because the documents have already been brought to the Court's attention and the Court will therefore deny the plaintiff's motion for judicial notice.

During the pendency of this case, the plaintiff has on several occasions re-filed documents that were previously submitted to the Court and asked the Court to take judicial notice of documents that are already on the Court's docket.  See, e.g., Pl.'s Apr. 4, 2019 Mot. for Judicial Notice; Pl.'s July 11, 2016 Mot. at 1 (asking the Court to "take judicial notice of the record" and providing a list of specific docket entries).  The Court has reviewed the already-voluminous record in this case and all of the docket entries, including, inter alia, the documents attached to the plaintiff's motion for judicial notice.  Neither the re-submission of documents already on the docket nor the submission of additional filings identifying prior docket entries assists the Court in expeditiously resolving the remaining issues in this case.  Therefore, the Court will direct the plaintiff to refrain from (1) re-filing any documents or submissions that were previously placed on the docket or (2) filing any submission having the sole purpose of identifying documents already on the docket, absent an instruction from the Court to do so.

"If an agency has made a <u>prima facie</u> showing of the adequacy of its search, [a] FOIA requester bears the burden of overcoming this presumption of good faith by 'provid[ing] countervailing evidence as to the adequacy of the agency's search.'"  <u>DaVita Inc. v. U.S. Dep't of Health & Hum. Servs.</u>, 2021 WL 980895, at *5 (D.D.C. Mar. 16, 2021) (quoting <u>Iturralde</u>, 315 F.3d at 315).  "If the plaintiff provides 'sufficient evidence to raise substantial doubt concerning the adequacy of the agency's search,' particularly when there are 'well[-]defined requests and positive indications of overlooked materials,' summary judgment is inappropriate." <u>Cooper 2012</u>, 890 F. Supp. 2d at 61–62.  Moreover, when "a FOIA requester points to 'evidence that would indicate that at the time the agency searched its files there was reason to believe that the missing documents were in those files[,]" <u>DaVita, Inc.</u>, 2021 WL 980895, at *6 (quoting <u>Ctr. for Biological Diversity v. Bureau of Land Mgmt.</u>, Civ. A. No. 17-1208 (BAH), 2021 WL 918204, at *7 (D.D.C. Mar. 9, 2021)) (alterations omitted), "the agency must explain those holes in the record, such that the Court is able to ascertain if the agency has explained the absence of the responsive records from the results of the search," <u>id.</u> (citations and alterations omitted). However, "in the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA." <u>Perry v. Block</u>, 684 F.2d 121, 127 (D.C. Cir. 1982).  And, because "particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them[,]" when an agency "fails to find an identified record or set of records through an otherwise-adequate search[,]" it need only explain "'why the record systems that it queried were the only ones likely to contain' the requested records and 'why it was unlikely that there were

additional files' or locations 'that could contain' the records.'"   DaVita, Inc., 2021 WL 980895,

at *7 (quoting Aguiar v. Drug Enf't Admin., 865 F.3d 730, 739–40 (D.C. Cir. 2017)).

      In support of his claims that the DEA's search did not account for the forfeiture records

he references, the plaintiff first provides documentation from a private Florida company,

Secure-All of Florida, Inc., showing "the receipt, maintenance, cost and disposition of [a] 1998

BMW 735I[,]" Pl.'s Opp'n, Ex. 2 (Tab G) at 108.[24]   See id., Ex. 2 (Tab G) at 110–22.   These

records show that a BMW seized by the DEA, see id., Ex. 2 (Tab G) at 118, associated with case

number G8-97-0100, see id., Ex. 2 (Tab G) at 110, was received by Secure-All of Florida on

May 18, 1998, see id., Ex. 2 (Tab G) at 108, and was sold "at a public auction[] on

November 30, 1999[,]" see id., Ex. 2 (Tab G) at 108.

      The plaintiff also identifies records reflecting an agreement between the West Palm

Beach Police Department and the DEA for the West Palm Beach Police Department to receive

ten percent of $24,210.00 in United States currency due to its participation in "a multi-agency

[DEA-]sponsored narcotics task force located in Palm Beach, Florida[.]"   Pl.'s Aug. 26, 2011

Mot., Ex. 1 at 2.   See id., Ex. 1 (Application for Transfer of Federally Forfeited Property) at 1–2

(reflecting an application filed by the West Palm Beach Police Department to obtain ten percent

of the proceeds from the forfeiture of $24,210.00 in United States currency); id., Ex. 1 (Equitable

Sharing Memorandum) at 3 (reflecting that a check totaling $2,406.60 was delivered to the DEA

in order for it to be transferred to the West Palm Beach Police Department); id., Ex. 4 (Letter

from William J. Mitchell, Special Agent in Charge, Asset Forfeiture Section, Drug Enf't Admin.,

---

[24] The plaintiff organized the documents attached to his opposition by tabs labeled Tab A through Tab J, and he refers to the material by the corresponding tab letter.   However, the Court's ECF system has sorted these tabs into two—rather than ten—exhibits.   See Pl.'s Opp'n, Ex. 1 (Tabs A through C); id., Ex. 2 (Tabs C through J). Accordingly, for ease of reference, the Court will (1) use the automatically generated page numbers assigned by the Court's ECF system; (2) refer in the text to the documents included in the tabs by ECF number and page number, e.g., ECF No. 156-1 page 10; and (3) cite the documents by referring to both the exhibit number and tab letter, e.g., Pl.'s Opp'n, Ex. 1 (Tab A) at 1; id., Ex. 2 (Tab D) at 1.

to Lieut. Ron Sowers, W. Palm Beach PD (May 22, 1998)) at 1 (referring to a "[s]haring

[r]equest filed with the [DEA]" by the West Palm Beach police department, "seeking equitable

distribution" of "$24,210.00 [in] U[nited ]S[tates] Currency"); id., Ex. 4 (Letter from Michael F.

Kane, Acting Special Agent in Charge, Miami Field Div., Drug Enf't Admin., to Chief of Police

Ric Bradshaw, W. Palm Beach Police Dep't (Aug. 28, 1999)) at 3 (stating that the DEA is

"forward[ing] to [the West Palm Beach police department]" a "United States Treasury Check[]"

for $2,406.60"); id., Ex. 4 at 5 (reflecting a United States Treasury check addressed to the West

Palm Beach police department, "seeking equitable distribution" of "$24,210.00 [in United

States] Currency"); id., Ex. 4 (Letter from Michael F. Kane, Acting Special Agent in Charge,

Miami Field Div., Drug Enf't Admin., to Chief of Police Ric Bradshaw, W. Palm Beach Police

Dep't (Aug. 28, 1999)) at 3 (stating that the DEA is "forward[ing] to [the West Palm Beach

police department]" a "United States Treasury Check[]" for $2,406.60"); id., Ex. 4 at 5

(reflecting a United States Treasury check addressed to the West Palm Beach Police Department

in the amount of $2,406.60).  The plaintiff argues that these records demonstrate that "there are

additional [ ] U[nited ]S[tates] Treasury checks and correspondence relating to those checks," as

well as "additional ATFFP[25] and [equitable sharing memoranda] relating to the BMW and

Infinity Q-45 that have yet to be disclosed[,]" Pl.'s Aug. 26, 2011 Mot. at 8 (citations omitted).

Although "[i]n certain circumstances, . . . a court may place significant weight on the fact

that a records search failed to turn up a particular document in analyzing the adequacy of a

records search[,]" Lamb v. Millennium Challenge Corp., 228 F. Supp. 3d 28, 36 (D.D.C. 2017)

(internal quotation marks omitted), the Court concludes that such circumstances are not present

---

[25] The Court is unaware of the name that the acronym "ATFFP" references and the plaintiff does not provide the full name in his filings.  Accordingly, the Court will construe the plaintiff's argument as asserting that there are additional documents pertaining to the seizure and forfeiture of the two vehicles that were not located by the defendants.

here. First, the plaintiff has provided no "countervailing evidence" of the existence of records regarding an Infiniti Q-45. <u>See generally</u> Pl.'s Aug. 26, 2011 Mot.; Pl.'s Opp'n. Accordingly, the plaintiff's speculative assertions that the defendants should have located such records fail to demonstrate that any records related to an Infiniti Q-45 "likely existed at the time of the search." <u>Lamb</u>, 228 F. Supp. 3d at 36.

Regarding the BMW and the Treasury checks, the Court agrees with the plaintiff that these records tend to suggest that the DEA would possess some records regarding the forfeiture of the BMW and the issuance of Treasury checks to the additional agencies that participated in the task force that conducted the criminal investigation of the plaintiff. In regards to the BMW, the case number listed on the Secure-All of Florida records, G8-97-0100, <u>see id.</u>, Ex. 2 (Tab G) at 110, matches a case number related to the plaintiff's name, <u>see id.</u>, Ex. 1 (Tab A) at 12 (listing the "[f]ile [n]umber" as "G8-97-0100" and the "[f]ile [t]itle" as the plaintiff's name), which suggests that the forfeiture of the BMW was related to the plaintiff's criminal case. Regarding the Treasury checks, the issuance of a check to the West Palm Beach Police Department pursuant to the equitable sharing memorandum, <u>see</u> Pl.'s Aug. 26, 2011 Mot., Ex. 1 at 5 (reflecting issuance of a check addressed to the West Palm Beach Police Department in the amount of $2,406.60 pursuant to an equitable sharing memorandum related to the seizure of $24,210 in the case number associated with the plaintiff's case), and the statement in the records from the West Palm Beach Police Department that it was "part of a multi-agency [DEA-]sponsored narcotics task force[,]" consisting of a total of nine agencies, which had an "agreement . . . that each agency would share equally in the distribution of forfeited items[,]" <u>id.</u>, Ex. 1 at 2, suggest that the other agencies in the task force also received such checks, about which some record would likely exist.

However, to the extent that the records provided by the plaintiff constitute "countervailing evidence[,]" Iturralde, 315 F.3d at 315, the DEA has adequately "explain[ed] those holes in the record" and "the absence of the responsive records from the results of [its] search," DaVita, Inc., 2021 WL 980895, at *7 (citations and alterations omitted).  Although the First Wassom Declaration does not address why the DEA's search failed to identify any forfeiture records associated with either the BMW or additional Treasury checks, see generally Wassom Decl., the DEA submitted a supplemental declaration supporting the adequacy of its search in light of the plaintiff's allegations that its initial search was inadequate, see generally Supp. Wassom Decl.  The Wassom Supplemental Declaration states that the "DEA retrieves asset forfeiture records using the [Justice Department] Consolidated Asset Tracking System[,]" id. ¶ 31, which differs from the IRFS system that was allegedly initially searched in response to the plaintiff's FOIA request, see Wassom Decl. ¶ 22.  The DEA further states that, "[f]or [the] DEA to retrieve asset forfeiture records, either the DEA Asset Forfeiture Seizure Number, or the asset name, DEA investigative case file number[,] and/or the date of the seizure is required[,]" Supp. Wassom Decl. ¶ 31, but "[t]he plaintiff failed to provide the information in his initial request to locate asset forfeiture records or specifically request asset forfeiture records in his initial request to [the] DEA[,]" id. ¶ 32; see Wassom Decl., Ex. A (Pl.'s DEA FOIA Request) at 1–5.  To the extent that the plaintiff provided his name, alias, date of birth, criminal case docket number, and passport number in his FOIA request, see id., Ex. A (Pl.'s DEA FOIA Request) at 1, the DEA represents that "[n]o system exists, to which [the] DEA has access, to retrieve asset forfeiture records by an individual's name or personal identifier" and, "[t]hus, the records were not and could not be located during the initial DEA search[,]" Supp. Wassom Decl. ¶ 32.

The Wassom Supplemental Declaration also addresses why the DEA's initial search may have failed to discover additional non-forfeiture records that were responsive to the plaintiff's request. The DEA states that it "does not maintain dossier[-]type files[,]" and therefore, because the plaintiff "is mentioned in five [ ] separate investigative case files with numerous drug and non-drug exhibits[,]" the DEA did not locate a file "unless the plaintiff's name is specifically mentioned in block 9 of the DEA Form 7 or DEA 7a." Id. ¶ 33. However, the DEA states, "[w]here it was clear that the information contained in a document related to the plaintiff, the document was processed and, where appropriate, released to the plaintiff." Id.

According to the DEA, even to the extent that it may have "liberally construed" the plaintiff's FOIA request to pertain to forfeiture records, "[n]o system exists, to which [the] DEA has access, to retrieve asset forfeiture records by an individual's name or personal identifier." Id. ¶ 32. Accordingly, based on the information provided by the plaintiff in his FOIA request, see Wassom Decl., Ex. 1 (Pl.'s DEA FOIA Request) at 1–5, any forfeiture records pertaining to either the BMW or additional Treasury checks, to the extent they exist, "could not [have] be[en] located during the initial DEA search[,]" Supp. Wassom Decl. ¶ 32. Moreover, in light of the plaintiff's failure to argue that he provided any information to the defendants that would have resulted in the discovery of records related to the forfeiture of the BMW, see Pl.'s Aug. 26, 2011 Mot.; Pl.'s Opp'n, the Court concludes that the DEA has sufficiently "explained the absence of the responsive records from the results of the search," DaVita, Inc., 2021 WL 980895, at *7.[26]

---

[26] The plaintiff also argues that a declaration filed in his criminal case by Vicki L. Rashid, "the Acting Forfeiture Counsel of the [DEA,]" see Rashid Decl. ¶ 4, "serves a[s] proof th[at] both [the] DEA and [the Marshals Service] knew or should have known of the vehicle forfeitures . . . as early as March 7, 2002, when [the plaintiff] provided this [C]ourt with [the] Rashid[ D]eclaration[,] which identified the DEA case and CATS identification numbers in[ ]which all of the seized items from [the plaintiff] were kept[,]" Pl.'s Sept. 13, 2013 Cross-Motion at 4. To the extent that the plaintiff is challenging the adequacy of the Marshals Service's search, the Court already addressed that issue in Cooper 2012 and, accordingly, will not address it again here. See Cooper 2012, 890 F. Supp. 2d at 64 (concluding that "the Marshals Service's search may not have been perfect, but it has now demonstrated that its

(continued . . .)

As "the adequacy of a FOIA search is generally determined not by the fruits of the

search, but by the appropriateness of the methods used to carry out the search[,]" Iturralde,

315 F.3d at 315, the Court declines to fault the DEA for allegedly failing to locate records that

could not have been located with the information it was provided.  Accordingly, the Court

concludes that the DEA's search for records responsive to the plaintiff's FOIA request was

adequate.[27]

### 2.  The Adequacy of the ATF's Search for Responsive Records

According to the Chambers Declaration, "[i]n an attempt to locate records responsive to

[the p]laintiff's request, [the] ATF searched the [TECS,]" because "[a]ny responsive record

_____

(. . . continued)
search was reasonable").  To the extent that this argument also challenges the adequacy of the DEA's search, the
Court concludes that the argument is not relevant to the issues currently before the Court.  The question now before
the Court is whether the defendants have "offered [an] explanation as to why an adequate search of the [DEA's]
records in response to [the plaintiff's] 1999 FOIA request would not have . . . produced[,]" Cooper I at 2 (emphasis
added), any allegedly missing records, not whether a hypothetical additional search in response to information in the
Rashid Declaration, submitted by the plaintiff in March 2002, would have located any such documents.  Although
the Court acknowledges that "it is well settled in this Circuit that the subsequent production of responsive
documents can remedy inadequate searches[,]" People for the Ethical Treatment of Animals, Inc. v. Bureau of
Indian Affs., 800 F. Supp. 2d 173, 179 (D.D.C. 2011), the plaintiff fails to identify—and the Court has been unable
to find—any case law supporting the proposition that agencies are obligated to conduct additional searches based on
new information provided by a plaintiff during litigation, particularly when the agency's initial search was adequate.
See Nolen v. Dep't of Just., 146 F. Supp. 3d 89, 95 (D.D.C. 2015) (concluding that the "additional search that the
[agency] voluntarily undertook" in response to information provided "for the first time in the Complaint . . . does not
compel the [agency], without more, to run searches as to every new piece of information contained in a complaint").
Accordingly, the Court disagrees with the plaintiff that the additional information he provided to the DEA after he
submitted his 1999 FOIA request demonstrates that the DEA did not conduct an adequate search in response to that
request.

[27] The plaintiff also argues that "[t]he fact[s] that the DEA['s and Marshals Service's] release[s] clearly do[] not
disclose[] the U[nited ]S[tates ]Treasury [c]hecks or even mention the letters evidence withholdings of at least an
additional [thirty-two] such letters and [twenty-four] U[nited ]S[tates ]Treasury checks by the DEA and [the]
Marshals Service relating to the [c]ashier's checks."  Pl.'s Apr. 4, 2019 Motion at 3.  This argument appears to
challenge the DEA's and Marshals Service's release of additional records to the plaintiff in the 2005 production.
However, the Court has already concluded that the DEA and the Marshals Service released all reasonably segregable
information regarding the documents that were produced in 2005.  See Cooper 2016, 169 F. Supp. 3d at 32, 44
(concluding that the DEA and the Marshals Service, "with one minor exception, . . . have adequately shown that
they disclosed all non-exempt portions of the documents at issue[,]" but "reserv[ing] judgment on whether the DEA
has released all reasonably segregable information from document 35"); Order at 3 (Aug. 31, 2017), ECF No. 145
(subsequently concluding that "the defendants have released to the plaintiff all reasonably segregable information
contained in" document 35).  Accordingly, the adequacy of the DEA's and the Marshals Service's search that led to
the 2005 release to the plaintiff is not one of "the unresolved issues in this case[,]" Cooper III at 2, that the Court
must address in this Memorandum Opinion.

pertaining to a criminal case in [the] ATF's computerized filing systems would be retrievable in

[the] TECS."  Chambers Decl. ¶ 10.  The ATF states that, "[w]hen there are no ATF

investigations, [its] Disclosure Division[,]" which is responsible for processing FOIA requests

made to the ATF, "cannot know which, if any, ATF office in the United States may have a

record[,]" "without additional information provided by the requester."  Id.  According to the

ATF, when it conducted its initial search of [the] TECS in response to "the identifiers supplied

by [the p]laintiff[,]" "no ATF-responsive records were located."  Id. ¶ 11.

       The ATF further states that, after the plaintiff (1) "filed a complaint and a summary

judgment motion with exhibits" as part of the litigation process which "provided additional

names of individuals related to his case[,]" (2) "stated that [it] had seized a gun[,]" and (3) "made

an allegation that the [DEA] and [Customs] forwarded documents to [it] regarding Biran

Arrandale[,]" it undertook additional efforts to retrieve any responsive records.  Id. ¶ 9.

Regarding the plaintiff's allegation that it had received documents from Customs, the ATF made

"an inquiry . . . of Customs" that resulted in Customs "locat[ing] an agent who may have had

contact with an ATF agent regarding the [p]laintiff."  Id.  After "[t]he ATF agent performed a

manual search of his office's records," he "locat[ed] one document that originated with [the]

DEA[,]" which "was referred to [the] DEA for processing[.]"  Id.  Regarding the additional

names provided by the plaintiff, the "ATF [ ] made an inquiry into the individual's name" and

"located a file under this other individual's name that contained information about a firearm

[that] was transferred from [the] DEA to [the] ATF."  Id.  Because the ATF "determined [this

file] to be relevant to the [p]laintiff's FOIA request and [his] reference to a seizure of a gun in his

[s]ummary [j]udgment [m]otion[,]" the "file, which totaled [twenty-three] pages, was

processed."  Id.

The Court concludes that, despite the efforts taken by the ATF, it has not provided sufficient information to demonstrate that its search was adequate.  Regarding the ATF's search of TECS, the ATF states that, "[u]sing the identifiers supplied by [the p]laintiff at the initial request stage, [it] . . . conducted a subject query in TECS II[,] but no ATF-responsive records were located[,]" id. ¶ 11, however, it does not provide any information about which "identifiers supplied by [the p]laintiff" were used, see generally id.  "Without a complete list of the search terms used in response to [a] FOIA request, the Court is unable to conclude that [the agency's] search was adequate."  Walston v. U.S. Dep't of Def., 238 F. Supp. 3d 57, 65 (D.D.C. 2017)

Regarding its searches in response to the information provided by the plaintiff during litigation, the ATF does describe at least some methods employed in its search in response to the additional information provided by the plaintiff.  See, e.g., Chambers Decl. ¶ 9 (stating that the ATF agent "performed a manual search of his office's records").  However, as to other methods, the ATF does not provide the requisite level of detail.  For example, although the ATF represents that it "made an inquiry into the individual's name provided in the [p]laintiff's [s]ummary [j]udgment [m]otion [e]xhibits[,]" id., it provides no indication as to either the type of "inquiry" it made or as to which individual's name—out of the multiple "additional names of individuals related to his case" that were provided by the plaintiff—was searched, see id.  See Kean v. Nat'l Aeronautics & Space Admin., 480 F. Supp. 2d 150, 157 (D.D.C. 2007) (concluding that "documents and declarations [we]re inadequate to satisfy [the] defendant's burden at summary judgment because they fail[ed] to 'describe in any detail what records were searched, by whom, and through what process[]'" (quoting Steinberg v. U.S. Dep't of Just., 23 F.3d 548, 552 (D.C. Cir. 1994)).

Moreover, the Chambers Declaration also fails to provide any statement that, in response to this additional information provided by the plaintiff during this litigation, the ATF searched all places where responsive records were reasonably likely to be found.  See Heffernan, 317 F. Supp. 3d at 113 (noting that a declaration in a FOIA case must "provide the requisite averment that all locations likely to contain responsive records were searched" (internal quotation marks omitted)).  Accordingly, the Court cannot conclude, based on the Chambers Declaration, that the ATF's search for information responsive to the plaintiff's original requests was adequate, and will direct the ATF to submit a supplemental declaration or additional Vaughn Index information regarding its search.

### 3.  The Adequacy of Customs' Search for Responsive Records

In support of the adequacy of Customs' search, the Kramer Declaration states that "[t]he usual and standard procedure in locating investigatory records pertaining to individuals and commercial entities is to conduct a search through [TECS,]" which, as explained above, is "a computer[-]based telecommunications system containing investigative information pertaining to individuals, businesses, vehicles, and aircraft" that "serves as an index to all Customs investigative records."  Kramer Decl. ¶ 22.  Customs states that, "by entering the name of the subject of interest, TECS will reference all of the case and file numbers, and denote the [r]egions, districts, or offices in which the records are maintained[,]" as well as "locate[] any records relating to things associated with the subject[,] such as aircraft, vessels, businesses, and vehicles."  Id.  In response, the plaintiff argues that Customs' declaration and Vaughn Index are inadequate because they "do[] not [ ] describe the type of search conducted, the search terms used, or whether its files were [ ] searched with regards to it[s] release."  Pl.'s Aug. 22, 2012 Reply at 14.  The Court agrees with the plaintiff.

Although the Kramer Declaration discusses the TECS and the materials that a search in the TECS usually retrieves, see Kramer Decl. ¶ 22, it does not, at any point, definitively state that Customs conducted a search in the TECS in response to the plaintiff's FOIA request to Customs, let alone provide the necessary discussion about "the method and scope of its search," Spurling v. U.S. Dep't of Just., 425 F. Supp. 3d 1, 10 (D.D.C. 2019) (Walton, J.), required by the FOIA. See generally Kramer Decl.; id., Ex. 20 (Customs Vaughn Index). Although the defendants are correct that agency declarations are "accorded a presumption of good faith[,]" SafeCard Servs., Inc., 926 F.2d at 1200; see Defs.' Br. at 11, the Court cannot speculate as to the specifics of the searches that were conducted when the declaration itself does not provide any information to that effect. Accordingly, the Court cannot agree with the defendants that Customs "searched for records using the [TECS,]" Defs.' Br. at 12, or that the Kramer Declaration "establish[es] the reasonableness and adequacy of [Customs'] initial searches[,]" id. at 14, and will direct Customs to submit an additional supplemental declaration or Vaughn Index information regarding its search in response to the plaintiff's FOIA request. See Lamb, 228 F. Supp. 3d at 36–37 (concluding that, "where the evidence raised questions about the adequacy of the search and the agencies' affidavits failed to provide sufficient detail to put those questions to rest[,] . . . the proper recourse is for the Court to require a more exhaustive account of the [ ] search" (internal quotation marks omitted)).

## D. The Withholdings in Records Produced Prior to the Plaintiff's 2005 Appeal

Turning now to the withholdings in the records produced prior to the plaintiff's 2005 appeal, the defendants represent that there are five productions to the plaintiff at issue: (1) a sixteen-page production to the plaintiff on February 16, 2000 by the ATF; (2) a thirteen-page production on January 3, 2000 by the DEA; (3) a sixty-one-page production on August 21, 2001

by the DEA; (4) a 182-page production on June 13, 2001 by Customs; and (5) a fifty-page production on July 7, 1999, by the Marshals Service.  See Defs.' Br. at 2.  The plaintiff does not appear to raise any challenge to the withholdings in the ATF's February 16, 2000 production or the Marshals Service's July 7, 1999 production, see generally Pl.'s Opp'n, but does challenge (1) the DEA's January 3, 2000 production, see id. at 3–4; (2) the DEA's June 25, 2001 production, see id. at 4; and (3) Customs' June 13, 2000 production, see id, as well as the withholding of eight pages that were referred by the ATF to the DEA, see id.  The Court will consider each of the exemptions claimed by the defendants in turn.

### 1.  Exemption 3

Exemption 3 excludes from compelled disclosure matters that are "specifically exempted from disclosure by statute."  5 U.S.C. § 552(b)(3).  Under this exemption, the defendants need only show that the statute claimed qualifies as a withholding statute and "that the withheld material falls within the statute."  Larson v. U.S. Dep't of State, 565 F.3d 857, 865 (D.C. Cir. 2009).  A statute falls under the purview of Exemption 3 only if it "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," "establishes particular criteria for withholding[,] or refers to particular types of matters to be withheld."  Morley v. Cent. Intel. Agency, 508 F.3d 1108, 1125 (D.C. Cir. 2007).

### a.  The ATF's Application of Exemption 3

The defendants represent that the "ATF applied Exemption 3 in conjunction with [the] Consolidated Appropriations Act of 20[05[28]] to protect certain firearms trace information."

---

[28] In their consolidated brief, the defendants argue that the "ATF applied Exemption 3 in conjunction with [the] Consolidated Appropriations Act of 2012 to protect certain firearms trace information."  Defs.' Br. at 4 (emphasis added).  They later argue, in a footnote, that "[t]he amendment to Exemption 3 contained in the OPEN FOIA Act of 2009, Pub. L. No. 111-83, 123 Stat. 2142, 2184, that requires statutes enacted after its enactment to cite Exemption 3 specifically in order to qualify under Exemption 3 does not apply because [the] ATF is relying on appropriations legislation passed in 2005."  Id. at 5.  It is unclear to the Court how the defendant could both "appl[y] Exemption 3

(continued . . .)

Defs.' Br. at 4; see Boucher Decl. ¶¶ 28 (attesting that the ATF "withheld information located on

the trace reports" under "Exemption 3").  Pursuant to the Consolidated Appropriations Act

of 2005,

> no funds appropriated under this or any other Act with respect to any fiscal year
> may be used to disclose part or all of the contents of the Firearms Trace System
> database maintained by the National Trace Center of the [ATF] or any
> information required to be kept by licensees pursuant to [§] 923(g) of title 18,
> United States Code, or required to be reported pursuant to paragraphs (3) and (7)
> of such [§] 923(g), to anyone other than a Federal, State, or local law enforcement
> agency or a prosecutor solely in connection with and for use in a bona fide
> criminal investigation or prosecution and then only such information as pertains
> to the geographic jurisdiction of the law enforcement agency requesting the
> disclosure and not for use in any civil action or proceeding other than an action or
> proceeding commenced by the [ATF], or a review of such an action or proceeding
> . . . and all such data shall be immune from legal process[.]

Consolidated Appropriations Act of 2005, Pub. L. No. 108–447, 18 Stat. 2809, 2859.  Variations

of this language have since appeared in subsequent appropriations acts.  See Abdeljabbar v.

Bureau of Alcohol, Tobacco, & Firearms, 74 F. Supp. 3d 158, 173 (D.D.C. 2014) (Walton, J.)

(noting that "[i]terations of [this same] language . . . have appeared in each of the consolidated

appropriations acts [from] at least 2005" to 2012).

   According to the ATF, "[t]he portions of the two pages withheld-in-part pursuant to

Exemption [3] are part of a firearms [t]race [r]eport wholly derived from the contents of the

Firearms Trace System [d]atabase referenced in [the Consolidated Appropriations Act of 2005]."

Boucher Decl. ¶ 35.  The ATF further represents that these "[t]race [r]eports are based [on] and

derived from information required to be kept by a Federal Firearms Licensee [ ] pursuant to . . .

§ 923(g)."  Id.  Therefore, under the plain language of the Consolidated Appropriations Act

---

(. . . continued)

in conjunction with [the] Consolidated Appropriations Act of 2012[,]" id. at 4, and "rely[ only] on appropriations
legislation passed in 2005[,]" id. at 5.  Therefore, the Court will assume for the purposes of its analysis that the
defendants indeed intend to "rely[ only] on appropriations legislation passed in 2005[,]" namely, the Consolidated
Appropriations Act of 2005.

of 2005, the ATF is prohibited from disclosing this information because it represents both

"part . . . of the contents of the Firearms Trace Systems database" and "information required to

be kept by licensees pursuant to [§] 923(g)[.]"  18 Stat. at 2859.  Accordingly, the Court

concludes that this information is properly withheld pursuant to Exemption 3.  See Abdeljabbar,

74 F. Supp. 3d at 176 (concluding "that the . . . language [in the Consolidated Appropriations

Act] continues to satisfy the requirements of FOIA's Exemption [3], and may be invoked by the

ATF to withhold the trace information").

### b.  The State Department's Application of Exemption 3

According to the State Department, to whom Customs referred one document, see

Grafeld Decl. ¶ 4, it applied Exemption 3 to withhold information that "relates directly to the

issuance or refusal of a visa or permit to enter the United States in a specific case."  Id. ¶ 8.  The

State Department represents that this "information, therefore, is required to be withheld under

[Exemption 3]."  Id.

As the defendants correctly note, see Defs.' Br. at 9, this Circuit has held that

8 U.S.C. § 1202(f) "expresses Congress' belief that information pertaining to visa issuances and

denials should be kept from the public[,]" and, accordingly, "Exemption 3 . . . precludes [a FOIA

requester] from circumventing that congressional directive by the use of a FOIA request."

Medina-Hincapie v. Dep't of State, 700 F.2d 737, 744 (D.C. Cir. 1983).  Accordingly, the Court

concludes that the State Department properly withheld information related to "the issuance or

refusal of a visa or permit to enter the United States in a specific case[,]" Grafeld Decl. ¶ 8,

pursuant to Exemption 3.

### 2.  Exemption 7

Exemption 7 prohibits the disclosure of

records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual[.]

5 U.S.C. § 552(b)(7).  Therefore, "Exemption 7 protects from disclosure 'records or information compiled for law enforcement purposes,' but only to the extent that disclosure of such records would cause [one of Exemption 7's] enumerated harm[s.]"  Lewis v. U.S. Dep't of Just., 867 F. Supp. 2d 1, 18 (D.D.C. 2011) (Walton, J.) (quoting id.).  The Court begins its analysis by addressing whether the defendant agencies have adequately demonstrated that the requested records were "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7), and then will turn to whether the defendants have demonstrated that "the production of such law enforcement records[,]" id., would result in any of Exemption 7's "enumerated harm[s,]" Lewis, 867 F. Supp. 2d at 18.

### a. Whether the Documents Were "Compiled for Law Enforcement Purposes"

"To show that the disputed documents were compiled for law enforcement purposes, [an agency] need only establish a rational nexus between [an] investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law."  Blackwell v. Fed. Bureau of Investigation, 646 F.3d 37, 40 (D.C. Cir. 2011).  "With respect to the threshold requirement of showing that the disputed

records were compiled for law enforcement purposes, courts 'are more deferential to the agency's claimed purpose for the particular records' when 'the agency's principal function is law enforcement,' and will 'scrutinize with some skepticism the particular purpose claimed' when 'the agency has mixed law enforcement and administrative functions.'"  Codrea v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 239 F. Supp. 3d 128, 132 (D.D.C. 2017).

Here, each of the defendant agencies—Customs, the DEA, the Marshals Service, and the ATF—are law enforcement agencies, whose "principal function is law enforcement[,]" id.  See id. (recognizing that "the ATF is a criminal and regulatory law enforcement agency" (internal quotation marks omitted)); Griffin v. Exec. Off. for U.S. Att'ys, 774 F. Supp. 2d 322, 326 (D.D.C. 2011) (recognizing that the Marshals Service has "statutory law enforcement responsibilities related to the execution of federal arrest warrants[,] the investigation of fugitives, [and] the [transport and maintenance] of federal prisoners from . . . their arrest [to final disposition]" (internal quotation marks omitted)); Lewis, 867 F. Supp. 2d at 18 (noting "the DEA's investigative jurisdiction derived from the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801, et seq., and corresponding authority to investigate incidences involving the trafficking in controlled substances" (internal quotation marks and alterations omitted)); Parker v. U.S. Immigr. & Customs Enf't, 238 F. Supp. 3d 89, 99 (D.D.C. 2017) (concluding that the threshold requirement has been met when the "records . . . were compiled as part of a criminal investigation by . . . Customs" and the defendant "characterize[d] his FOIA request as seeking [ ] records pertaining to [Customs'] prior criminal investigation of [the p]laintiff").  The Court therefore concludes that the agencies' "claimed purpose for the [ ] records" is entitled to deference.  Codrea, 239 F. Supp. 3d at 128.

Moreover, the plaintiff sought "records under the FOIA related to his arrest and prosecution[,]" Pl.'s Opp'n at 2, which are quintessential "law enforcement records within the scope of Exemption 7[,]" Lewis, 867 F. Supp. 2d at 18.  Indeed, the defendants confirm that the information in the records they located was compiled for law enforcement purposes.  See Defs.' Br. at 5 (asserting that "[a]ll of the information located by [Customs] was compiled for law enforcement purposes[,]" "[t]he same is true for [the] DEA and [the Marshals Service,]" and the "ATF also located responsive information in its criminal investigative files").  Furthermore, the declarations submitted by the defendants represent that (1) Customs withheld documents "compiled for law enforcement purposes" because "the entire case file pertains to criminal investigation, apprehension[,] and prosecution[,]"  Kramer Decl. ¶ 21; (2) "[a]ll [of] the responsive information [located by the DEA in response] to the plaintiff's request is investigatory data compiled for law enforcement purposes[,]" Wassom Decl. ¶ 24; (3) the Marshals Service "compiled [the records] pursuant to its law enforcement responsibilities" and "asserted [E]xemption 7(c) to withhold the names of federal law enforcement officers[,]" Graham Decl. ¶ 7; and (4) "the [ATF] records responsive to [the plaintiff's] FOIA request were located in a third[-]party criminal file[,]" Boucher Decl. ¶ 21.  The plaintiff has failed to respond to these contentions and makes no argument that Exemption 7 does not apply.  See generally Pl.'s Opp'n.

Given the content of the plaintiff's requests, coupled with the clear law enforcement nature of the defendant agencies and the plaintiff's failure to make any argument to the contrary, the Court concludes that the defendants have satisfied the threshold showing that the relevant records are law enforcement records for purposes of Exemption 7.  The Court will now address

whether the production of the records "would cause [one of the] enumerated harm[s]" in Exemption 7, <u>Lewis</u>, 867 F. Supp. 2d at 18.

### b. Exemption 7(C)

Exemption 7(C) protects from disclosure information in law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "To determine whether disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy for purposes of Exemption 7(C)," the Court "must balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information."[29] <u>Roth v. U.S. Dep't of Just.</u>, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (internal quotation marks omitted).

### i. The Marshals Service's Withholdings Pursuant to Exemption 7(C)

According to the Marshals Service, it produced two batches of documents to the plaintiff from which it withheld information pursuant to Exemption 7(C): (1) "[i]n response to [the] plaintiff's initial request, . . . the [Marshals Service] located [twenty-four] pages of documents pertaining to the plaintiff[,]" Bordley Supp'l Decl. ¶ 3, and "released [twenty pages] in full, and four pages . . . with limited exempt information excised and withheld pursuant to [Exemption 7(C),]" Graham Decl. ¶ 6; and (2) "[eighty-three] pages of documents . . . approved for disclosure to [the] plaintiff, with the exception of administrative markings and [the] names of [Marshals Service] employees and third-party individuals[,] which were exempt from disclosure

---

[29] In a filing made on June 26, 2006, the plaintiff refers in passing to an argument that "the standard articulated under FOIA exemption (b)(7)(C) or any other FOIA exemption does not, and should not have been[,] applied to his personal phone and rental information" in records kept by the DEA and Customs, however, neither that filing nor the prior filings cited in that filing provide any grounds for why Exemption 7(C) would not apply. <u>See</u> Pl.'s June 26, 2006 Objection at 9 (citing Pl.'s Mar. 16, 2006 Notice ¶¶ 5–6). Moreover, the plaintiff did not elaborate on this argument in his filings after <u>Cooper III</u>. <u>See generally</u> Pl.'s Opp'n; Pl.'s Apr. 4, 2019 Mot. for Judicial Notice. Without further elaboration as to why Exemption 7(C) would not apply, the Court will not consider this argument. <u>See</u> <u>Mehrbach v. Citibank, N.A.</u>, 316 F. Supp. 3d 264, 268 (D.D.C. 2018) ("[T]he Court need not assume the role of the <u>pro se</u> plaintiff's advocate.").

pursuant to [Exemption 7(C),]" Bordley Supp'l Decl. ¶ 10.  Specifically, the Marshals Service

states that it withheld information pursuant to Exemption 7(C) "to withhold the names and

telephone numbers pertaining to law enforcement officers[,] [ ] other government employees[,]

and third-party individuals." Id. ¶ 12.

   The Court concludes that there are strong privacy interests weighing against disclosure of

the withheld information.  The Marshals Service states that release of this information could

(1) "subject [the law enforcement officers and government employees] to unwarranted public

attention, harassment, and annoyance, and would thereby impair the effectiveness of these

employees in carrying out their official duties[,]" (2) "potentially cause unwarranted attention to

them in their private lives," and (3) "possibly pose a danger to their life or physical safety." Id.;

see also Graham Decl. ¶ 8 (attesting that "public disclosure of the names of [these] law

enforcement officers would subject these individuals to undue public scrutiny, criticism, and

harassment[,] and would therefore interfere with the effective performance of official duties and

in conducting their private lives").  Regarding the names of the third parties, the Marshals

Service states that "[r]elease of this information could expose these individuals to unnecessary

public attention, criticism, harassment[,] and embarrassment." Supp. Bordley Decl. ¶ 13.

"Courts in this Circuit have repeatedly recognized the 'strong interest' of individuals, whether

they be suspects, witnesses, or investigators, 'in not being associated unwarrantedly with alleged

criminal activity.'" Dillon v. U.S. Dep't of Just., 444 F. Supp. 3d 67, 99–100 (D.D.C. 2020)

(quoting Fitzgibbon v. Central Intel. Agency, 911 F.2d 755, 767 (D.C. Cir. 1990)).  Moreover,

the plaintiff presents no argument that refutes these representations.  See generally Pl.'s Opp'n.

   Against these strong privacy interests, the Court must weigh "citizens' right to be

informed about what their government is up to." Id. at 95.  For purposes of this analysis, "the

requester carries the burden of showing both (1) that the 'public interest sought to be advanced is a significant one' that is 'more specific than having the information for its own sake' and (2) that the information sought is 'likely to advance that interest.'"  Id. (quoting Nat'l Archives & Recs. Admin. v. Favish, 541 U.S. 157, 172 (2004)).  Although the plaintiff presents no explicit argument why the "public interest sought to be advanced is a significant one[,]" Favish, 541 U.S. at 172, see generally Pl.'s Opp'n, he does argue that the requested information will demonstrate impropriety by the defendants in their criminal investigation and prosecution of him, see, e.g., Pl.'s Opp'n at 6 (arguing that "no one, neither [the] DEA nor the [Marshals Service] has explain[ed] why the DEA agent's sworn testimony about the seized cash in this case that was converted into cashier's checks by First Union Bank in early November 1997, produced cash deposits into Nation's Bank [four] weeks later and cash forfeit[ures] months after that" (internal citations omitted)); Pl.'s July 16, 2007 Cross-Motion at 3 n.2 (arguing that this information will demonstrate that "the mon[ie]s confiscated in his [criminal] case w[ere] neither documented nor placed in[]to evidence by the DEA and [Marshals Service] in order to 'cover up' the DEA agent's perjured testimony in reckless disregard of [the] truth"); see also Cooper 2003 (concluding that the plaintiff "is still without evidence to demonstrate that government agents acted illegally in the course of their investigation and prosecution of him"); Cooper 2005 at 2 (noting that the plaintiff is seeking to "uncover[] documents that he believes will prove that the investigation that led to his conviction was illegal").

"[W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties," a "requester must produce evidence that would warrant a belief by a reasonable person that the alleged [g]overnment impropriety might have occurred."  Favish,

541 U.S. at 174.  From the Court's review of the plaintiff's filings in this case, it appears that he argues that the requested documents will demonstrate improprieties with the Marshals Service's handling of the money that was confiscated during the agencies' investigation of him.  See Pl.'s Opp'n at 6 (arguing that "no one, neither [the] DEA nor the [Marshals Service] has explain[ed] why the DEA agent's sworn testimony about the seized cash in this case that was converted into cashier's checks by First Union Bank in early November 1997, produced cash deposits into Nation's Bank [four] weeks later and cash forfeit[ures] months after that" (internal citations omitted)).  The plaintiff identifies testimony allegedly from his criminal trial, see Pl.'s Opp'n, Ex. 2 (Tab E) at 39 (in a letter from Special Assistant United States Attorney Joseph A. Pixley to Gerry Auerbach, Acting General Counsel, Marshals Service, noting that "[d]uring [the plaintiff's] trial, a DEA agent (probably Ray Catena) testified that cash was seized from [the plaintiff], and then converted into [a] cashier's check to the [ ] Marshals Service"), in which a DEA agent states that, after he confiscated the money from a confidential informant, he "[p]ut it in a heat[-]sealed envelope and[,] later on during the week[, he] brought it to the bank, where [the DEA] has an agreement with the bank that counts [the DEA's] money and [ ] make[s] it into a cashier's check to the [ ] Marshals Service, [to] who[m] then [the DEA agent] turn[s] the check over . . . for forfeiture proceedings."  Id., Ex. 2 (Tab E) at 41.

        The plaintiff then identifies the three cashier's checks, in the amounts of $5,800, $24,210, and $1,500, that were provided to him by the Marshals Service in the 2005 production, see id., Ex. 2 (Tab H) at 129–31 (photocopies of the checks that were produced to the plaintiff), and records from the Marshals Service recording the assets, see id., Ex. 2 (Tab H) at 132 (reflecting that $24,210 in United States Currency, identifiable as Asset No. 98-DEA-342561, was deposited into an account at Nation's Bank in Miami, Florida); id., Ex. 2 (Tab H) at 133

(reflecting that $5,800 in United States Currency, identifiable as Asset No. 98-DEA-342900, was deposited into an account at the same Nation's Bank); id., Ex. 2 (Tab H) at 134 (reflecting that $1,500 in United States Currency, identifiable as Asset No. 98-DEA-342902, was deposited into an account at the same Nation's Bank).

Finally, the plaintiff identifies a declaration filed in his criminal case by Vicki L. Rashid, in which Rashid, "the Acting Forfeiture Counsel of the [DEA,]" describes the notification and forfeiture processes undertaken by the DEA regarding these three assets.  See Rashid Decl. ¶ 4 (stating that "Asset Identification No. 98-DEA-342561 represents $24,210.00 [in] U[nited ]S[tates] Currency seized from Glenroy Craig on October 31, 1997" and describing the administrative forfeiture process regarding this asset); id. ¶ 5 (stating that "Asset Identification No. 98-DEA-342900 represents $5,800.00 [in] U[nited ]S[tates] Currency seized from Glenroy Craig on November 6, 1997" and describing the administrative forfeiture process regarding this asset); id. ¶ 6 (stating that "Asset Identification No. 98-DEA-342902 represents $1,500.00 [in] U[nited ]S[tates] Currency seized from Arnett Shakes on November 10, 1997" and describing the administrative forfeiture process regarding this asset).  Based on this evidence, the plaintiff claims that the DEA agent perjured himself because "no one . . . has explain[ed] why the DEA agent's[30] sworn testimony about the seized cash in this case that was converted into cashier's checks by First Union Bank in early November 1997, produced cash deposits into Nation's Bank [four] weeks later and cash forfeit[ures] months after that[.]"  Pl.'s Opp'n at 6 (internal citations omitted)).

---

[30] It appears that the plaintiff is referring to DEA Agent Ray Catena, Jr.  See Pl.'s Opp'n, Ex. 2 at 39 (in a letter from Special Assistant United States Attorney Joseph A. Pixley to Gerry Auerbach, Acting General Counsel, Marshals Service, noting that "[d]uring [the plaintiff's] trial, a DEA agent (probably Ray Catena) testified that cash was seized from [the plaintiff], and then converted into [a] cashier's check to the [ ] Marshals Service").

The Court concludes that the evidence proffered by the plaintiff fails to "warrant a belief by a reasonable person[,]" Favish, 541 U.S. at 174, that any improprieties occurred regarding the three assets seized that were converted into cashier's checks.  Rather, the evidence identified by the plaintiff shows that the DEA agent, upon seizing the three assets, followed the agency's usual practice of taking it to "the bank that counts [the DEA's] money and [ ] make[s] it into a cashier's check to the [ ] Marshals Service," and then "turn[ing] the check over [to the Marshals Service] for forfeiture proceedings."  Pl.'s Opp'n, Ex. 2 (Tab E) at 41.  As reflected on the cashier's checks, this bank was First Union, and the checks were issued by First Union on November 13, 1977.  See id., Ex. 2 (Tab H) at 129–31.  Then, according to the Marshals Service records that were produced to the plaintiff, on December 17, 1997, the Marshals Service took custody of the three assets, which were subsequently stored at Nation's Bank.  See id., Ex. 2 (Tab H) at 132–34.  Finally, according to the Rashid Declaration, the DEA followed the administrative forfeiture processes for all three assets, including conducting "a legal review of the evidence that existed to seize" the three assets; "sen[ding] written notice of th[e] seizure[s] by certified mail" to the individuals from whom the assets were seized; publishing notice of the seizures and information as to how "to contest the forfeiture action" "in the USA TODAY, a newspaper of general circulation in the Southern District of Florida[;]" and, "after there had not been any properly executed claim received, and after the time limit for filing [a] claim [had] expired," forfeiting the amounts "to the United States pursuant to Title 19, U.S.C., Section 1609[.]"  Rashid Decl. ¶¶ 4–6.

This evidence demonstrates that (1) the government agents involved in this case followed their agencies' usual practices, (2) the seized assets were transferred from the DEA to the Marshals Service, who deposited the First Union cashier's checks into an account at Nation's

Bank, and (3) the assets were properly administratively forfeited to the government.  Contrary to

the plaintiff's argument that this information demonstrates that "the mon[ie]s confiscated in his

[criminal] case w[ere] neither documented nor placed in[]to evidence by the DEA and [Marshals

Service] in order to 'cover up' the DEA agent's perjured testimony in reckless disregard of [the]

truth[,]" Pl.'s July 16, 2007 Cross-Motion at 3 n.2, the evidence actually shows that the money

was documented by the Marshals Service, see Pl.'s Opp'n, Ex. 2 at 132–34, and reflects no

inconsistencies, let alone perjury, in the DEA agent's testimony at the plaintiff's criminal trial.

The "[p]laintiff's recounting of a litany of allegedly suspicious circumstances lacks any

substantiation and thus fails to meet the demanding Favish standard" because the plaintiff's

"'evidence' does not directly implicate a law enforcement official in any unlawful act" and his

"circumstantial evidence is similarly lacking: simply put, conjecture of wrongdoing is not the

'meaningful evidentiary showing' that Favish demands."  King & Spalding LLP v. U.S. Dep't of

Health & Hum. Servs., 330 F. Supp. 3d 477, 499 (D.D.C. 2018) (internal quotation marks and

alterations omitted).  Accordingly, the Court fails to perceive any showing of impropriety on the

part of the defendants, let alone evidence "warrant[ing] a belief by a reasonable person[,]"

Favish, 541 U.S. at 174, that the government had acted inappropriately.  See King & Spalding,

330 F. Supp. 3d at 499 (concluding that although the plaintiff FOIA requester in that case

"creatively w[o]ve[] together a host of disparate facts to paint a portrait of government

wrongdoing, none of its evidence 'warrant[ed] a belief by a reasonable person that the alleged

[g]overnment impropriety might have occurred'" (quoting Favish, 541 U.S. at 174)).

Moreover, even assuming that the plaintiff's evidence rose to the level of "warrant[ing] a

belief by a reasonable person[,]" id., that the money confiscated in his criminal case was not

documented or that a DEA agent gave perjured testimony about the money, the plaintiff fails to

identify how "the names and telephone numbers pertaining to law enforcement officers[,] [ ]
other government employees[,] and third-party individuals" that were withheld by the Marshals
Service pursuant to Exemption 7(C), Suppl. Bordley Decl. ¶ 12, will demonstrate this alleged
malfeasance.  See generally Pl.'s Opp'n.  See Humane Soc'y Intl. v. U.S. Fish & Wildlife Serv.,
394 F. Supp. 3d 67, 78 (D.D.C. 2019) (concluding that the Humane Society "ha[d] not
demonstrated a public interest in the disclosure of [ ] individuals' names that outweighs the
privacy interests at stake[,]" in part because the Humane Society's evidence of government
impropriety did not "have much to do with [the Humane Society's] purported need for the names
of the[] individuals").

Accordingly, the Court concludes that the plaintiff has not met his burden to demonstrate
that the public interest outweighs the strong privacy interests present in the information withheld
by the Marshals Service pursuant to Exemption 7(C).

ii.   **The DEA's Withholdings Pursuant to Exemption 7(C)**[31]

According to the First Wassom declaration, the DEA produced three batches of
documents to the plaintiff from which it withheld information pursuant to Exemption 7(C):
(1) its January 3, 2000 production of thirteen pages, see Wassom Decl. ¶ 11; (2) its August 21,
2001 production from the plaintiff's "related files" withholding six pages in their entirety, see id.
¶ 18; and (3) its August 21, 2001 production of "portions of [twenty-three] pages pursuant to
[the] DEA's referral to [Customs] for consultation[,]" see id. ¶ 17 (noting that Customs returned

---

[31] The Court notes that, in its consolidated brief, the defendants do not present any argument that the DEA
appropriately applied Exemption 7(C).  See Defs.' Br. at 6 (arguing that the Marshals Service, Customs, and the
ATF "appropriately applied Exemption 7(C)[,]" without any mention of the DEA's application of Exemption 7(C)).
However, in light of the clear evidence in the First Wassom Declaration that the DEA did apply Exemption 7(C) to
its January 3, 2000, and August 21, 2001 productions, see Wassom Decl. ¶¶ 11, 17–18, and the mandate in
Cooper III to address "the withholdings in records produced to [the plaintiff] prior to [his] second appeal[,]"
Cooper III at 1, which would include the DEA's withholdings as to Exemption 7(C), the Court will sua sponte
address the propriety of the DEA's application of Exemption 7(C).

the referral to the DEA "with information withheld pursuant to[,]" <u>inter alia</u>, Exemption 7(C));

<u>id.</u> ¶ 18 (noting the release of the documents to the plaintiff).  The DEA states that, in these

documents, it withheld information regarding "names, addresses[,] and other identifying

information which would reveal the identity of and disclose personal information about

individuals who were involved or associated with the plaintiff[,]" <u>id.</u> ¶ 41, as well as "[t]he

identities of government employees (including DEA employees and Special Agents) and

innocent third parties[,]" <u>id.</u> ¶ 42.

      As it concluded regarding the personal information withheld from the Marshals Service's

productions, the Court concludes that there are strong privacy interests weighing against

disclosure of the withheld information.  As the DEA states, these "individuals have a privacy

interest in their identities in light of their association with an individual who was convicted of a

drug offense" and "[r]elease of the information would reveal nothing about government

operations or activities."  <u>Id.</u> ¶ 41.  Moreover, according to the DEA, "[r]eleasing their identities

and information pertaining to these individuals could imply that otherwise innocent persons are

involved in illicit activities or would place each of these persons in such a position that they may

suffer undue invasions of privacy, harassment[,] and humiliation from disclosure of their

identities in a criminal law enforcement investigatory file."  <u>Id.</u> ¶ 42.  As noted earlier, "[c]ourts

in this Circuit have repeatedly recognized the 'strong interest' of individuals, whether they be

suspects, witnesses, or investigators, 'in not being associated unwarrantedly with alleged

criminal activity.'"  <u>Dillon</u>, 444 F. Supp. 3d at 99–100 (quoting <u>Fitzgibbon v. Cent. Intel.</u>

<u>Agency</u>, 911 F.2d 755, 767 (D.C. Cir. 1990)).  Moreover, the plaintiff presents no argument to

the contrary.  <u>See generally</u> Pl.'s Opp'n.

Against this strong privacy interest, the Court weighs the same public interest as the plaintiff asserts in regards to the Marshals Service, see supra Section III.D.2.b.i, namely, the government's alleged improprieties regarding the money seized from the plaintiff in conjunction with his criminal case.  See Pl.'s Opp'n at 6 (arguing that "no one, neither [the] DEA nor the [Marshals Service] has explain[ed] why the DEA agent's sworn testimony about the seized cash in this case that was converted into cashier's checks by First Union Bank in early November 1997, produced cash deposits into Nation's Bank [four] weeks later and cash forfeit[ures] months after that" (internal citations omitted)).  For the same reasons expressed above, see supra Section III.D.2.b.i, the Court concludes that the plaintiff has not met his burden of producing "evidence that would warrant a belief by a reasonable person that the alleged [g]overnment impropriety might have occurred[,]" Favish, 541 U.S. at 174.  Accordingly, the Court concludes that the plaintiff has not met his burden to demonstrate that the public interest outweighs the strong privacy interests present in the information withheld by the DEA pursuant to Exemption 7(C).

### iii.    Customs' Withholdings Pursuant to Exemption 7(C)

According to the Kramer Declaration, Customs produced two batches of documents to the plaintiff from which it withheld information pursuant to Exemption 7(C): (1) three TECS records,[32] see Kramer Decl. ¶ 10; and (2) "182 pages of documents[,]" of which 179 pages were released with redactions[,]" id. ¶ 17.  Customs states that, in these documents, it withheld information regarding "the names of Customs [o]fficers, local law enforcement officers, [and] the names of third parties of investigatory interest to Customs[,]" id. ¶ 24, as well as "[t]he

---

[32] The Kramer Declaration notes that Customs informed the plaintiff that there were "four [ ] TECS records responsive to his request[,]" but that "[t]hree of the[se] TECS records were provided to [the plaintiff], with certain portions withheld pursuant to exemptions from disclosure . . . (b)(7)(C) of the FOIA."  Kramer Decl. ¶ 10.

identities of Customs clerical personnel" and "the names and identifying data for suspects []or the subject of Customs investigations[,]" id. ¶ 27.

As it did regarding the similar information withheld by the Marshals Service and the DEA, see supra Sections III.D.2.b.i–ii, the Court concludes that there are strong privacy interests weighing against disclosure of this information. The Kramer Declaration states that Customs' redactions pursuant to Exemption 7(C) were intended to (1) "protect the identities of Customs [o]fficers responsible for conducting and[] supervising the investigative activities reported in the documents[,]" id. ¶ 25; (2) protect "Customs clerical personnel" from "becom[ing] targets of harassing inquiries for unauthorized access to the information if their identities were released[,]" id. ¶ 26; (3) protect the subjects of Customs investigations from "derogatory inferences to be made" from the fact that they are under investigation, id. ¶ 27; and (4) prevent subjects of Customs investigations from learning that they are under investigation and thereby "giving the individual the opportunity to minimize the risk of arrest by allowing the individual time to avoid detection and impede apprehension[,]" id. The Court reiterates that "[c]ourts in this Circuit have repeatedly recognized the 'strong interest' of individuals, whether they be suspects, witnesses, or investigators, 'in not being associated unwarrantedly with alleged criminal activity.'" Dillon, 444 F. Supp. 3d at 99–100 (quoting Fitzgibbon, 911 F.2d at 767). Moreover, the information withheld by Customs—the identities of its officers, clerical personnel, and investigatory subjects—is information of a "personal nature" that entails a "substantial privacy interest[.]" Chase v. U.S. Dep't of Just., 301 F. Supp. 3d 146, 155 (D.D.C. 2018).

The plaintiff fails to identify any public interest or government impropriety that could outweigh this "strong privacy interest[,]" Dillon, 444 F. Supp. 3d at 1000. To the extent that he relies on the same alleged government misconduct discussed above, see supra

Sections III.D.2.b.i–ii, these allegations demonstrate, at best, actions of DEA and Marshals

Service personnel.  The plaintiff makes no argument and—more importantly under <u>Favish</u>, <u>see</u>

541 U.S. at 172—presents no evidence to support an allegation that Customs officials took any

action regarding the money that was seized during the investigation.  <u>See generally</u> Pl.'s Opp'n.

Because the plaintiff fails to provide any argument that "the information at issue has anything to

do with public employees' job performance[,]" <u>Dillon</u>, 444 F. Supp. 3d at 98, the Court "'need

not linger over the balance' between the agency's asserted privacy interests in the requested

material" and any public interest, <u>id.</u>; <u>see id.</u> at 98–99 ("[S]omething, even a modest privacy

interest, outweighs nothing every time.").  Accordingly, the Court concludes that the plaintiff has

not met his burden to demonstrate that a public interest outweighs the strong privacy interests

present in the information withheld by Customs pursuant to Exemption 7(C).

### iv.    The ATF's Withholdings Pursuant to Exemption 7(C) [33]

The Chambers Declaration states that the ATF applied Exemption 7(C) to "protect the

names of law enforcement officers and third parties, along with their identifying information."

Chambers Decl. ¶ 13.  As it did with the Marshals Service's, the DEA's, and Customs' similar

redactions, <u>see supra</u> Sections III.D.2.b.i–iii, the Court again concludes that there is a substantial

privacy interest weighing in favor of the withholding of this information.  <u>See</u> <u>Chase</u>,

301 F. Supp. 3d at 155 (noting that information of a "personal nature[,]" like names and

---

[33] The defendants argue in their consolidated brief that the "Court should uphold [the] ATF's application of Exemption 7(C)[,]" Defs.' Consolidated Br. at 6, and cite to a paragraph in the Chambers Declaration where the ATF represents that "[t]his exemption was used to protect the names of law enforcement officers and third parties, along with their identifying information[,]" Chambers Decl. ¶ 13.  However, earlier in that declaration, when discussing its production to the plaintiff and the redactions in that production, the ATF represents that "[sixteen] pages were partially released by [a] letter dated February 16, 2000" that "stated [ ] the reasons why some information from these [sixteen] pages was withheld under FOIA Exemptions (b)(2) and (b)(7)(A)."  <u>Id.</u> ¶ 9.  The ATF does not state that any redactions were made pursuant to Exemption 7(C).  <u>See generally id.</u>  Nonetheless, in light of the ATF's statement that it applied Exemption 7(C) "to protect the names of law enforcement officers and third parties, along with their identifying information[,]" <u>id.</u> ¶ 13, and the defendants' argument that "the Court should uphold [the] ATFs application of Exemption 7(C)[,]" Defs.' Consol. Br. at 6, the Court will address the application of Exemption 7(C) by the ATF.

identifying information, entails a "substantial privacy interest"); Dillon, 444 F. Supp. 3d at 99–
100 ("Courts in this Circuit have repeatedly recognized the 'strong interest' of individuals,
whether they be suspects, witnesses, or investigators, 'in not being associated unwarrantedly
with alleged criminal activity.'" (quoting Fitzgibbon, 911 F.2d at 767)).

        As the Court concluded above regarding Customs' withholdings pursuant to
Exemption 7(C), see supra Section III.D.2.b.iii, it concludes that the plaintiff fails to present any
public interest that could outweigh this "strong privacy interest[,]" Dillon, 444 F. Supp. 3d
at 1000.  To the extent that the plaintiff relies on the same alleged government misconduct
discussed above, see supra Section III.D.2.b.i–iv, these allegations demonstrate, at best, actions
with regards to DEA and Marshals Service personnel.  The plaintiff makes no argument—and,
more importantly under Favish, see 541 U.S. at 172, presents no evidence to support an
allegation—that ATF personnel took any action regarding the money that was seized during the
investigation.  See generally Pl.'s Opp'n.  As concluded already, because the plaintiff fails to
contend that "the information at issue has anything to do with public employees' job
performance[,]" Dillon, 444 F. Supp. 3d at 98, the Court "'need not linger over the balance'
between the agency's asserted privacy interests in the requested material" and the public interest,
id.; see id. at 98–99 ("[S]omething, even a modest privacy interest, outweighs nothing every
time.").  Accordingly, the Court concludes that the plaintiff has not met his burden to
demonstrate that a public interest outweighs the strong privacy interests present in the
information withheld by the ATF pursuant to Exemption 7(C).

c.  **Exemption 7(D)**

Exemption 7(D) protects from disclosure information in law enforcement records that could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).  In other words, "Exemption 7(D) protects records or information compiled by criminal law enforcement authorities in the course of criminal investigations if their release could reasonably be expected to disclose the identity of, as well as information provided by, a confidential source."  Comput. Prof'ls for Soc. Resp. v. U.S. Secret Serv., 72 F.3d 897, 905 (D.C. Cir. 1996) (citing id.).  "Where, as here, the records at issue were compiled by criminal law enforcement authorit[ies] in the course of a criminal investigation, they are covered by Exemption 7(D) if producing the records could reasonably be expected to disclose the identity of a confidential source or information furnished by such a source."  Roth v. Dep't of Just., 642 F.3d 1161, 1184 (D.C. Cir. 2011) (internal quotation marks omitted) (citing 5 U.S.C. § 552(b)(7)(D)). "The applicability of . . . [Exemption 7(D)] in each case depends upon whether the particular source who furnished the information at issue was granted confidentiality, either expressly or by implication."  Mays v. Drug Enf't Admin., 234 F.3d 1324, 1328 (D.C. Cir. 2000) (citing Landano, 508 U.S. at 172).

Regarding implied confidentiality, although a source is not confidential under Exemption 7(D) merely because the source provides information to the government during a criminal investigation, "often the [g]overnment [will] be able to point to more narrowly defined circumstances that will support the inference."  Id. at 1329 (internal quotation marks omitted) (citing Landano, 508 U.S. at 179).  Moreover, "[t]here may well be other generic circumstances

in which an implied assurance of confidentiality fairly can be inferred." Id. (alteration in original) (internal quotation marks omitted) (citing Landano, 508 U.S. at 179). "For example, when circumstances such as the nature of the crime investigated and [the informant's] relation to it support an inference of confidentiality, the [g]overnment is entitled to [such] a presumption[,]" which would be the case when "the cooperating individual supplied information about a conspiracy to distribute crack and powder cocaine." Id. (internal quotation marks omitted) (citing Landano, 508 U.S. at 181). This presumption acknowledges "the violence and risk of retaliation that attend this type of crime." Id. The government may also show that an informant supplied confidential information about a conspiracy to distribute cocaine "by providing a sufficiently detailed explanation of the basis for the agency's conclusion." Campbell, 164 F.3d at 34.

### i.   The DEA's Withholdings Pursuant to Exemption 7(D)[34]

The First Wassom Declaration states that the DEA withheld information pursuant to Exemption 7(D) in both its January 3, 2000 and August 21, 2001 productions. See Wassom Decl. ¶ 11 (noting that of the "portions of [thirteen] pages [released] to the plaintiff" on January 3, 2000, "[i]nformation was withheld pursuant to[,]" inter alia, Exemption (b)(7)(D)); id. ¶¶ 17–18 (noting that of the DEA's review of the plaintiff's "related files[,]" "six responsive pages were . . . withheld in their entirety pursuant to[,]" inter alia, Exemption 7(D), and of the "[thirty-eight] pages [released] pursuant to [the] DEA's referral to [Customs] for consultation[,]"

---

[34] In their consolidated brief, the defendants cite to the Wassom Supplemental Declaration as support for their argument that the "DEA made limited redactions under Exemption 7(D) to protect information associated with confidential informants." Defs.' Br. at 6. But the Wassom Supplemental Declaration is intended to address the DEA's participation in the 2005 production, rather than any productions prior to the plaintiff's second appeal. See Supp. Wassom Decl. ¶ 7 (discussing the DEA's January 31, 2006 production); id. ¶ 9 (discussing the DEA's April 10, 2007 production). Because the Circuit's mandate in Cooper III requires the Court to address "the withholdings in records produced to [the plaintiff] prior to [his] second appeal[,]" Cooper III at 1, the Court will also consider the First Wassom Declaration, which describes the DEA's search and withholdings in the records released prior to the plaintiff's second appeal, see Wassom Decl., rather than just the Wassom Supplemental Declaration.

"information [was] withheld pursuant to[,]" <u>inter alia</u>, Exemption 7(D)).  The DEA states that

certain information withheld pursuant to Exemption 7(D) was information from "[c]oded

informants[,]" who "are individuals who have a continuing cooperative association with [the]

DEA" and "are expressly assured confidentiality in their identities and the information they

provide to [the] DEA."  <u>Id.</u> ¶ 45.  The DEA further states that coded informants are "assured that

their names will not be used in DEA investigative materials" and are instead "assigned an

identification code which is used in place of their name or referred to as [']CI[']."  <u>Id.</u>  The DEA

also provides a list of the information from coded informants withheld pursuant to

Exemption 7(D).  <u>See id.</u> ¶¶ 46–73.  Additionally, the DEA states that certain information was

withheld pursuant to Exemption 7(D) because it was from sources with implied confidentiality,

for whom "an inference of confidentiality" was warranted due to "the character of the crime

being investigated[] and the source's relation to the nature of the crime."  <u>Id.</u> ¶ 74.  The DEA

also provides a list describing the information from sources with implied confidentiality that was

withheld pursuant to Exemption 7(D).  <u>See id.</u> ¶¶ 76–81.

   First, the Court addresses the DEA's withholding of information related to coded

informants, for whom the DEA represents there was an express promise of confidentiality.  <u>See</u>

<u>Id.</u> ¶ 45 (stating that "[c]oded informants . . . are expressly assured confidentiality in their

identities and the information they provide to [the] DEA"); <u>see also</u> <u>id.</u> ¶¶ 46–73 (describing the

information from coded informants that was withheld by the DEA).  Pursuant to

Exemption 7(D), "in the case of a record or information compiled by a criminal law enforcement

authority in the course of a criminal investigation . . . , information furnished by a confidential

source" is exempted from disclosure.  5 U.S.C. § 552(b)(7)(D).  The information described by

the First Wassom Declaration as being from coded informants reflects that it was both

"compiled" by the DEA in the course of its investigation of the plaintiff and "furnished by" coded informants, who are "confidential sources[,]" id. See, e.g., Wassom Decl. ¶ 50 (stating that one paragraph of "a four[-]page [r]eport of [i]nvestigation, describing the arrest of the plaintiff[,]" was withheld because it "contains information from two coded informants about the activities of the plaintiff"); id. ¶ 55 (stating that "a fifteen[-]page [r]eport of [i]nvestigation containing information about [United States] currency received by a coded informant from a third party" was withheld); id. ¶ 49 (stating that "a two[-]page [r]eport of [i]nvestigation containing the debriefing of a coded informant, who provided information about his/her drug[-]trafficking interactions with the plaintiff and third parties" was withheld).  Accordingly, the Court concludes that the DEA appropriately applied Exemption 7(D) to the information from coded informants.

Second, the Court turns to the DEA's withholding of information regarding confidential informants for whom it represents that there was an implied promise of confidentiality.  The defendants argue that the Court should infer an implied promise of confidentiality due to the nature of the plaintiff's conviction.  See Defs.' Apr. 5, 2002 Mot. at 27 (arguing that the plaintiff's conviction for "conspiracy to distribute cocaine and heroin" and "arrest[] for possession of cocaine, armed robbery, possession of ammunition, and possession of an unlicensed firearm" made it "reasonable to infer that the individuals who provided information about the [p]laintiff would fear for their safety if their identities or the information they provided was revealed"); Wassom Decl. ¶ 75 (stating that "[i]t is reasonable to infer that the individuals who provided information about the plaintiff would fear for their safety if their identities or the information they provided was revealed" and that "release of the name of the sources could jeopardize DEA operations").  Consistent with the conclusion reached by this Circuit that

78

"information about a conspiracy to distribute crack and powder cocaine . . . warrant[s] an implied

grant of confidentiality for such a source[,]" Mays, 234 F.3d at 1330, the First Wassom

Declaration's representations are sufficient to demonstrate that the information from sources

with implied confidentiality withheld by the DEA was "furnished by a confidential source[,]"

5 U.S.C. § 552(b)(7)(D), and is therefore exempted from disclosure under Exemption 7(D).  See

Cooper 2016, 169 F. Supp. 3d at 40 (concluding, in regards to similar withholdings by the DEA

in the 2005 production, that "[t]hese representations more than adequately establish that the

source of the redacted information is protected by Exemption 7(D), as it is reasonable to infer

that the information provided was in connection with the DEA's drug importation and

distribution investigation of the plaintiff").

  Accordingly, and because the plaintiff raises no argument to the contrary, see generally

Pl.'s Opp'n, the Court concludes that the DEA appropriately applied Exemption 7(D) to

withhold information from coded informants and sources with implied confidentiality.

### ii. Customs' Withholdings Pursuant to Exemption 7(D)

  According to Customs, it "exempt[ed] from disclosure[,]" pursuant to Exemption 7(D),

certain information in its June 13, 2001 production of 182 pages to the plaintiff, Kramer Decl.

¶ 17, and in a report of investigation that was referred to it by the DEA, see id. ¶¶ 18–19.

Customs states that the withheld information was "supplied to [it] by a source on a confidential

basis[,]" reflects "names or other identifying information relating to that source[,]" and, if

disclosed, "would identify the source either by the name of the individual or by confidential

information furnished by the individual."  Id. ¶ 28.  Customs further states that Exemption 7(D)

"recognizes that [its] system of gathering information depends on encouraging individuals to

come forward with information to aid [ ] law enforcement efforts" and "the reality that the

identity of a source may be determined from an analysis of the information furnished by the source[,]" particularly when "the analysis is made by a knowledgeable person familiar with the facts and circumstances of the investigation."  Id.

"Violence and [the] risk of retaliation attendant to drug trafficking warrant an implied grant of confidentiality to a source who provides information to investigators."  Lasko v. U.S. Dep't of Just., 684 F. Supp. 2d 120, 134 (D.D.C. 2010).  In light of the plaintiff's conviction and his FOIA requests seeking information related to that conviction, as the Court concluded in Cooper 2016 regarding the information withheld by the DEA pursuant to Exemption 7(D), "it is reasonable to infer that the information provided was in connection with the [ ] drug importation and distribution investigation of the plaintiff."  169 F. Supp. 3d at 40.  Accordingly, and because the plaintiff makes no argument to the contrary, see generally Pl.'s Opp'n, the Court concludes that Customs appropriately withheld information that was "supplied . . . by a source on a confidential basis" and "the names or other identifying information relating to that source[,]" Kramer Decl. ¶ 28, pursuant to Exemption 7(D).

### d.  Exemption 7(E)

Exemption 7(E) protects from disclosure information in law enforcement records, the release of which

> would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions[,] if such disclosure could reasonably be expected to risk circumvention of the law[.]

5 U.S.C. § 552(b)(7)(E).  This exemption "sets a relatively low bar for the agency to justify withholding[,]" Blackwell v. Fed. Bureau of Investigation, 646 F.3d 37, 42 (D.C. Cir. 2011), specifically, "'[r]ather than requiring a highly specific burden of showing how the law will be circumvented, [E]xemption 7(E) only requires that the [agency] demonstrate logically how the

release of the requested information might create a risk of circumvention of the law[,]'" id.

(second alteration in original) (quoting Mayer Brown LLP v. Internal Revenue Serv., 562 F.3d

1190, 1194 (D.C. Cir. 2009)).

In this case, according to the defendants, Customs "applied Exemption 7(E) to protect

investigative techniques[,]" and the "ATF applied Exemption 7(E) to protect TECS and

[National Crime Information Center ("NCIC")] computer access codes and file numbers."  Defs.'

Br. at 8.  The Court will address the agencies' applications of Exemption 7(E) in turn.

### i.   Customs' Withholdings Pursuant to Exemption 7(E)

The Kramer Declaration states that Customs used Exemption 7(E) to withhold

information from its June 13, 2001 production, see Kramer Decl. ¶ 17, and its July 10, 2001

referral from the DEA, see id. ¶ 19, because the "information [ ], if released, would disclose

investigative techniques and procedures for law enforcement investigations and prosecutions or

disclose guidelines for the conduct of such law enforcement investigations or prosecutions where

disclosure could reasonably be expected to risk circumvention of the law or avoid

apprehension[,]" id. ¶ 29.

Customs states that "[d]isclosure of this information would aid violators or potential

violators to circumvent the laws and regulations and avoid detection" and "would further impair

[ ] investigators by informing and alerting violators or potential violators of the various

techniques, procedures[,] and practices that [ ] investigators may employ."  Id.; see Defs.' Br.

at 8 (arguing that "the release of investigative techniques would risk circumvention of the law

because it would allow criminals to alter or conceal their activities from law enforcement or

increase the threat to the integrity of the agencies' computer databases").  Given the "relatively

low bar" of Exemption 7(E), Blackwell, 646 F.3d at 169, Customs's explanation meets the

defendants' burden to show "how the release of the requested information might create a risk of circumvention of the law[,]" id.  Accordingly, and because the plaintiff has raised no argument to the contrary, see generally Pl.'s Opp'n, the Court concludes that Customs appropriately applied Exemption 7(E) as the basis for its withholdings.

### ii.  The ATF's Withholdings Pursuant to Exemption 7(E)

The ATF states that it applied Exemption 7(E) "to withhold the information related to TECS and NCIC computer access codes and file numbers."  Boucher Decl. ¶ 23.  According to the ATF, "[t]hese file numbers and computer codes are primarily used to store and retrieve law enforcement information[,]" and "[d]isclosure of such numbers and codes could allow individuals outside [of] the agency to . . . gain access to sensitive investigative information" or "alter or create false records[,]" which "could result in the circumvention of [the] ATF's law enforcement duties."  Id.

Again, given the "relatively low bar" that an agency must meet to withhold information pursuant to Exemption 7(E), the Court concludes that the ATF has satisfied its burden to "demonstrate logically how the release of the requested information might create a risk of circumvention of the law."  Blackwell, 646 F.3d at 42 (quoting Mayer Brown LLP, 562 F.3d at 1194; see, e.g., Shapiro v. U.S. Dep't of Just., 893 F.3d 796, 800 (D.C. Cir. 2018) (concluding that the Federal Bureau of Investigation (the "FBI") appropriately withheld "records under Exemption 7(E) on the basis that releasing them would provide information on how a database is 'searched, organized[,] and reported'" (quoting Blackwell, 646 F.3d at 42)).  Accordingly, and because the plaintiff has raised no argument to the contrary, see generally Pl.'s Opp'n, the Court concludes that the ATF appropriately applied Exemption 7(E) as the basis for its withholdings.

### iii.    Customs' Withholdings Pursuant to Exemption 2

The "DEA, [Customs], [the Marshals Service], and [the] ATF initially invoked

Exemption 2[,]" Defs.' Br. at 2, which protects from disclosure information "related solely to the

internal personnel rules and practices of an agency[,]" 5 U.S.C. § 552(b)(2), "to withhold certain

internal information, such as computer and reference codes[,]" Defs.' Br. at 2.  See Wassom

Decl. ¶¶ 37–39 (stating that "many of the pages in this case contain 'violator identifiers'

consisting of [Geographical Drug Enforcement Program [("G-DEP")] codes[35] and [Narcotic

and Dangerous Drug Information System ("NADDIS")] numbers[36,] which "are part of [the]

DEA's internal system of identifying information"); Kramer Decl. ¶ 23 (stating that Customs

withheld information pursuant to Exemption 2 "for information regarding Customs filing

system[s], record identification, case [and file] numbers, and access codes"); Chambers Decl.

¶ 12 (stating that the ATF withheld information related to "law enforcement file numbers/codes

and [TECS] and [NCIC] computer access codes"); Supp. Bordley Decl. ¶ 11 (stating that the

Marshals Service applied Exemption 2 to "internal case numbers used by investigative agencies

to link particular asset records with ongoing investigation[s] or litigation").  These

representations are confirmed by the defendants' Vaughn indices.  See generally Wassom Decl.,

Ex. L (DEA Vaughn Index); Kramer Decl., Ex. 20 (Customs Vaughn Index); Chambers Decl.,

Ex. 1 (ATF Vaughn Index); Supp. Bordley Decl. ¶ 14 (Marshals Service Vaughn Index).

However, in 2011, during the pendency of this case, the Supreme Court issued its opinion

in Milner v. Department of the Navy, 562 U.S. 562 (2011), which held that "Exemption 2,

---

[35] According to the DEA, "G-DEP . . . codes are assigned to all DEA cases and indicate the classification of the violator, the types and amount of suspected drugs involved, the priority of the investigation[,] and the suspected location and scope of criminal activity."  Wassom Decl. ¶ 39(1).

[36] According to the DEA, "NADDIS . . . numbers are multi-digit numbers assigned to drug violators and suspected drug violators known to [the] DEA."  Wassom Decl. ¶ 39(2).

consistent with the plain meaning of the term 'personnel rules and practices,' encompasses only records relating to issues of employee relations and human resources." Id. at 581.  According to the defendants, this "caus[ed] three of the agencies[,]" the Marshals Service, the ATF, and the DEA, "to review and revise their Exemption 2 withholdings[.]"  Defs.' Br. at 3.  The Marshals Service "made a supplemental release of thirty-nine [ ] pages consisting of the administrative markings and internal case numbers that were previously withheld pursuant to Exemption 2[,]" 2d Supp. Bordley Decl. ¶ 3; therefore, the Court need not consider the validity of the Marshal Service's original withholdings pursuant to Exemption 2.  The ATF and the DEA "claim[ed] other exemptions" for the withheld material, Defs.' Br. at 3; see Boucher Decl. ¶¶ 15–19 (stating that the ATF is "no longer asserting [ ] Exemption [2] to withhold any of the information previously withheld under [Exemption 2,]" but will "continue to withhold the information" pursuant to "Exemption [3]" and "Exemption [7(E)]"); Little Decl. ¶ 11 (stating that the "DEA is no longer asserting [Exemption 2] and is [instead] asserting [Exemption 7(E)] to withhold violator codes"), and the Court has already considered the validity of those exemptions either in its previous Memorandum Opinions or together with the other material withheld pursuant to those exemptions, see supra Section III.D.1.a (addressing the ATF's assertion of Exemption 3); Section III.D.2.d.ii (addressing the ATF's assertion of Exemption 7(E)); Cooper 2016, 169 F. Supp. 3d at 38 (holding that the DEA properly withheld information pursuant to Exemption 7(E) that was initially withheld pursuant to Exemption 2).  Customs, however, "failed to submit evidence about any reconsideration of its treatment of Exemption 2 after Milner."  Defs.' Br. at 3.  Despite this lack of reassessment by Customs, the defendants urge the Court to conclude that the information is properly withheld pursuant to Exemption 7(E).  See id. at 3–4.

According to Customs, it "utilized [Exemption 2] for information regarding [(1)] Customs['] filing system[s], record identification, case numbers, and access codes" and (2) "case and file numbers and other administrative markings that are used solely for the purposes of indexing, storing, locating, retrieving[,] and distributing information in the investigative files of [Customs'] Office of Investigations[.]"  Kramer Decl. ¶ 23.  According to Customs,

> [t]hese markings have no significance in and of themselves and have no bearing upon substantive information in Customs records. These numbers would not benefit the [p]laintiff nor the public if released, nor is there any genuine or significant public interest.  In addition to the fact that the numbers are used for the purpose of indexing, storing, locating, retrieving[,] and distributing information in the investigative files, some of the numbers have a dual purpose, i.e., type and location of case, whether or not subject should be subjected to close Customs inspection, and other information the disclosure of which, in the hands of a "computer hack[er]" could jeopardize the integrity of TECS.  Knowledge of this information would increase the risk of circumvention of laws and regulations, compromise the electronic records system, facilitate improper access to sensitive investigatory records, impede effectiveness of law enforcement activities, and endanger Customs['] investigatory practices and techniques. The information is predominately internal and does not relate to the [p]laintiff.  Rather it pertains to purely investigative practices, procedures[,] and techniques of the case. Furthermore, disclosure of some of the information withheld pursuant to this exemption would advise violators or potential violators of Customs law enforcement practices, procedures[,] and techniques, enabling them to circumvent the law[,] avoid detection[,] and evade apprehension.

Id.

The defendants argue that all of the information is properly withheld by Customs pursuant to Exemption 7(E) because it "is highly similar to that [information that was] re-processed by [the] DEA and other law enforcement agencies in the wake of Milner[,]" and "[c]ourts have approved law enforcement's application of Exemption 7(E) to withhold this same type of material reflecting internal file and information management[.]"  Defs.' Br. at 3–4 (citing Skinner v. Dep't of Just., 893 F. Supp. 2d 109 (D.D.C. 2012), summarily aff'd sub nom. Skinner v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, No. 12-5319, 2013 WL 3367431 (D.C.

Cir. May 31, 2013)); Miller v. U.S. Dep't of Just., 872 F. Supp. 2d 12, 29 (D.D.C. 2012);

Higgins v. Dep't of Just., 919 F. Supp. 2d 131, 150–51 (D.D.C. 2013)).

In accordance with its conclusion regarding the ATF's assertion of Exemption 7(E) to

withhold information related to TECS and NCIC access codes and file numbers, the Court

concludes that Customs properly withheld "information regarding Customs filing system[s],

record identification, case numbers, and access codes" and "case and file numbers and other

administrative markings that are used solely for the purposes of indexing, storing, locating,

retrieving[,] and distributing information in the investigative files of the [Customs'] Office of

Investigations[.]"  Kramer Decl. ¶ 23; see, e.g., Shapiro, 893 F.3d at 800 (concluding that the

FBI appropriately withheld "records under Exemption 7(E) on the basis that releasing them

would provide information on how a database is 'searched, organized[,] and reported'" (quoting

Blackwell, 646 F.3d at 42)).

### e.  Exemption 7(F)

The Court now turns to Exemption 7(F), which authorizes the withholding of information

compiled for law enforcement purposes that "could reasonably be expected to endanger the life

or physical safety of any individual[,]" 5 U.S.C. § 552(b)(7)(F).  "Unlike Exemption 7(C), which

involves a balancing test, Exemption 7(F) 'is an absolute ban against [the] disclosure of certain

information'" Pinson v. Dep't of Just., 236 F. Supp. 3d 338, 368 (D.D.C. 2017) (citations

omitted) (quoting Raulerson v. Ashcroft, 271 F. Supp. 2d 17, 29 (D.D.C. 2002)), and, "'within

limits, courts defer to the agency's assessment of danger[,]'" id. (quoting Sanchez-Alaniz v. Fed.

Bureau of Prisons, No 13-1812, 2016 WL 1222214, at *7 (D.D.C. Mar. 28, 2016)).

Exemption 7(F)'s "language is very broad" and "does not require that a particular kind of

individual be at risk of harm;" rather, "'any individual' will do."  Pub. Emps. for Env't Resp. v.

U.S. Section, Int'l Boundary & Water Comm'n, 740 F.3d 195, 205 (D.C. Cir. 2014).  "Moreover,

'[d]isclosure need not definitely endanger life or physical safety; a reasonable expectation of

endangerment suffices.'"  Pinson, 236 F. Supp. 3d at 368 (alteration in original) (emphasis in

original) (quoting Pub. Emps. for Env't Resp., 740 F.3d at 205).

According to the First Wassom Declaration, the DEA applied Exemption 7(F) in

conjunction with Exemption 7(C) to withhold "[t]he names and identities of DEA Special

Agents, Supervisory Agents, and other law enforcement officers involved in the drug

investigation of the plaintiff[.]"  Wassom Decl. ¶ 82.[37]  The DEA states that "the release of

Special Agents' identities has, in the past, resulted in several instances of physical attacks,

threats, harassment[,] and attempted murder of undercover and other DEA Special Agents."  Id.

¶ 84.  It further represents that the "DEA considers it to be within the public interest not to

disclose the identity of Special Agents so that they may effectively pursue their undercover and

investigatory assignments" and that "[p]ublic disclosure of the identities of [ ] investigatory

personnel would [therefore] have a detrimental effect on the successful operation of [the]

DEA[.]"  Id.

Although, as the defendants correctly note, "[t]he Court need not separately analyze

whether Exemption 7(F) applies if it upholds the same material being withheld under Exemption

7(C)[,]"  Defs.' Br. at 8–9 (citing Cooper 2016, 169 F. Supp. 3d at 40 n.15), even if the Court

were to separately analyze the DEA's withholdings, it would conclude that the DEA

appropriately applied Exemption 7(F).  The First Wassom Declaration, which cites the past

[37] As they did in support of the DEA's exemptions pursuant to Exemption 7(D), the defendants rely on the Wassom Supplemental Declaration as support for their argument that the "DEA applied Exemption 7(F) in conjunction with Exemption 7(C) to protect the lives and physical safety of state, local[,] and federal law enforcement personnel." Defs.' Br. at 8 (citing Supp. Wassom Decl. ¶¶ 55–58).  However, as the Court noted previously, see supra note 34, the Court will refer to both the First Wassom Declaration, which describes the DEA's search and withholdings in the records released prior to the plaintiff's second appeal, see Wassom Decl., and the Wassom Supplemental Declaration, rather than just to the Wassom Supplemental Declaration.

"physical attacks, threats, harassment[,] and attempted murder of undercover and other DEA Special Agents" that resulted from "the release of Special Agents' identities," Wassom Decl. ¶ 84, establishes that release of the identities of these officials "could reasonably be expected to endanger the life or physical safety of an[] individual[,]" 5 U.S.C. § 552(b)(7)(F). See Schotz v. Samuels, 72 F. Supp. 3d 81, 89 (D.D.C. 2014) (concluding that Exemption 7(F) "affords broad protection to the identities of individuals mentioned in law enforcement files . . . , including any individual reasonably at risk of harm" (alteration in original) (quoting Quinto v. U.S. Dep't of Just., 711 F. Supp 2d 1, 8 (D.D.C. 2010)); cf. Anderson v. Fed. Bureau of Prisons, 806 F. Supp. 2d 121, 128 (D.D.C. 2011) (concluding that the Federal Bureau of Prisons' "withholdings under Exemption 7(F) were [ ] proper" in light of an agency declaration that "release of this information could jeopardize the safety of individual(s) as it would likely result in harassment and/or retaliation, to possibly include physical assaults, directed toward individual(s) identified in the investigation" (internal quotation marks omitted)).  Accordingly, and without argument to the contrary by the plaintiff, see generally Pl.'s Opp'n, the Court concludes that the DEA appropriately withheld the information not provided to the plaintiff pursuant to Exemption 7(F).

### 3.  The Plaintiff's Counter-Arguments

The plaintiff makes numerous arguments that the defendants have not provided adequate support for their withholdings, which the Court will address in turn.

#### a.  The Plaintiff's Argument that the DEA's Vaughn Index Fails to Account for All of the Pages Processed by the DEA

The plaintiff first argues that the DEA's Vaughn Index does not account for all documents processed by the DEA in response to his FOIA requests.  See Pl.'s Opp'n at 3 & n.7; Pl.'s Aug. 22, 2012 Reply at 9–10.  Specifically, the plaintiff argues that (1) the DEA's Vaughn Index does not account for the DEA's January 3, 2000 production of thirteen pages, see Pl.'s

Opp'n at 3 n.7 (arguing that the DEA's Vaughn Index "double count[s]" pages, which "clearly confirms [that] the [DEA's V]aughn [I]ndex page itemization does not account for the DEA['s] January 3, 2000 release"); and (2) the DEA's Vaughn Index does not account for the thirty-nine pages that were referred to Customs, see Pl.'s Aug. 22, 2012 Reply at 9 (arguing that "the DEA has not met its duty under the FOIA because it has not accounted for documents which were referred and returned to [it] by [ ] Customs for review and processing").

Regarding whether the DEA's Vaughn Index accounts for the DEA's January 3, 2000 production, the plaintiff is correct to the extent that the pagination of the DEA's Vaughn Index is difficult to follow. See, e.g., Wassom Decl., Ex. L (DEA Vaughn Index) at 1–12, ECF No. 175-4 at 92–103[38] (repeating page numbers 1 through 6 twice); id. ¶ 27 (explaining that the DEA's Vaughn Index has "two [sets of] pages numbered 1 through 6" because, "[w]hen the related files were processed, the responsive pages from the related files were numbered 1 through 6"). However, the First Wassom Declaration clearly states that "[a] total of 288 pages of responsive material was retrieved and reviewed by [the DEA] pursuant to the plaintiff's FOIA requests[,]" of which "236 pages were withheld from the plaintiff in their entirety and "[p]ortions of [fifty-two] pages were released to the plaintiff." Id. ¶ 25. Despite the incorrect pagination of several pages in the DEA's Vaughn Index—including but not limited to the pages numbered 1 through 6—the DEA's Vaughn Index accounts for 288 pages, which matches the First Wassom Declaration's statement that the DEA processed 288 pages, see id. Accordingly, the Court

---

[38] The DEA's Vaughn Index contains page numbers at the top of each page (the "internal page numbers"), in addition to the automatically generated page number assigned by the Court's ECF system to the defendants' filing of the Wassom Declaration and attached exhibits, including the DEA's Vaughn Index, at ECF No. 175-4. Because the defendants refer to the DEA's Vaughn Index by the internal page numbers, see, e.g., Defs.' Reply at 8, the Court will also refer to those numbers when discussing individual pages in the DEA's Vaughn Index. However, for ease of reference, in its citations, the Court will also provide the Court's automatically generated page number. See, e.g., Wassom Decl., Ex. L (DEA Vaughn Index) at 58, ECF No. 175-4 at 153.

disagrees with the plaintiff that the DEA's <u>Vaughn</u> Index does not account for all pages processed by the DEA.

Regarding whether the DEA's <u>Vaughn</u> Index accounts for the thirty-nine pages referred to Customs, the plaintiff argues that "the DEA's <u>Vaughn</u> [I]ndex [ ] state[s] that a total of thirty-nine [ ] pages [were] referred to Customs for processing," but "Custom[s'] <u>Vaughn</u> [I]ndex [ ] only account[s] for 182 pages released by its Miami, Florida field office on June 13, 2001" and "only acknowledged its receipt of the [thirty-nine] pages of documents which it had returned to [the] DEA to take whatever action [the DEA] deemed appropriate." Pl.'s Aug. 22, 2012 Reply at 9 (citing Kramer Decl. ¶¶ 17–19; Wassom Decl. ¶¶ 16–17) (underline added). The plaintiff further argues that the "DEA admitted that it had in fact referred a total of thirty-nine [ ] pages to Custom[s] and that deletions from those documents have not been defended in its <u>Vaughn</u> [I]ndex." <u>Id.</u> at 10 (underline added) (citing Wassom Decl. ¶ 25).

The plaintiff misrepresents the First Wassom Declaration. In the First Wassom Declaration, the DEA states that, "[r]egarding the [thirty-nine] pages [that] were referred to [Customs] for consultation, only [the] DEA's redactions and exemptions are included in the [DEA's] <u>Vaughn</u> [Index]." Wassom Decl. ¶ 25. Therefore, according to the First Wassom Declaration, <u>see id.</u>, the withholdings <u>by the DEA</u> have "been defended in its <u>Vaughn</u> [I]ndex[,]" Pl.'s Aug. 22, 2012 Reply at 10 (underline added). Moreover, as the defendants correctly note in their reply, <u>see</u> Defs.' Reply at 12, at least some of the withholdings by Customs appear to have been addressed in the Kramer Declaration.[39] <u>Compare, e.g.</u>, Kramer Decl., Ex. 20 (Customs

---

[39] The DEA and Customs state that thirty-nine pages were referred to Customs by the DEA and that thirty-eight of those thirty-nine pages were produced to the plaintiff as part of the August 21, 2001 production. <u>See</u> Wassom Decl. ¶¶ 16–19; Kramer Decl. ¶¶ 18–19. In Tab C, the plaintiff has included thirty-four pages that contain handwritten notations of claimed exemptions, <u>see</u> Pl.'s Opp'n, Ex. 1 (Tab C) at 49–83, with the first page stating "U.S. Customs Service Consultation[,]" <u>see id.</u>, Ex. 1 (Tab C) at 49.

Vaughn Index) ¶ 45 (referring to a report of investigation prepared on February 11, 1998, with exemptions pursuant to Exemptions 2, 7(C), and 7(E)), with, e.g., Pl.'s Opp'n, Ex. 1 (Tab C) at 49, (noting "U.S. Customs Service [c]onsultation" and exemptions pursuant to 2, 7(C) and 7(E) regarding a report of investigation prepared on February 11, 1998).  Therefore, without any evidence from the plaintiff demonstrating that "deletions from [the thirty-nine documents referred to Customs by the DEA] have not been defended[,]" Pl.'s Aug. 22, 2012 Reply at 10, the Court disagrees with the plaintiff that Customs and the DEA have not included the withholdings from the DEA's thirty-nine page referral to Customs in their Vaughn indices.

> **b.  The Plaintiff's Argument that the DEA's Vaughn Index Does Not Present Authority for the Withholdings in the DEA's January 3, 2000 Production**

Second, the plaintiff argues that the First Wassom Declaration and the DEA's Vaughn Index do not present "the authority for withholding the deleted portions of the [thirteen] pages" produced by the DEA on January 3, 2000, thereby "depriving [him] and the Court of a meaningful opportunity [to] evaluate the soundness of the exemption claims."  Pl.'s Opp'n at 3–4.  To support this argument, the plaintiff has presented documents that he represents are the pages that the DEA produced to him on January 3, 2000.  See id., Ex. 1 (Tab A) at 6–18; id. at 3 (stating that "[o]n January 3, 2000[, the] DEA released [thirteen] pages" and citing to Tab A).  In response, the defendants argue that "[a]lthough the [First Wassom Declaration and the Wassom Supplemental Declaration] do not trace the pages for the various groups of records released in part and withheld in full, . . . the [two Wassom] declaration[s] cover[] all or nearly all of the records discussed[.]"  Defs.' Reply at 7.  To support their argument, the defendants have provided a chart in which they connect pages provided by the plaintiff in Tab A to his opposition to entries in the DEA's Vaughn Index.  See id. at 8–14.

Although the DEA's chart indicates that the DEA's <u>Vaughn</u> Index accounts for most of the documents in Tab A, for the reasons that follow, the defendants' representations regarding certain documents in Tab A are insufficient to support the conclusion that the DEA has accounted for all of these documents in its <u>Vaughn</u> Index.  Thus, the Court will require the defendants to submit a supplemental declaration or <u>Vaughn</u> Index regarding these documents.

### i.    Row 5 of the Defendants' Chart

First, on row 5 of the defendants' chart, they identify page 58 of the DEA's Vaughn Index as pertaining to page 10 of ECF No. 156-1.[40]  <u>See</u> Defs.' Reply at 8; <u>see also</u> Wassom Decl., Ex. L (DEA <u>Vaughn</u> Index) at 58, ECF No. 175-4 at 153.  However, in the "Notes" column, the defendants state, "THIS DOESN'T LOOK LIKE THE SAME RECORD[.]"  <u>Id.</u> (capitalization in original).  Upon further review of both page 58 of the DEA's <u>Vaughn</u> Index and page 10 of ECF No. 156-1, the Court cannot reconcile either the defendants' representation in their chart that page 58 of the DEA's <u>Vaughn</u> Index corresponds to ECF No. 156-1 page 10, or their note that it "does[ ]n[o]t look like the same record[.]"  <u>Id.</u> (capitalization omitted).  On the one hand, the three redactions are all contained on the bottom half of the page, <u>see</u> Pl.'s Opp'n, Ex. 1 (Tab A) at 10, which does not correspond to <u>Vaughn</u> Index page 58's statement that material was deleted from the "whole page[,]" Wassom Decl., Ex. L (DEA Vaughn Index) at 58, ECF No. 175-4 at 153.  On the other hand, the three redactions omit sections of text in their entirety, <u>see</u> Pl.'s Opp'n, Ex. 1 (Tab A) at 10, which leaves no context for the Court to review whether the redactions are of "suspect name(s) [and] investigative details[,]" as the DEA's

---

[40] The Court notes that the defendants use page numbers for the tabs attached to the plaintiff's opposition that correspond to the page numbers automatically generated by the Court's ECF system.  As noted above, <u>see</u> <u>supra</u> note 24, for ease of reference, the Court will also refer to the pages in all of the plaintiff's exhibits attached to his opposition, including Tab A, according to the page numbers automatically generated by the Court's ECF system, <u>e.g.</u>, "ECF No. 156-1 page 10[.]"

Vaughn Index indicates, see Wassom Decl., Ex. L (DEA Vaughn Index) at 58, ECF No. 175-4 at 153.  Accordingly, the Court is without a basis to conclude that page 58 of the DEA's Vaughn Index pertains to ECF No. 156-1 page 10.  Moreover, if ECF No. 156-1 page 10 is not the same record as page 58 of the DEA's Vaughn Index, the Court is without any indication from the defendants as to which page in the DEA's Vaughn Index addresses the withholdings on ECF No. 156-1 page 10, or as to the FOIA exemptions under which the DEA has withheld information on ECF No. 156-1 page 10.[41]  Accordingly, the Court will direct the defendants to provide supplemental Vaughn Index information or declarations addressing the bases for the withholdings on ECF No. 156-1 page 10.

### ii.    Row 9 of the Defendants' Chart

Second, on row 9 of the chart, the defendants identify page 6[42] of the DEA's Vaughn Index, see Wassom Decl., Ex. L (DEA Vaughn Index) at 6, ECF No. 175-4 at 103, as pertaining

---

[41] There appears to be only one other page in the DEA's Vaughn Index dated January 5, 1998, the same date as the document at ECF No. 156-1 page 10:  Vaughn Index page 57.  See Wassom Decl., Ex. L (DEA Vaughn Index) at 57, ECF No. 175-4 at 152.  However, Vaughn Index page 57 is also not a clear match to ECF No. 156-1 page 10.

Vaughn Index page 57 represents that "suspect name(s) [and] investigative details" were withheld from the "who[l]e page" and the "name of [a] special agent" and the "name of [a Customs] special agent]" were withheld from paragraphs three, five, and seven.  Id., Ex. L (DEA Vaughn Index) at 57, ECF No. 175-4 at 152 (capitalization omitted).  However, ECF No. 156-1 page 10 does not appear to have paragraphs.  See Pl.'s Opp'n, Ex. 1 (Tab A) at 10.  The top half of the page reflects a form with boxes numbered from 47 to 66; the middle portion of the page is a single box of the form titled "remarks[,]" which contains one typewritten paragraph; and the bottom portion of the page reflects more boxes, with dates left unredacted on the right-hand side of the page.  See id.  Two of the three redactions are in the "remarks" box, with one redaction of a small amount of information at a slight angle under the typewritten paragraph, and the other redaction short in length and vertical, located on the right margin of the page next to an unredacted date.  See id.  The last redaction is of an unknown number of boxes in the part of the form at the bottom of the page.  See id.

In short, none of the three redactions appear to be of paragraphs, and there is no information on ECF No. 156-1 page 10 to support a conclusion that, even if the redactions were of—brief and likely handwritten—paragraphs, that they would be numbered three, five, or seven.  See id.; see also Wassom Decl., Ex. L (DEA Vaughn Index) at 57, ECF No. 175-4 at 152.  Accordingly, the Court cannot conclude that page 57 of the DEA's Vaughn Index pertains to ECF No. 156-1 page 10, or that there is any other page in the DEA's Vaughn Index that addresses ECF No. 156-1 page 10.

[42] As the plaintiff correctly notes, see Pl.'s Opp'n at 3 n.7, and as the Court has explained above, see supra Section III.D.3.a, the DEA's Vaughn Index identifies two different sets of pages by page numbers 1 through 6.

(continued . . .)

to ECF No. 156-1 page 14.  See Defs.' Reply at 9.  Page 6 of the DEA's Vaughn Index

references a June 25, 1998 report of investigation with the following withholdings:  (1) in "P1[,]"

the "names of law enf[orcement] personnel" were "deleted" based on Exemptions 7(C) and 7(F)

because they provided "suspect name(s) [and] investigative details" and (2) in "P2[,]" "third

party names" were "deleted" pursuant to Exemption 7(C) because they identified the "name(s) of

individual(s)[.]"  Wassom Decl., Ex. L (DEA Vaughn Index) at 6, ECF No. 175-4 at 103

(capitalization omitted).

    Although the defendants are correct that ECF No. 156-1 page 14 pertains to a report of

investigation dated June 25, 1998, the similarities between ECF No. 156-1 page 14 and page 6 of

the DEA's Vaughn Index end there.  ECF No. 156-1 page 14 reflects eight redactions, including

a redaction at the top of the page to a "G-DEP identifier[.]"  See Pl.'s Opp'n, Tab A at 14, ECF

No. 156-1.  For several reasons, clarification is needed.  First, although the DEA's Vaughn Index

notes the redaction of G-DEP identifiers on other pages, see, e.g., Wassom Decl., Ex. L (DEA

Vaughn Index) at 56, 155, 252, ECF No. 175-4 at 151, 232, 296, it does not reflect any

redactions of G-DEP identifiers on page 6, see Wassom Decl., Ex. L (DEA Vaughn Index) at 6,

ECF No. 175-4 at 103 (indicating redactions to "suspect name(s) [and] investigative details" and

the "name(s) of individual(s)" (capitalization omitted)).  Second, the First Wassom Declaration

---

(. . . continued)

Compare Wassom Decl., Ex. L (DEA Vaughn Index) at 1–6, ECF No. 175-4 at 92–97 (pages 1–2 corresponding to a
report of investigation dated June 7, 1999; pages 3–6 corresponding to a report of investigation arrest report dated
December 19, 1997), with id., Ex. L (DEA Vaughn Index) at 1–6, ECF No. 175-4 at 98–103 (page 1—which is
sequentially the seventh page in the DEA' Vaughn Index—corresponding to a defendant disposition report dated
September 11, 1998; pages 2–3 corresponding to a personal history report dated December 26, 1997; pages 4–5
corresponding to a personal history report dated May 21, 1997; and page 6 corresponding to a report of investigation
dated June 25, 1998).  Regarding what the Court is addressing here, the defendants are referring to the second
page 6.  See Defs.' Reply at 9 (citing Wassom Decl., Ex. L (DEA Vaughn Index) at 6, ECF No. 175-4 at 103.  As
indicated above, see supra note 38, the Court will provide the automatically generated page number, in addition to
the page number on the Vaughn Index itself, to avoid any confusion as to which set of pages 1 through 6 the Court is
referring.

discusses G-DEP identifiers as being subject to withholding under Exemption 2,[43] which is not

an exemption claimed on page 6. See id., Ex. L (DEA Vaughn Index) at 6, ECF No. 175-4

at 103 (reflecting redactions only pursuant to Exemptions 7(C) and 7(F)). Third, the DEA's

Vaughn Index references "P1" and "P2[,]" see id.; however, it appears that although the first

paragraph is redacted in full, the second paragraph has no redactions, see id. Fourth and finally,

there are redactions, including the redaction of the G-DEP identifier code, that are in boxes—not

paragraphs—and, based on the surrounding, unredacted boxes, these boxes seemingly should be

numbered 12 and 14. See Pl.'s Opp'n, Ex. 1 (Tab A) at 14, ECF No. 156-1. Accordingly, the

Court cannot conclude that page 6 of the DEA's Vaughn Index refers to ECF No. 156-1 page 14.

There seemingly not being a basis for the withholdings on page 14 of ECF No. 156-1, the Court

will direct the defendants to provide a supplemental declaration or Vaughn Index information

addressing the bases for the withholdings on ECF No. 156-1 page 14.

### iii.   Row 10 of the Defendants' Chart

Third, on row 10 of the chart, the defendants do not provide any corresponding Vaughn

Index page for ECF No. 156-1 page 15.[44] See Defs.' Reply at 9. Accordingly, the Court is

---

[43] As discussed above, following the Supreme Court's decision in Milner, the DEA relied on Exemption 7(E) for the withholding of information that was previously withheld pursuant to Exemption 2. See Defs.' Br. at 3 (stating that the "DEA claimed Exemption 7(E) in place of Exemption 2 for violator codes"). Because the First Wassom Declaration pre-dates Milner, compare Wassom Decl. at 23 (signed March 22, 2002), with Milner, 562 U.S. 562 (2011), it is understandable why the First Wassom Declaration relied on Exemption 2 to support withholding a G-DEP identifier, as it does in other parts of the declaration, see, e.g., Wassom Decl., Ex. L (DEA Vaughn Index) at 56, ECF No. 175-4 at 151. However, even if the DEA had initially withheld a G-DEP identifier pursuant to Exemption 7(E), this would not support the conclusion that page 6 of the DEA's Vaughn Index corresponds to ECF No. 156-1 page 14, because ECF No. 156-1 page 14 reflects no withholdings pursuant to Exemption 7(E). See Pl.'s Opp'n, Ex. 1 (Tab A) at 14, ECF No. 156-1.

[44] The Court notes that the date of ECF No. 156-1 page 15—March 23, 1998—is shared by the document referred to on page 7 of the DEA's Vaughn Index. Compare Pl.'s Opp'n, Ex. 1 (Tab A) at 15, ECF No. 156-1, with Wassom Decl., Ex. L (DEA Vaughn Index) at 7, ECF No. 175-4 at 104. However, page 7 of the DEA's Vaughn Index refers to information withheld from "P1" and "P2[,]" id., Ex. L (DEA Vaughn Index) at 7, ECF No. 175-4 at 104, whereas ECF No. 156-1 page 15 reflects redactions to several boxes, including a "[p]rogram [c]ode[,]" and text in paragraphs numbered 1 and 2, see Pl.'s Opp'n, Ex. 1 (Tab A) at 15, ECF No. 156-1. Accordingly, the Court declines to conclude that page 7 of the DEA's Vaughn Index accounts for ECF No. 156-1 page 15.

without any basis for assessing the withholdings on ECF No. 156-1 page 15, and the Court will direct the defendants to submit supplemental <u>Vaughn</u> Index information or a declaration regarding ECF No. 156-1 page 15.

#### iv.    Row 13 of the Defendants' Chart

Fourth, on row 13 of the chart, the defendants do not provide any corresponding <u>Vaughn</u> Index page for ECF No. 156-1 page 18. <u>See</u> Defs.' Reply at 10. As with Row 10, the Court is without any basis for assessing the withholdings on ECF No. 156-1 page 18 and will direct the defendants to submit supplemental <u>Vaughn</u> information or a declaration regarding ECF No. 156-1 page 18.

#### c.    The Plaintiff's Arguments that the DEA Has Failed to Present Authority for the Withholdings in the DEA's August 21, 2001 Production

The plaintiff next argues that the DEA's August 21, 2001 production "contain[s] no exemption markings in the pages to identify and correspond with the authority for withholding the deleted portions of the pages."[45] <u>Pl.'s Opp'n</u> at 5. As Tab C to his opposition, the plaintiff attaches fifty-eight pages of documents that he claims, <u>see id.</u> at 4, represent the DEA's August 21, 2001 release to the plaintiff of the "portions of [twenty-three] pages pursuant to the disposition of the plaintiff's appeal, and [the] portions of [thirty-eight] pages pursuant to [the] DEA's referral to [Customs] for consultation[,]" Wassom Decl. ¶ 18. <u>See</u> Pl.'s Opp'n at 4 (stating that Tab C represents the "[twenty-three] pages in addition to [thirty-eight] of [thirty-nine] pages that originated with [Customs] for a total of [sixty-one] pages released [by the DEA]

---

[45] As an initial matter, the Court notes that thirty-four of the pages included at Tab C do contain such exemption markings. <u>See</u> Pl.'s Opp'n, Ex. 1 (Tab C) at 49–83. However, the Court will consider the plaintiff's argument to the extent that the remaining pages do not contain such markings.

on August 21, 2001").[46]  In their reply, the defendants argue that the "DEA's redactions are

justified in Exhibit M[[47]] to the [First] Wassom Declaration" and Customs "addressed those

records in the [Kramer Declaration]."  Defs.' Reply at 15 (citing Wassom Decl. ¶ 249;[48] Kramer

Decl. ¶¶ 18–19).  To support their argument, the defendants identify the remaining portion of the

chart in their reply, connecting each page provided by the plaintiff in Tab C to his opposition to

the DEA's Vaughn Index.  See id. at 10–14.

　　　In addressing this dispute, the Court first notes that the plaintiff provides no—and the

Court has been unable to find any—authority to support the proposition that records produced

under the FOIA must contain "exemption markings in the pages" themselves.  See Pl.'s Opp'n

at 5.  See generally id.  In this case, as is customary in FOIA cases, the defendants provided

Vaughn indices to support their claimed exemptions, which "describe[] the documents withheld

or redacted and the FOIA exemptions invoked, and explain[] why each exemption applies[,]"

Prison Legal News v. Samuels, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015); see Vaughn v. Rosen,

---

[46] The Court notes that, according to the DEA, "[b]y letter dated August 21, 2001," it "released portions of [twenty-three] pages pursuant to the disposition of the plaintiff's appeal, and portions of [thirty-eight] pages pursuant to [the] DEA's referral to [Customs,]" Wassom Decl. ¶ 18, which would total sixty-one pages, whereas Tab C contains fifty-eight pages, see Pl.'s Opp'n, Ex. 1 (Tab C) at 31–84, ECF No. 156-1; id., Ex. 2 (Tab C) at 1–4, ECF No. 156-2.  Accordingly, at minimum, Tab C does not represent the entirety of the DEA's August 21, 2001 production and it is unclear to the Court whether Tab C represents any part of the DEA's August 21, 2001 production.  However, because the defendants provide no argument that the documents at Tab C are not part of the DEA's August 21, 2001 production, see generally Defs.' Br.; Defs.' Reply, and the Court concludes that the documents at Tab C are—at least partially—consistent with entries in the DEA's Vaughn Index, the Court will assume, without deciding, that Tab C represents part of the DEA's August 21, 2001 production.

[47] The defendants refer to Exhibit M of the First Wassom Declaration and cite paragraph 249 of the First Wassom Declaration, see Defs.' Reply at 15; however, in the materials submitted by the defendants in response to the Court's May 26, 2020 Order, see Order at 1 (ECF No. 162); Defendants' Notice of Compliance with May 26, 2020 Order at 1, ECF No. 164, there exists neither an "Exhibit M" to the First Wassom Declaration, nor a paragraph 249 of the First Wassom Declaration, which ends at paragraph 86.  The plaintiff commits the same error.  See Pl.'s Opp'n at 3 (citing to "Declaration of Leila I. Wassom ('Wassom Decl.') (DE:42), Ex.[ ]M").  To the extent that the defendants intend to refer to the DEA's Vaughn Index, which is Exhibit L to the First Wassom Declaration, the Court will consider the DEA's Vaughn Index when the defendants refer to Exhibit M of the First Wassom Declaration.

[48] As discussed in the preceding footnote, see supra note 47, there is no paragraph 249 of the First Wassom Declaration.  However, the Court notes here that that is the paragraph to which the defendants cite in their reply.  See Defs.' Reply at 15 (citing Wassom Decl. ¶ 249).  The Court has been unable to determine the correct citation.

484 F.2d 820, 827 (D.C. Cir. 1973) (requiring that "the agency specify in detail which portions of the document are disclosable and which are allegedly exempt[,]" which "could be achieved by formulating a system of itemizing and indexing that would correlate statements made in the [g]overnment's refusal justification with the actual portions of the document"); Pub. Emps. for Env't Resp. v. U.S. Env't. Prot. Agency, No. 18-cv-2219, 2021 WL 2515007, at *6 (D.D.C. June 18, 2021) ("An agency may prove the applicability of claimed exemptions through a Vaughn index or supporting affidavits or declarations, or both[.]").

However, assuming that the plaintiff is arguing that the DEA's Vaughn Index does not adequately state the bases for the withholdings in the DEA's August 21, 2001 production because the documents at Tab C, which were allegedly produced to the plaintiff by the DEA in that production, are not accounted for in the DEA's Vaughn Index, the Court agrees to a degree and concludes that the defendants' Vaughn Index requires further supplementation.  This is necessary due to the fact that the defendants' chart in their reply and the documents in Tab C, at minimum, reflect notable discrepancies between the DEA's Vaughn Index and the documents that were allegedly produced to the plaintiff.

First, although the corresponding Vaughn Index entry does not reflect any withholding of a G-DEP identifier code, several pages in Tab C that the defendants represent correspond to pages in the DEA's Vaughn Index have what appear to be G-DEP identifier codes redacted.  For example, on ECF No. 156-1 page 31, there is a redaction in the upper right-hand corner of the page of the information contained in a box titled "G-DEP ID[.]"  Pl.'s Opp'n, Ex. 1 (Tab C) at 31.  However, page 8 of the DEA's Vaughn Index, which was identified by the defendants in row 14 of their chart as being the corresponding page, see Defs.' Reply at 10, only reflects redactions of the "names of special agents" and the "names of support personnel" at the "middle"

and "bottom" of the page, Wassom Decl., Ex. L (DEA <u>Vaughn</u> Index) at 8, ECF No. 175-4

at 105 (capitalization omitted).  And, as the Court noted earlier, <u>see</u> <u>supra</u> Section III.D.3.b.ii, the

DEA's <u>Vaughn</u> Index generally specifies the redaction of G-DEP identifier codes.  <u>See, e.g.</u>,

Wassom Decl., Ex. L (DEA <u>Vaughn</u> Index) at 56, 155, 252, ECF No. 175-4 at 151, 232, 296,

Thus, the absence of any notation of a redaction of a G-DEP identifier code in the DEA's

<u>Vaughn</u> Index leads the Court to question whether ECF No. 156-1 page 31 does, in fact,

correspond to page 8 of the DEA's <u>Vaughn</u> Index.  Therefore, for the pages on which there

appear to be G-DEP identifier codes redacted, but the DEA's <u>Vaughn</u> Index does not account for

the redaction of G-DEP identifier codes, the Court will direct the defendants to submit a revised

<u>Vaughn</u> Index and declaration regarding the withholdings on these pages.[49]

Second, several entries in the DEA's <u>Vaughn</u> Index that are identified by the defendants

in their chart fail to account for redactions on the pages in Tab C.  For example, ECF No. 156-1

page 40 is a form with redactions at the top of the page to boxes 4, 5, and 9; at the middle of the

page to paragraphs 1 and 2; and at the bottom of the page to what appear to be boxes 12 and 14.

<u>See</u> Pl.'s Opp'n, Ex. 1 (Tab C) at 40, ECF No. 156-1.  However, page 37 of the DEA's <u>Vaughn</u>

Index, which is identified as the corresponding entry by the defendants, <u>see</u> Defs.' Reply at 11,

only lists withholdings in "P1" and "P2[,]" Wassom Decl., Ex. L (DEA <u>Vaughn</u> Index) at 37,

ECF No. 175-4 at 132.  Similarly, ECF No. 156-1 page 42 is a form with redactions at the top to

information in boxes 2, 4, 5, and 9; redactions in the middle to paragraphs 1 through 4; and

redactions at the bottom to information in boxes 12 and 14.  <u>See</u> Pl's Opp'n, Ex. 1 (Tab C) at 42.

However, page 53 of the DEA's <u>Vaughn</u> Index, <u>see</u> Defs.' Reply at 11 (identifying page 53 as

---

[49] The following pages in Tab C have redacted G-DEP identifier codes that are not accounted for on the <u>Vaughn</u>
Index entries identified by the defendants in rows 14–15, 23–28, 31–33, 35, and 67 of the chart in their reply:  ECF
No. 156-1 pages 31–32, 40–45, 48–50, 52, and 84.  <u>See</u> Defs.' Reply at 10–14.

the corresponding <u>Vaughn</u> Index page), only discusses redactions to "P1–3[,]" "P2[,]" "P3[,]" and "P4[,]" and does not identify any redactions to information contained in any boxes.  Wassom Decl., Ex. L (DEA <u>Vaughn</u> Index) at 53, ECF No. 175-4 at 148.  Accordingly, for these pages,[50] the Court cannot agree with the defendants that the "records [that the p]laintiff has submitted at Tab C match up by date and description exactly using the numbers handwritten in the bottom right[-]hand corners of those records as the DEA [p]age numbers assigned in the <u>Vaughn</u> [I]ndex[,]" Defs.' Reply at 16.  Because the Court is without a basis to assess the withholdings in the documents comprising Tab C, the Court will require the defendants to submit supplemental <u>Vaughn</u> Index information or a declaration regarding the documents at Tab C.

---

[50] In addition to the two pages just discussed by the Court, the Court also finds that the following pages do not align with the <u>Vaughn</u> Index entries identified by the defendants.  First, on ECF No. 156-1 page 48, the page reflects redactions to index entries 2 through 6, whereas page 145 of the DEA's <u>Vaughn</u> Index, <u>see</u> Defs.' Reply at 11 (identifying page 145 of the DEA's <u>Vaughn</u> Index as the corresponding page to Tab C page 48), only reflects redactions to paragraphs 19 through 21.  <u>Compare</u> Pl.'s Opp'n, Ex. 1 (Tab C) at 48, <u>with</u> Wassom Decl., Ex. L (DEA <u>Vaughn</u> Index) at 145, ECF No. 175-4 at 223.  Second, on ECF No, 156-1 page 52, the page reflects redactions to large portions of text that precede paragraphs 9 and 10, whereas page 159 of the DEA's <u>Vaughn</u> Index, <u>see</u> Defs.' Reply at 12 (identifying page 159 of the DEA's <u>Vaughn</u> Index as the corresponding page to Tab C page 52), only reflects redactions to paragraphs 5 and 6.  <u>Compare</u> Pl.'s Opp'n, Ex. 1 (Tab C) at 52, <u>with</u> Wassom Decl., Ex. L (DEA <u>Vaughn</u> Index) at 159, ECF No. 175-4 at 234.  Unless the document contains numbered paragraphs, but omits paragraphs 7 and 8, there are also redactions to paragraphs 7 and 8 that are not reflected on page 159 of the DEA's <u>Vaughn</u> Index.  Third, on ECF No. 156-1 page 63, the page is dated October 29, 1997, whereas page 198 of the DEA's <u>Vaughn</u> Index, <u>see</u> Defs.' Reply at 13 (identifying page 198 of the DEA's <u>Vaughn</u> Index as the corresponding page to Tab C page 63), identifies a document dated October 21, 1997.  <u>Compare</u> Pl.'s Opp'n, Ex. 1 (Tab C) at 63, <u>with</u> Wassom Decl., Ex. L (DEA <u>Vaughn</u> Index) at 198, ECF No. 175-4 at 261.  Fourth, on ECF No. 156-1 page 84, the page reflects redactions to information contained in boxes 1, 4, 5, and 9 at the top of the page; information in paragraph 1 and the indexing section in the middle of the page; and information in what appear to be boxes 12 and 14 at the bottom of the page.  <u>See</u> Pl.'s Opp'n, Ex. 1 (Tab C) at 84.  However, page 270 of the DEA's <u>Vaughn</u> Index, <u>see</u> Defs.' Reply at 14 (identifying page 270 of the DEA's <u>Vaughn</u> Index as the corresponding page to ECF No. 156-1 page 84), only reflects redactions to "P1[.]"  <u>See</u> Wassom Decl., Ex. L (DEA <u>Vaughn</u> Index) at 270, ECF No. 175-4 at 307.  Fifth and finally, on ECF No. 156-2 pages 1 through 4, the document reflects a date of March 31, 1998, whereas pages 272 through 274 of the DEA's <u>Vaughn</u> Index, reference a document dated March 3, 1998, and page 276 of the DEA's <u>Vaughn</u> Index references a document dated March 25, 1998, <u>see</u> Defs.' Reply at 14 (identifying pages 272 through 274 and 276 of the DEA's <u>Vaughn</u> Index as the corresponding pages to 156-2 pages 1 through 4).  <u>Compare</u> Pl.'s Opp'n, Ex. 2 (Tab C) at 1–4, <u>with</u> Wassom Decl., Ex. L (DEA <u>Vaughn</u> Index) at 272–74, 276, ECF No. 175-4 at 309–11, 313.

### d.  The Plaintiff's Challenge to Customs' <u>Vaughn</u> Index

The Court next turns to the plaintiff's argument that the Kramer Declaration does not account for the 154[51] pages withheld by Customs.[52]  <u>See</u> Pl.'s Sept. 13, 2013 Cross-Motion at 17 & n.9.

The plaintiff correctly notes, <u>see id.</u> at 17 n.9, that the Kramer Declaration does not explicitly indicate the number of pages withheld in their entirety.  <u>See generally</u> Kramer Decl. However, Customs' <u>Vaughn</u> Index states that 154 pages were withheld in their entirety, <u>see id.</u>, Ex. 20 (Customs <u>Vaughn</u> Index) at 9, and, for each document, lists the number of pages withheld in their entirety and the FOIA exemption that was applied, <u>see, e.g.</u>, <u>id.</u>, Ex. 20 (Customs <u>Vaughn</u> Index) at 2 (stating that report of investigation "No. 007" had two pages "withheld in [their] entirety" under Exemptions 2 and 7(C) because they contain "[a]nalysis for [the plaintiff's c]ellular [t]elephone/[s]ubpoena [s]ervice").  Moreover, the Kramer Declaration states the basis

---

[51] In his September 13, 2013 cross-motion for summary judgment, the plaintiff refers to "159 documents[,]" Pl.'s Sept. 13, 2013 Cross-Motion at 7, as opposed to 154 documents; however, it appears that this discrepancy is likely a typographical error.  In the plaintiff's opposition, <u>see</u> Pl.'s Opp'n at 4, as well as later in the plaintiff's September 13, 2013 cross-motion, <u>see</u> Pl.'s Sept. 13, 2013 Cross-Motion at 7, the plaintiff states that 154 documents—rather than 159 documents—were withheld in their entirety by Customs.  Moreover, Customs' <u>Vaughn</u> Index further confirms that 154 documents were withheld.  <u>See</u> Kramer Decl., Ex. 20 (Customs <u>Vaughn</u> Index) at 9 (346 "total pages found[;]" 154 "total pages withheld in entirety[;]" 189 "total pages released in part[;]" and 3 "total pages released in entirety" (capitalization omitted)).  Accordingly, with no basis for the plaintiff's representation that 159 pages were withheld or are unaccounted for, the Court will assume for purposes of its analysis that the plaintiff is representing that 154 pages were withheld in their entirety by Customs.

[52] As the defendants correctly note, <u>see</u> Defs.' Reply at 18 (arguing that the "[p]laintiff's [opposition] fails to present any argument concerning the response by [Customs] to his FOIA request"), the plaintiff presents no argument in his opposition regarding the adequacy of Customs' withholdings, <u>see</u> Pl.'s Opp'n at 4 (representing that "[o]n June 13, 2001, [Customs] released 182 pages[,]" and "withheld in their entirety" "154 pages[,]" which included "photographs of [the plaintiff,]" "his boat 'ALL EYES ON ME[,]'" and "his cell phone records").  However, in earlier filings, the plaintiff <u>does</u> challenge the adequacy of the Kramer Declaration, namely, arguing that it is "insufficient" because it "do[es] not account for 159 pages of documents withheld."  Pl.'s Sept. 13, 2013 Cross-Motion at 7; <u>see also id.</u> at 17 n.9 (arguing that "although these withheld documents are accounted for in the page-itemization of Customs' [V]aughn [Index], they are not accounted for in [the] Kramer[ D]eclaration").  Moreover, in light of the fact that the issues before the Court on remand from <u>Cooper III</u> are the same issues that were briefed before this Court initially, the length of time since these issues were first presented to the Court, the mandate to construe the pro se plaintiff's filings liberally, and the plaintiff's incorporation of his prior arguments in his opposition, <u>see</u> Pl.'s Opp'n at 2 n.3 ("request[ing] leave [to] rel[y] on [enumerated] submissions and exhibits previously filed in this case"), the Court declines to deem the argument waived merely because the plaintiff did not repeat it in his latest opposition.

for the withholdings in conjunction with the applicable FOIA exemption.  <u>See, e.g.</u>, <u>id.</u> ¶¶ 24–26 (stating that Customs applied Exemption 7(C) "to protect the identities of Customs [o]fficers[,]" "Customs clerical personnel[,]" "local law enforcement officers[,]" and "third parties of investigatory interest to Customs").  Accordingly, the Court concludes that Customs' <u>Vaughn</u> Index and the Kramer Declaration provide an adequate basis for the Court to review whether the 154 pages were properly withheld pursuant to the FOIA.

### e.   The Plaintiff's Challenge to the Adequacy of the Defendants' <u>Vaughn</u> Indices

The plaintiff next "challenge[s] the overall adequacy of the defendants' initial <u>Vaughn</u> indices and dispute[s] the defendants['] reliance on blanket [e]xemptions to justify their withholdings."  Pl.'s Aug. 22, 2012 Reply at 13 (underline added).  Specifically, he argues that the defendants' "[b]ox-by-box description[s] and generic categorization[s] without cross-references and information about [ ] individual document[s]" are "insufficient to allow [the plaintiff] or this Court to realistically evaluate the claimed exemption[s]."  <u>Id.</u> at 14.

The Court concludes, however, that aside from the specific deficiencies that the Court has already identified, the <u>Vaughn</u> indices are otherwise sufficient.  An adequate <u>Vaughn</u> Index must "index[] and specifically describe[] withheld or redacted documents and explain[] why each withheld record is exempt from disclosure."  <u>Schoenman v. Fed. Bureau of Investigation</u>, 604 F. Supp. 2d 174, 196 (D.D.C. 2009) (citing <u>King v. U.S. Dep't of Just.</u>, 830 F.2d 210, 219 (D.C. Cir. 1987)).  Although "there is no set form for a <u>Vaughn</u> [I]ndex, the [ ] Circuit has noted three important elements for an adequate <u>Vaughn</u> [I]ndex: (1) the index should be one document that is complete in itself, (2) the index must adequately describe the withheld documents or deletions, [and] (3) the index must state the particular FOIA exemption, and explain why the exemption

applies." Id. (citing Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir.

1979)).

As a general matter, the Vaughn indices provided by the defendants "describe the

withheld documents or deletions" and "state the particular FOIA exemption[] and explain why

the exemption applies." Id.  In the DEA's Vaughn Index, it provides, for each page, the type of

document, the date of the document, the author and recipient, the portion of the page that was

withheld, the nature of the information withheld, and the FOIA exemptions pursuant to which the

information was withheld, see Wassom Decl., Ex. L (DEA Vaughn Index), and in the

accompanying First Wassom Declaration, the DEA describes the documents that were processed

by the DEA and the bases for the application of FOIA exemptions, see id.  In Customs' Vaughn

Index, it provides, for each document, the type of document, the number of pages and the status

of each page, the date of the document, the subject of the document, and the FOIA exemptions

pursuant to which the information was withheld, see Kramer Decl., Ex. 20 (Customs Vaughn

Index), and in the accompanying Kramer Declaration, it describes the documents that were

processed by Customs and the bases for the application of FOIA exemptions, see id.  In the

ATF's Vaughn Index, it provides, for each document, a description of the document, the

paragraphs from which information was withheld, the FOIA exemptions pursuant to which the

information was withheld, and a description of the information withheld, see Chambers Decl.,

Ex. 1 (ATF Vaughn Index), and in the accompanying Chambers Declaration, it describes the

documents that were processed by the ATF and the bases for the application of FOIA

exemptions, see id.  Finally, in the Grafeld Declaration, the State Department describes the

document that was referred to it by Customs and the basis for its application of FOIA

Exemption 3.  See Grafeld Decl.  Thus, contrary to the plaintiff's assertion, the Vaughn indices

provided by the defendants do not rely "on blanket [e]xemptions" or provide "generic categorization[s] without cross-references and information about [ ] individual document[s,]" Pl.'s Aug. 22, 2012 Reply at 13–14.[53]

### f.   The Plaintiff's Challenge to the ATF's Referral to the DEA on January 20, 2000, and February 7, 2000

The plaintiff also argues that the ATF's and DEA's Vaughn indices are incomplete because "[e]ven though [the] DEA has acknowledged its receipt of" the referral of eight pages by the ATF to the DEA made on January 20, 2000, and February 7, 2000, "neither the DEA nor the ATF has accounted for the [eight]-page referral."  Pl.'s Opp'n at 4; see also Pl.'s Sept. 13, 2013 Cross-Motion at 6 (arguing similarly).  In response, the defendants argue that the "DEA has no record of receiving [this referral] and[,] after extensive efforts to find the documents referred, [the] ATF has been unable to locate the pages in order to re-send them."  Defs.' Br. at 10.

As the plaintiff correctly notes, see Pl.'s Opp'n at 4, on February 7, 2000, the ATF "referred to [the] DEA" seven pages that had "originated with [the] DEA" and that had been located by the ATF in "a file . . . that contained information about a firearm [that] was transferred from [the] DEA to [the] ATF[,]" Chambers Decl. ¶ 9.  But, although the defendants argue that the "DEA has no record of receiving [this referral,]" Defs.' Br. at 10, they provide no citation to a declaration from a representative of the DEA or any other source stating that the DEA has no record of receiving the ATF's referral, see id. (arguing that the "DEA has no record of receiving it" without any citation); Defs.' Reply at 17 (arguing similarly without any

---

[53] To the extent that the plaintiff makes specific assertions that particular documents are unaccounted for in the defendants' Vaughn indices or that the Vaughn indices do not address particular redactions, see, e.g., Pl.'s Aug. 22, 2012 Reply at 14 (arguing that the "DEA's Vaughn itemization of page 27 only" reflects "exemption[s] and redactions . . . made at the 'top and middle' of the page, whereas the document contain[s] multiple sections with redactions"), the Court has already addressed these arguments, see supra Sections III.D.3.a–d.

citation).[54]  Moreover, neither the First Wassom Declaration, which otherwise addresses the records processed by the DEA in response to the plaintiff's FOIA requests, see generally Wassom Decl., nor the Wassom Supplemental Declaration, which addresses the records processed by the DEA in the 2005 production, see generally Supp. Wassom Decl., mention this referral.  Although the declarations provided by representatives of the ATF describe the extensive search efforts undertaken by the ATF to locate the files, see Boucher Decl. ¶¶ 9–15; Orlow Decl. ¶¶ 3–10, and the defendants correctly note that, "[i]f [an] agency is no longer in possession of [a] document, for a reason that is not itself suspect, then the agency is not improperly withholding that document[,] and the court [should] not order the agency to take further action in order to produce it[,]" Defs.' Reply at 18 (quoting SafeCard Servs. v. Secs. & Exch. Comm'n, 926 F.2d 1197, 1201 (D.C. Cir. 1991)), the lack of representations from the DEA regarding its receipt of the referral compels the Court to decline to address the propriety of the defendants' handling of the seven pages at this time.

        Accordingly, the Court will direct the defendants to provide supplemental Vaughn Index information or a supplemental declaration addressing whether the DEA received this referral from the ATF, prior to resolving whether summary judgment is merited for the defendants regarding the ATF's referral to the DEA.

---

[54] The two citations provided by the defendants are to declarations from representatives of the ATF, not the DEA, see Defs.' Br. at 10 (citing to the Boucher Declaration and the Orlow Declaration), and neither of these declarations addresses the DEA's receipt of the referred documents, see Boucher Decl. ¶¶ 8–15 (declaration by the Chief of the ATF's Disclosure Division regarding the ATF's efforts to locate the file after the "ATF was told to re-send the referral to [the] DEA"); Orlow Decl. ¶¶ 3–10 (declaration by the Associate Chief Counsel of Field Operations and Information at the ATF regarding the ATF's efforts to locate the "responsive documents to [the plaintiff's] FOIA request").

g.  **The Plaintiff's Argument that the Release of Records in Their Entirety by Other Agencies Demonstrates that the Defendants' Exemption Claims Are Invalid**

Finally, the plaintiff argues that "the fact that the City of West Palm Beach has released [certain] documents in full[,]" causes "the DEA and the [Marshals Service's] exemption claims with respect to the same [documents to be] null and void."  Pl.'s Apr. 4, 2019 Motion at 3–4. This argument lacks merit because the FOIA does not apply to the City of West Palm Beach, a State of Florida municipality, see 5 U.S.C. § 552(f) (defining "agency" for purposes of the FOIA as "any executive department, military department, [g]overnment corporation, [g]overnment[-]controlled corporation, [ ] other establishment in the executive branch of the [g]overnment[,]" or "any independent regulatory commission"), and, accordingly, the City of West Palm Beach's disclosure of records is not pertinent to the Court's determination of whether the defendants have appropriately withheld information pursuant to the FOIA.

E.  **Segregability**

The Court next addresses whether the defendants provided to the plaintiff all reasonably segregable information.  Under the FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  "[I]t has long been the rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."  Wilderness Soc'y v. U.S. Dep't of Interior, 344 F. Supp. 2d 1, 18 (D.D.C. 2004) (Walton, J.) (emphasis omitted).  Therefore, because "[t]he focus of the FOIA is information, not documents, [ ] an agency cannot justify withholding an entire document simply by showing that it contains some exempt material."  Mead Data Ctr., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).  "A district court's determination that agency records

are exempt from disclosure under the FOIA is subject to remand if the court does not also make

specific findings on the question of segregability[,]" Judicial Watch, Inc. v. U.S. Dep't of Def.,

245 F. Supp. 3d 19, 36 (D.D.C. 2017) (Walton, J.), "even if the requester did not raise the issue

of segregability before the court[,]" Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1116 (D.C.

Cir. 2007).

In order to assess segregability, "the district court must be provided with a 'relatively

detailed description' of the withheld material." Judicial Watch, Inc., 245 F. Supp. 3d at 36.

(citing Goldberg v. U.S. Dep't of State, 818 F.2d 71, 78 (D.C. Cir. 1987)). To comply with this

requirement, "[a]gencies must review the withheld documents and determine whether, absent the

exempted material, the resulting document would still be comprehensible, or whether 'the result

would be an essentially meaningless set of words and phrases.'" Id. at 36–37 (citing Mead Data

Ctr., 566 F.2d at 261). "[T]o show that an entire document cannot be produced[,]" an agency

must conduct "[a] 'document-by-document' review and [provide] a declaration that each piece of

information that is withheld is not reasonably segregable[.]" Id. (citing Juarez v. U.S. Dep't of

Just., 518 F.3d 54, 61 (D.C. Cir. 2008)).

Although "[a]gencies are entitled to a presumption that they complied with the obligation

to disclose reasonably segregable material[,]" Ecological Rts. Found. v. U.S. Envtl. Prot.

Agency, __ F. Supp. 3d __, 2021 WL 2209380, at *20 (D.D.C. June 1, 2021) (quoting Sussman,

494 F.3d at 1117), an "agency must provide a 'detailed justification' for [the exempt material's]

non-segregability[,]" id. (quoting Johnson v. Exec. Off. for U.S. Att'ys, 310 F.3d 771, 776 (D.C.

Cir. 2002)) (alterations in original). Generally, "[a]ffidavits attesting to the agency's 'line-by-

line review of each document withheld in full' and the agency's determination 'that no

documents contained releasable information which could be reasonably segregated from the

nonreleasable portions,' in conjunction with a <u>Vaughn</u> index describing the withheld record, suffice." <u>Id.</u> (quoting <u>Johnson</u>, 310 F.3d at 776).

For the following reasons, the Court concludes that the defendants have adequately demonstrated that Customs and the State Department "disclose[d all] reasonably segregable material[,]" <u>id.</u> at 1117, but will direct the defendants to supplement the record as to the DEA's, the ATF's, and the Marshals Service's "bases for their conclusions regarding segregability[,]" <u>Khatchadourian v. Def. Intel. Agency</u>, 453 F. Supp. 3d 54, 81 (D.D.C. 2020).

## 1. Whether Customs Disclosed All Reasonably Segregable Material

First, the Court considers whether Customs has demonstrated that it released all reasonably segregable information.  For the following reasons, the Court is satisfied that Customs conducted a proper segregability analysis.

According to Customs, "[a]ll of the[] records [it released to the plaintiff] have been reviewed on a line[-]by[-]line basis and all segregable portions have been released[.]"  Kramer Decl. ¶ 30.  Customs also provides a <u>Vaughn</u> Index which provides specific insight as to the information that was withheld from each record and the exemptions pursuant to which the information was withheld.  <u>See id.</u>, Ex. 20 (Customs <u>Vaughn</u> Index) at 1–9.  For example, Customs "withheld in [their] entirety" two pages from "ROI No. 007" dated July 29, 1997[,] pursuant to Exemptions 2 and 7(C) because the pages reveal the "[a]nalysis for [the plaintiff's c]ellular [t]elephone\[s]ubpoena [s]ervice[.]"  <u>Id.</u>, Ex. 20 (Customs <u>Vaughn</u> Index) at 2.

The combination of Customs' <u>Vaughn</u> Index, the Kramer Declaration "attesting to the agency's line-by-line review of each document[,]" and Customs' "determination that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions[,] . . . suffice[,]" <u>Ecological Rts. Found.</u>, 2021 WL 2209380, at *20 (internal quotation marks omitted), to satisfy Customs' burden to establish that it disclosed all

reasonably segregable non-exempt information.  In response, the plaintiff makes no specific argument about segregability, see generally Pl.'s Opp'n, and, for the reasons discussed above, see supra Section III.D, none of the plaintiff's generalized assertions about the defendants' bad faith "warrant a belief by a reasonable person[,]" Favish, 541 U.S. at 159, that Customs acted inappropriately.  Accordingly, based on the representations in the Kramer Declaration and Customs' Vaughn Index, the Court concludes that Customs has reasonably segregated the information it properly withheld.

## 2.   Whether the State Department Disclosed All Reasonably Segregable Material

Second, the Court considers whether the State Department has demonstrated that it has released all reasonably segregable information.  For the following reasons, the Court is satisfied that the State Department conducted a proper segregability analysis.

The Grafeld Declaration sets forth a detailed description of the one-page document referred to the State Department by Customs that the State Department withheld in full pursuant to Exemption 3.  See Grafeld Decl. at 6–7.  This description, combined with the Grafeld Declaration's statement that "[t]here is no substantive information in this document which may be segregated and released[,]" id. at 7, "are sufficient to fulfill the agency's obligation to show with reasonable specificity why a document cannot be further segregated[,]" Johnson, 310 F.3d at 776.  Furthermore, as noted above, see supra Section III.E.1, the plaintiff makes no specific argument about segregability, see generally Pl.'s Opp'n, and, for the reasons discussed above, see supra Section III.D, none of the plaintiff's generalized assertions about the defendants' bad faith "warrant a belief by a reasonable person[,]" Favish, 541 U.S. at 159, that the State Department acted inappropriately.  Accordingly, the Court concludes that the Grafeld Declaration demonstrates that the State Department has reasonably segregated the information it properly withheld.

### 3.   Whether the DEA Disclosed All Reasonably Segregable Material

Third, the Court addresses whether the DEA has demonstrated that it has released all reasonably segregable information.  For the following reasons, the Court concludes that the DEA has not satisfied its burden.

According to the First Wassom Declaration, the DEA "segregated exempt and non-exempt information[,] and on [fifty-five] pages no non-exempt information was located[, t]herefore no portions of those pages were released."  Wassom Decl. ¶ 26.  For information that was withheld pursuant to Exemption 7(C), the DEA states that "[a]ny information about the plaintiff appearing on the withheld pages is inextricably intertwined with information about third parties[,]" id., and, accordingly, "[a]ll segregable information has been sent to the plaintiff" and "there is no additional information that may be released[,]" id. ¶ 85.  For information that was withheld pursuant to Exemption 7(D), the DEA states that "[n]one of the information is reasonably segregable[,]" id. ¶ 44, and provides document-by-document descriptions of the information, see id. ¶¶ 46–81; see, e.g., id. ¶ 46 (describing "[p]age '9'" as "a DEA 7a, Acquisition of Non-Drug Property and Regulatory Seizures[, form,]" which "contains information about several non-drug exhibits obtained from a coded informant").

Although the DEA has submitted "a comprehensive Vaughn [I]ndex, describing each document withheld, as well as the exemption under which it was withheld[,]" Johnson, 310 F.3d at 776, neither the First Wassom Declaration nor the other materials submitted by the defendants demonstrate "how [the DEA] undertook its segregability analysis[,]" Khatchadourian, 453 F. Supp. 3d at 95 (emphasis added).  See generally Wassom Decl.[55]  Cf. Juarez, 518 F.3d at 61

---

[55] In its consolidated brief, the government cites, inter alia, the Wassom Supplemental Declaration as support for its representation that, "[w]ith respect to the withholdings that were made prior to 2005, each agency indicated that it had segregated exempt information with reasonable care[.]"  Defs.' Br. at 9 (citing Suppl. Wassom Decl. ¶¶ 59–65).

(continued . . .)

(concluding that the agency had "provided sufficient information in its affidavits to allow a court to affirm [its] withholding[s]" when it (1) "stated that it had conducted a page-by-page review of all investigative records . . . and determined that each document, and each page of each document, contained information subject to . . . exemptions" and (2) "justified its inability to simply redact sensitive portions . . . by pointing out that the balance of information remaining in the documents could still reveal" sensitive information that would "jeopardize the investigation"). Accordingly, the Court will direct the defendants to supplement the record in order to "provide the 'reasonable specificity' necessary to enable judicial review with respect to segregability." Id. at 90 (quoting Johnson, 310 F.3d at 776).

### 4. Whether the ATF Disclosed All Reasonably Segregable Material

Fourth, the Court turns to whether the ATF has demonstrated that it has released all reasonably segregable information. For the following reasons, the Court concludes that it has not satisfied its burden.

According to the Chambers Declaration, the ATF "released all reasonably segregable portions" of the sixteen pages it released in part to the plaintiff on February 16, 2000. See Chambers Decl. ¶ 15. The ATF provides a Vaughn Index that lists the specific paragraphs that were redacted and the reasons why the information was withheld. See id., Ex. 1 (ATF Vaughn Index) at 1–2. For example, for the first document referenced in the ATF's Vaughn Index,

---

(. . . continued)

However, as the Court has noted previously, see supra notes 34, 37, the Wassom Supplemental Declaration pertains to the 2005 production, rather than the pre-2005, pre-Cooper II productions that are at issue at this stage of this case. See, e.g., id. ¶ 4 (stating that "[t]he purpose of this supplemental declaration is to address the receipt, review, and processing of 241 pages of documents referred to the DEA from the . . . Marshals Service[,]" which were forwarded "[i]n August[] 2005"). Accordingly, even though the Wassom Supplemental Declaration states that "each page was examined to determine whether any reasonable segregable information could be released[,]" Supp. Wassom Decl. ¶ 59, this statement does not apply to the DEA's productions that are currently at issue before the Court. Therefore, the Court refers to the First Wassom Declaration, rather than the Wassom Supplemental Declaration, in assessing whether the DEA has satisfied its burden to demonstrate that it has produced all reasonably segregable information.

which is a "[f]ax [c]over [s]heet[,]" the ATF withheld from "[p]aragraph 13[,]" the "[n]ames and identifying [i]nformation of [a f]ederal [l]aw [e]nforcement [o]fficer and [a t]hird [p]arty" pursuant to Exemption 7(C).  Id., Ex. 1 (ATF Vaughn Index) at 1.  However, like the DEA, the ATF has failed to provide any information regarding "how [it] undertook its segregability analysis[,]" Khatchadourian, 453 F. Supp. 3d at 95, which prevents the Court from concluding that the ATF has demonstrated with "reasonable specificity" that it "provided all reasonably segregable non-exempt information[,]" id.  See generally Chambers Decl.  Cf. Sack v. Cent. Intel. Agency, 49 F. Supp. 3d 15, 24 (D.D.C. 2014) (concluding that the agency "ha[d] satisfied its burden to establish that it has released all reasonably segregable, non-exempt material" when it "explained that it reviewed each withheld document on a line-by-line basis" and its "descriptions of the documents withheld and justifications for the withholdings are sufficiently detailed").  Accordingly, the Court will direct the defendants to supplement the record in order to "provide the 'reasonable specificity' necessary to enable judicial review with respect to segregability."  Khatchadourian, 453 F. Supp. 3d at 84 (quoting Johnson, 310 F.3d at 776).

## 5.  Whether the Marshals Service Disclosed All Reasonably Segregable Material

Finally, the Court considers whether the Marshals Service has demonstrated that it released all reasonably segregable information.  For the following reasons, the Court concludes that the Marshals Service has also not satisfied its burden.

According to the Graham Declaration, of the "[twenty-four] pages of material pertaining to [the] plaintiff[,] . . . four pages were released with minimal deletions[,]" and "all non-exempt portions of documents were segregated and disclosed to [the] plaintiff."  Graham Decl. ¶ 11; see id. ¶ 6 ("The [Marshals Service] has released all reasonably segregable information.").  The Marshals Service further states that "[n]o documents were withheld from disclosure in [their] entirety[.]"  Id. ¶ 11.  Although the defendants have not provided a page-by-page Vaughn Index,

the Marshals Service states that the withholdings were only of "the names of federal law enforcement officers" and they were withheld pursuant to Exemption 7(C).  Id. ¶ 7.

Like the DEA and the ATF, the Marshals Service has failed to provide the requisite explanation with "reasonable specificity" of "how the agency undertook its segregability analysis."  Khatchadourian, 453 F. Supp. 3d at 83.  See generally Graham Decl.  Cf. Juarez, 518 F.3d at 61 (describing a sufficient level of explanation); Sack, 49 F. Supp. 3d at 24 (same). Accordingly, the Court will direct the defendants to supplement the record in order to "provide the 'reasonable specificity' necessary to enable judicial review with respect to segregability." Khatchadourian, 453 F. Supp. 3d at 84 (quoting Johnson, 310 F.3d at 776).

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part summary judgment to the defendants; deny the plaintiff's cross-motion for summary judgment; deny the plaintiff's motion for judicial notice; and deny the plaintiff's motion for discovery.

SO ORDERED this 1st day of March, 2022.[56]

REGGIE B. WALTON
United States District Judge

---

[56] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.